# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case Number 21-cr-88-DLF** |
| **RONALD SANDLIN,** | : | |
| | : | **Bond Hearing: March 25, 2021** |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT RONALD SANDLIN'S MOTION FOR BOND

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to the defendant's motion for bond filed on March 22, 2021. The government seeks the defendant's continued detention pending trial pursuant to 18 U.S.C. §§ 3142 (f)(2)(A) (Serious Risk of Flight) and 3142 (f)(2)(B) (Serious Risk to Obstruct Justice). The government requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at the bond hearing, be considered in the Court's determination regarding pretrial detention.

## Procedural History

On January 20, 2021, the District Court for the District of Columbia issued an arrest warrant pursuant to the filed complaint charging the defendant Ronald Sandlin with two felony counts of Obstructing Law Enforcement Incident to Civil Disorder (in violation of 18 U.S.C. § 231(a)(3)), based on two separate assaults on law enforcement officers, and two misdemeanor counts related to his unlawful and disorderly conduct at the U.S. Capitol Grounds and U.S. Capitol Building. These charges stemmed from his actions on January 6, 2021, during the timeframe a joint session of the United States Congress had convened to certify the vote count of

the Electoral College of the 2020 Presidential Election.

On January 28, 2021, the defendant was arrested in the District of Nevada on the arrest warrant mentioned above.  On February 3, 2021, U.S. Magistrate Judge Daniel Albregts of the District of Nevada ordered the defendant detained, finding that no combination of release conditions would reasonably assure the safety of the community (by clear and convincing evidence), or the defendant's appearance in court (by a preponderance of the evidence). Notably, the judge cited the defendant's lack of a verified business license and a $500,000 tax bill described in the Nevada Pretrial Services Report as contributing to his risk of non-appearance.  Judge Albregts also found that he was likely to obstruct justice and "would not follow any condition imposed by the court even if the court could fashion conditions to address flight risk, danger and obstruction of justice concerns."

On February 5, 2021, a federal grand jury in the District of Columbia returned an eleven-count indictment charging the defendant with various unlawful entry and disorderly conduct offenses as well as two counts of Assaulting Certain Officers, in violation of 18 U.S.C. § 111 (felonies under these facts), and Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) & 2 (also a felony).

On March 18, 2021, the defendant was arraigned on the above charges.  On March 22, 2021, the defendant filed a motion to revoke the magistrate judge's order of detention, attaching several letters of support from friends and family.  This memorandum responds to the assertions in that motion and seeks to provide additional factual bases justifying the defendant's continued detention.

## Applicable Authority

Pursuant to 18 U.S.C. § 3142(f)(2), the Court "*shall* hold a hearing to determine whether any condition or combination of conditions … will reasonably assure the appearance of such person as required and the safety of any other person and the community … upon motion of the attorney for the Government or upon the judicial officer's own motion in a case that involves a serious risk that such person will flee or a serious risk that such person will obstruct or attempt to obstruct justice[.]" *Id.* (emphasis added) (numbering and extraneous punctuation omitted). Whatever the basis for detention, the Bail Reform Act's plain language does not limit the Court's consideration of the factors under § 3142(g). Indeed, exactly the opposite: section 3142(g) directs that judges "shall … take into account the available information concerning" the enumerated factors at the detention hearing.

The above provisions thus operate in two steps as follows. First, the judicial officer, based on a "proffer of what the hearing might establish," must ascertain if one of the circumstances enumerated under § 3142(f) is present to "trigger[] a detention hearing." *United States v. Singleton,* 182 F.3d 7, 9, 12 (D.C. Cir. 1999) (holding courts must use categorical approach to determine whether charged offense is a crime of violence triggering a detention hearing, and also discussing the § 3142(f)(2) triggers for detention). The D.C. Circuit has instructed that "[t]he decision whether to hold a hearing occurs based on even less information than a decision to detain or release," and that imposing a "fact-intensive analysis at an earlier stage of the case than Congress appears to have intended" would "blur [the] two distinct statutory inquiries" set forth in sections 3142(f) and (g). *See id.* at 12. In other words, the evidentiary standard to trigger a detention hearing in the first place is lower than the preponderance or clear and convincing evidentiary standards applicable at the detention hearing

itself.  *See id.*  If the government proffers evidence sufficient to meet this initial lower

evidentiary threshold, the Court must hold a detention hearing.[1]  *See id.*; 18 U.S.C. § 3142(f)(2).

At this second step in the process, the Court is required to consider the full panoply of

factors under § 3142(g) to determine whether there are conditions of release that will reasonably

assure the defendant's appearance in court and the safety of any other person and the community.

*See Singleton*, 182 F.3d at 9; *see also United States v. Ailon-Ailon,* 875 F.3d 1334, 1336-37 (10th

Cir. 2017) (setting forth same two-step process); *United States v. Holmes,* 438 F.Supp.2d 1340,

1341 (S.D. Fla. 2005) (reasoning that, under *Singleton*, a court "should evaluate all the factors in

subsection (g) when making its detention determination . . . regardless of whether detention is

sought under [§ 3142] (f)(1) or (f)(2)"); *United States v. Plata Hernandez,* 766 Fed. Appx. 651,

656 (10th Cir. 2019) ("The plain language of § 3142(f) pertains to what triggers the requirement

that a detention hearing be held, not the factors that guide the detention decision.").

Judge Nichols recently came to the same conclusion in a Capitol riot case, finding that a

detention hearing was appropriate under § 3142(f)(2) and considering the full range of § 3142(g)

factors, including the danger presented by the defendant to the community if he were released.

*See United States v. Curzio*, 21-cr-41 (Minute Order dated Mar. 9, 2021).[2]  Judge Nichols

ultimately ordered that the defendant remain in custody pending trial.

---

[1] The government's position, as it has been in other Capitol riot cases, is that the Bail Reform Act does not enable a
detained defendant to seek reconsideration of whether a detention hearing was properly held in the first place, but
rather only permits him to seek review of whether he should be detained under the § 3142(g) factors.  *See* 18 U.S.C.
§§ 3142(f); 3145(b) (permitting a defendant detained by a magistrate judge to move the court having original
jurisdiction for "revocation or amendment of the order").  The most natural reading of § 3145(b)'s reference to
"amendment or revocation" is to a detention determination: a court amends or revokes conditions of release or
detention.  It does not "amend" or "revoke" a decision to proceed to a detention hearing in the first place.
[2] The transcript for the defendant's bond motion hearing has not yet been issued, but this is the government's
understanding of Judge Nichols's oral ruling.  Once the transcript is issued, the government will supplement the
record, as appropriate.

Prior to Judge Nichols's ruling, Judge Mehta also considered the interplay between sections 3142(f)(2) and 3142(g) in another Capitol riot case, *United States v. Riley*, 21-cr-69. *See* Ex. A.  He agreed with the two-step framework—i.e., that the statutory bases listed in section 3142(f) serve as triggers for a detention hearing, and that once established, the Court may proceed to consider all the factors under § 3142(g) in deciding whether to detain the defendant. Judge Mehta further found that the obstruction of justice trigger for a detention hearing was subject to a lower evidentiary standard than those applicable at the actual detention hearing, as the government needed only to proffer a serious risk of obstruction of justice to proceed to a detention hearing.

Judge Mehta held, however, that while the defendant's prior obstructive acts in the Capitol were compelling evidence of such a serious risk, he believed that the government was also required to proffer evidence supporting that the defendant posed a serious risk of obstruction to a *judicial* proceeding.  Judge Mehta cited several examples of such evidence, such as destroying evidence, assisting others in evading police, and directing others on how to stash evidence—examples which led him, in part, to find a serious risk of obstruction and ultimately detain another Capitol riot defendant.  *See United States v. Caldwell*, 21-cr-28 (D.D.C. 2021), ECF No. 75.  Because the government proffered no such evidence in *Riley*, Judge Mehta ordered the defendant released.  As will be discussed further below, this is not the case here, as the government has evidence of obstructive acts by the defendant related to judicial proceedings sufficient to demonstrate a serious risk that he will attempt to obstruct justice in this case.  *See* 18 U.S.C. § 3142(f)(2)(B).

In another Capitol riot case, *United States v. Calhoun*, 21-cr-116, this Court found that while the magistrate judge did not err in granting a detention hearing under § 3142(f)(2), there

were conditions of release that could address the Court's concerns.[3]  This Court further found that the government must present evidence demonstrating a risk of obstructive acts tied to a judicial proceeding when relying on obstruction of justice grounds for detention.

Implicit in the statute is the ability to detain a defendant solely on flight risk or obstruction of justice grounds or on either ground combined with safety concerns pursuant to a section 3142(g) analysis.  Indeed, "[b]y its plain terms, 18 U.S.C. § 3142(f)(2)(B) permits this Court to order a defendant held without bond pending trial when the Court finds by clear and convincing evidence that no condition or combination of conditions will reasonably prevent the defendant from obstructing justice."  *United States v. Robertson*, 608 F. Supp. 2d 89, 92 (D.D.C. 2009) (Lambreth, J.) (detaining defendant pending trial on obstruction of justice grounds after finding that "prior efforts" to obstruct justice "speaks volumes").  Nothing in § 3142's text, however, limits the Court's consideration under § 3142(g) to the underlying basis for the detention hearing.  Instead, once the government has established a circumstance "triggering a detention hearing," the court "must consider the enumerated factors" in § 3142(g), including dangerousness.  *Singleton*, 182 F.3d at 9; *see also United States v. Gloster,* 969 F. Supp. 92, 95 (D.D.C. 1997).

The government seeks the defendant's continued detention pursuant to 18 U.S.C. § 3142 (f)(2)(A) and (B), as he poses a serious risk to obstruct justice as well as a serious risk of flight.  Under the Bail Reform Act, the government may proceed by way of proffer.  *See, e.g.*, *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996); *United States v. Cabrera-Ortigoza*, 196 F.R.D. 271 (S.D. Cal. 2000); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 42 (D.D.C. 2013).  The government further submits that because there is no condition or combination of conditions

---

[3] As above, this is the government's understanding of the Court's oral ruling without the benefit of having reviewed the transcript.

that will reasonably assure the safety of any other person and the community, the integrity of this proceeding, and the defendant's appearance in court, he should remain detained.

## Factual Background

### I.   The Attack on the United States Capitol on January 6, 2021

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m.  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

## II.     Conduct Specific to the Defendant

*i.     General Background*

On January 22, 2021, law enforcement reviewed the publicly-available content of the defendant's Facebook account, which showed several posts of the defendant displaying or carrying various guns.  On August 11, 2020, he posted a picture of a gun in a "cubby hole" in a car, asking "[w]here do you keep your guns when you're driving?"  In another post, pasted below, the defendant described his "everyday carry," which included a "Kimber .45acp diamond ultra II"

semi-automatic pistol, an "M&P bodyguard .380ACP" semi-automatic pistol, a "Colonel Blades folder" knife, and a "Colonel Blades LowVZ" fixed blade.  These posts were not recovered via the search warrant return on the defendant's Facebook account and thus appear to have been deleted by the defendant sometime after January 22.



In response to the search warrant, Facebook returned posts and conversations in which the defendant discussed "stop[ping] the steal" and displayed an adherence to the QAnon conspiracy theory movement.  *See* CBS News, *What Is the QAnon Conspiracy Theory?* (Nov. 24, 2020), https://www.cbsnews.com/news/what-is-the-qanon-conspiracy-theory/.   On December 10, 2020, he posted an image decrying the use of masks and facility closures to combat the COVID-19 pandemic, accompanied by the hashtag "#WWG1WGA"—where we go one we go all—a QAnon refrain.  *See id.*  In response to some commenters' criticism of this post, Sandlin wrote what would become his own rallying cry leading up to the riot on January 6: "tyranny always masquerades itself as safety and security. Freedom is paid for with blood, there is a reason why America was founded on the principles of give me liberty or give me death."  The government understands that Sandlin carried around a coin with the letter "Q" on it, apparently to demonstrate his proud affiliation with the QAnon movement.

ii.      *Planning and Coordination Pre-January 6*

In response to a search warrant for the Facebook account of the defendant (hereinafter referred to as the defendant or "Sandlin" for the sake of clarity), Facebook returned a post from December 23, 2020, in which Sandlin posted as follows:

> Who is going to Washington D.C. on the 6th of January? I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon.[4]  If you are a patriot I believe it's your duty to be there. I see it as my civic responsibility. If you're going comment below or PM me so we can meet up.

Nathaniel DeGrave,[5] an individual who ultimately traveled with Sandlin to D.C. and was present with him inside the Capitol, responded to Sandlin that he was "considering" joining him, and that he could "come to Nashville and drive there with you."  In a post on December 31, 2020, Sandlin announced his plans with DeGrave and Josiah Colt[6] to travel to D.C. on January 6:

> Dear Patriots, I'm organizing a caravan of patriots who are going to Washington D.C. to stand behind our president Donald J. Trump.  I posted about this last week and a got almost a dozen messages from people asking how they can help or expressing their wish to participate somehow.  Josiah Colt, Nate DeGrave, and myself have already booked and paid for our trip to Washington D.C. but we could use your help and support!  Every dollar you contribute to us is a smack in the face to Antifa. Every penny is a boot in the ass against tyranny. Every Buffalo nickel is a body slam against China.  If you can't be there in person this is the next best thing.  We will be documenting our journey and every contributer will get a personal thank you video shot on location in Washington D.C. and will be featured as a contributor on the video mini documentary.  Share, comment, like, and hate on us in the comments.

---

[4] This phrase apparently is a reference to Julius Caesar's crossing the Rubicon river and signifies committing oneself "irrevocably to a risky or revolutionary course of action, similar to the modern phrase 'passing the point of no return.'"  *See* https://en.wikipedia.org/wiki/Crossing_the_Rubicon.

[5] DeGrave has been indicted on multiple charges, including Assaulting Certain Officers, in violation of 18 U.S.C. § 111, and Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) & 2.

[6] Colt was present with the defendant inside the Capitol building during the riot and has been indicted on multiple offenses in connection with the Capitol riot.  Unlike Sandlin and DeGrave, he has not been charged with assaulting law enforcement officers and turned himself in.  The government did not seek Colt's detention pending trial.

The post also contains a link to a GoFundMe webpage[7] with Sandlin's face superimposed on that of an individual in a car holding what appears to be a semi-automatic rifle, along with the caption "The only thing necessary for the triumph of evil is for good men to do noth[ing]…Ronnie Sandlin needs your support for Patriots Defending Our Country On Jan 6th."

More significantly, the defendant's Facebook return reflects coordination and planning for violence in D.C. on January 6. In one December 30, 2020 conversation, Sandlin wrote DeGrave, "Yo sorry bro I'm going back and fourth [sic] about going some people I respect are saying it may get dangerous" and then "Are you down for danger bro?" DeGrave responded, "Im bringing bullet proof clothing" and "yes." The next day, DeGrave solicited his Facebook community for recommendations on someone "[w]ho can shoot and has excellent aim and can teach me today or tomorrow." In response to other users' comments to this post, DeGrave wrote "I want somebody special forces or ex fbi to teach me"; "I want personalized training from the best"; and "I'm open to learning all the essential skills. Whatever is necessary to survive." When a user recommended a particular person for the task and advised "he's not cheap," DeGrave responded that "this is for a very patriotic cause."

Beginning on December 31, 2020, Sandlin, DeGrave, and Colt began a private group chat on Facebook to plan for the 6th. They discussed "shipping guns" to Sandlin's residence in TN, where they would all meet before driving to D.C. Colt said he would try to fly with his "G43," which the government understands to refer to a Glock .43 pistol. They filled up their Amazon shopping carts with weapons and paramilitary gear to take to the Capitol. For example, DeGrave stated he was "looking at a 100w laser the thing that can instantly burn paper." Sandlin responded: "Good god you want to burn these communists retinas?" Sandlin later stated he was bringing his

---

[7] GoFundMe is a social fundraising online platform allowing individuals to raise money for a particular cause or reason.

"little pocket gun" and a knife.  Later that evening, DeGrave asked for Sandlin's address, which Sandlin provided, and then wrote that he had "about 300 worth of stuff coming to you."  Sandlin appears to have reviewed DeGrave's list of Amazon purchases and then wrote: "Nate is really ready for battle hahaha."  Sandlin and Colt later posted pictures of their recent purchases, including a glock holster, gas masks, and a helmet.

On January 4, 2021, DeGrave wrote Sandlin and Colt, "[w]e meet here at 10:00 a.m." and sent a screenshot of "wildprotest.com" depicting a map of the U.S. Capitol with a "Meet Here" notation in front of the building.  He also forwarded them a post from the Parler application stating: "#DoNotCertify #january6th" and "#stopthestealcaravan #darktolight #thegreatawakening #DRAINTHESWAMP," followed by his own commentary, "let em try us."  That same day, Sandlin posted a picture of Colt lying in a bed holding a firearm, with the caption, "My fellow patriot Josiah Colt sleeping ready for the boogaloo Jan 6."  The government understands that the term "boogaloo" is code in some extremist circles for civil war.  *See* Anti-Defamation League, *The Boogaloo: Extremists' New Slang Term for a Coming Civil War* (Nov. 26, 2019), https://www.adl.org/blog/the-boogaloo-extremists-new-slang-term-for-a-coming-civil-war?gclid=EAIaIQobChMImeGQ1KzH7wIVDK7ICh2nCwHZEAAYASAAEgLTyPD_BwE.

On January 5, 2021, the trio arrived in D.C. and picked up a fourth individual—a female— from Reagan National Airport.  That evening, Colt posted a video to his social media bearing the caption "Nate's bear mace was going off in his pocket and it started filling the van bear spray."  In the video, Sandlin states that bear mace was going off in the car, and both Sandlin and Colt can be seen coughing in the video.

Sandlin, Colt, and DeGrave ultimately brought the following weapons and other items with them in a rental car from Tennessee to the D.C. metropolitan area:  one Glock 43 pistol, Sandlin's

M&P bodyguard pocket pistol (seen in the above photo), two magazines of ammunition, bear mace, gas masks, a handheld taser/stun gun, military-style vests/body armor, two helmets, an expandable baton, walkie talkies, and several knives, including Sandlin's fixed blade (also seen in the above photo).  Colt brought his gun to a rally in Washington, D.C. on January 5.

The government understands that Sandlin armed himself with at least a knife while in the Capitol on January 6.  Colt similarly was armed with a knife as well as bear mace in his backpack.  DeGrave carried a walkie talkie, as did Colt.  In a selfie-style video posted to Colt's social media the morning of the riot, the defendant can be seen with Colt, DeGrave, and the female in a hotel room.  Colt discusses a "debate we've been having for days now:  should we carry our guns or not?"  DeGrave says: "for the camera's sake, we're not going to carry," which Colt repeats for the social media audience.  Sometime after the recording of this video, Colt and Sandlin discussed whether to carry their guns that day and stated to each other that they would not.

### iii.    Events of January 6

As the videos described below illustrate, the defendant's stated goal on January 6 was to "take the Capitol" and obstruct the Electoral College certification proceeding.  In the process, he assaulted several U.S. Capitol Police officers, which is also captured on video.

On or after January 6, investigators received a "selfie"-style video recorded by Sandlin, DeGrave, and Colt as an anonymous online tip.  In the video, which was recorded on January 6 but prior to the riot at the Capitol, the three are eating in a booth at a TGI Friday's.  Sandlin says in the video, no less than three times, ***"freedom is paid for with blood."***  Sandlin is also heard saying:

> Alright so we have been at the protests…we were there pretty early, scoped it out…there were some scrimmages, I will upload the video later…I think a precursor of what is going to [happen] in a few hours.  People are really mad…it is just a precursor to what's going

to happen…Either way there is going to be violence.

A little later in the video, Sandlin states:

> What is happening to this country is absolutely horrific, absolutely
> horrific…we are ready to occupy the state capitol if needed to…I
> urge other patriots watching this too, to be willing to take the
> capitol…***if you are watching this and you are a patriot and are
> here, I think it is time to take the capitol and I don't say that
> lightly***…. I am willing to do it, I willing to go and fight for this
> country.  Even if that means I have to sacrifice in some capacity.  It
> is not what I want to do…

In the video, Sandlin hands the device used to record the video to Colt and DeGrave.  Colt

states that "[t]he whole thing is a scam, dude.  The whole election, they can't just steal an election.

Like they are trying to do in Georgia last night.  It is a lie."  DeGrave responds: "We are sick and

tired of the fucking lies.  It is time to put an end to this once and for all."  At this point, Sandlin

takes the device back from them and states: "You either have conviction and you stand up for what

you believe in or you sit down and shut the fuck up."  Towards the end of the video, Sandlin stated:

> ***If we need to occupy the capitol, we will occupy the capitol.***  You
> guys are driving all the way to D.C. and you are missing the rally.
> We have been at the rally, we went last night, we have been at the
> rally since six in the morning.  We needed to grab a bite to eat, and
> like decompress because we went through a few intense moments
> and also regroup and plan for the next….***one o'clock is when it is
> all going to go down.  So we are going to be there back by one
> o'clock when it is action time it is game time.***

These statements appear to refer to the joint session of Congress at the U.S. Capitol building that

began at approximately 1:00 p.m. Eastern Standard Time (EST).

Videos posted to Colt's social media show Colt, Sandlin, and DeGrave walking down

Pennsylvania Avenue towards the Capitol.  In one video of Colt and DeGrave walking toward the

Capitol, Colt says, "It's a historic day. To save America. Save freedom. Save the way of life that

we love. Save everything that our ancestors fought for and laid down their life for."  The three

ultimately joined the mob and entered the Capitol building through a door to the rotunda.

Surveillance footage from the entrance to the Capitol rotunda depicts a mob outside attempting to gain entry through a door. The door's glass windows are damaged. Individuals already inside can be seen moving benches blocking the door to try to let the mob in, at which point three U.S. Capitol Police ("USCP") officers move in to stand guard in front of the door. Sandlin, DeGrave, and Colt are then seen entering the area, along with approximately twenty to thirty other individuals. The USCP officers are without backup.

Sandlin approaches the officers and can be seen yelling and pointing at them. Sandlin continues to yell, and DeGrave moves to his side. Immediately thereafter, the crowd, including Sandlin and DeGrave, begins pushing the officers and slowly forces the door behind the officers open, allowing the mob outside to begin streaming in. Rather than shy away, Sandlin continues to engage and records the ongoing attack on the officers. Sandlin then tries to rip the helmet off of one of the USCP officers, an apparent attempt to expose him and render him vulnerable as the mob surrounds him.

Sandlin and DeGrave continue to engage with the crowd near the entrance, with at least one officer still trapped in the midst, until Colt taps DeGrave on the shoulder and leads the two away and up nearby stairs. Around this time, the government understands that Colt shouted something to the effect of "we have to get to the Senate" and "there's no turning back now, boys, we're here."

They eventually made their way to the Senate. Additional surveillance video footage from the Capitol Senate Gallery provides a view of a hallway and several sets of doors, which lead to the upper balcony of the Senate Chamber, where shortly before the Senate and the Vice President had been convened for the Electoral College vote count certification. The beginning of the video

clip shows several unidentified subjects in the hallway.  A USCP officer (hereinafter "USCP1") can be seen entering one of these sets of doors and is shortly joined by two other USCP officers ("USCP2" and "USCP3").  As part of their official duties, USCP1, USCP2, and USCP3 were clearing individuals out of rooms and securing the doors.

Approximately 27 seconds into the video clip, Sandlin enters the view of the security camera.  Shortly thereafter, USCP2 and USCP3 move toward the second set of doors to start to usher people out, while USCP1 finishes locking the first set of doors.  Sandlin can be seen walking next to USCP1 as he approaches the second set of doors, and while USCP2 is attempting to close the second set of doors.  Sandlin cuts in front of USCP1 and attempts to wrestle the door away from USCP2.  DeGrave then joins Sandlin in a shoving match with the USCP officers in an attempt to keep the door open.  During this assault, Sandlin took a swing at one of the officers and made contact with the back of the officer's head, near his ear.[8]  As the three USCP officers make their way away from the crowd, Sandlin, DeGrave, and several others are observed on the video footage acting in an aggressive manner towards the officers.  Sandlin can be seen pointing and shouting at the retreating USCP officers.

Shortly thereafter, Sandlin, DeGrave, and Colt entered the now open doors and reached the upper balcony of the Senate Chamber, which members and staff of Congress and the Vice President had already evacuated.  Colt handed the GoPro, which he had been carrying and using to record the riot, to DeGrave, as he prepared to jump down to the floor of the Senate Chamber. After Colt jumped down, DeGrave was one of several individuals yelling at Colt to take documents and laptops.  Shortly thereafter, the three were separated and did not meet back up until they were

---

[8] In an interview, this USCP officer did not recall being punched, but at least three witnesses recalled seeing a rioter make contact with the officer's head after taking a swing during this incident, and the officer appears to react to the contact in the surveillance footage by looking back towards Sandlin immediately afterwards.  One of the witnesses identified the rioter as Sandlin.

outside the Capitol.

At some point during the chaos, Sandlin stole a book with a picture of former presidents on the cover from someone's desk inside the Capitol.  He took this book with him to Las Vegas.

Subsequent investigation revealed Twitter posts by an account named Cleavon_MD containing videos and posts from Sandlin's Facebook account.  *See* Cleavon MD, *Meet Ronnie Sandlin who stormed the Capitol: "We did it. We did it,"* Twitter https://twitter.com/cleavon_md/status/1347692511561539590?lang=en.  This post contained a selfie-style video in which Sandlin appeared emotional and exclaimed, "We took it.  We did it." In another video clip, Sandlin stated "we breached the building, we breached the building into our Capitol."  Additional video clips of Sandlin inside the Capitol can also be found in a New York Post article, including a clip of Sandlin on the balcony of the Senate Chamber and another clip in which he says, apparently to law enforcement, "we've pushed our way through already, sir."  Laura Italiano, *Video shows rioter smoking pot in Capitol Rotunda during siege* (N.Y. Post, Jan. 9, 2021), https://nypost.com/2021/01/09/video-shows-rioter-smoking-pot-in-capitol-rotunda-during-siege/.

iv.     *Post-January 6 Activities*

Sandlin, DeGrave, and Colt left D.C. and drove cross country almost immediately after their unlawful entry into the Capitol and were well aware of the criminal nature of their actions that day.  Indeed, in a Facebook group chat on January 7, Sandlin told the female who stayed in the hotel with them that the trio had left D.C. to get "to a safe spot," and that they were "at risk for serious jail time."  That same day, he wrote another individual on Facebook that "[w]e are looking at charges," and the "FBI [is] after us."  In another conversation on January 8, the defendant stated he believed charges against him were "imminent."  He also wrote the female who stayed in the hotel with them on the 9th that it was "highly likely I'm spending a long time in prison."

The search warrant return for Sandlin's Facebook reveals a post from shortly after the riot in which Sandlin wrote, "Who has a contact with TMZ and/or Epoch Times?  Thanks patriots.  I have the truth not the media lies.  What I haven't shown will show the REAL truth.  We are not terrorists.  We occupied and for the most part left that place relatively put together all things considered."  One commenter responded, "Bro, are you ok?  Here's what you've already shown today… A clip of you where the people with/around you are calling for the theft of federal property, including high-security laptops & paperwork.  *A clip of you trying to demand access to where the actual senators were being kept & telling the guard 'we've already forced our way into other places.'*"  At least one witness has corroborated that Sandlin did in fact say this to law enforcement around the time he assaulted officers near the Senate Chamber balcony.

Sandlin's own statements reflect that he was "on the run" from "the Feds" after the events at the Capitol.  On January 8, 2021, he asked several individuals to let him borrow money to help pay for a lawyer and an AirBnb.[9]  In one such plea, he stated that he was "all over the news," and that he was "*on the run right now Josiah already has arrest warrant*."  Sandlin also conversed with a third party on Facebook that day regarding his arrival to her residence.  He predicted that they would arrive on January 9 around 4 o'clock.  He thanked her and stated, "on the bright side I'm technically not a fugitive so you aren't harboring a fugitive."

On January 14, 2021, the defendant explained to another associate on Facebook that they had "road tripped from DC to Vegas to avoid" the "Feds."  He added that, "when we got there it was Heating up Josiah stayed at my safe house," but that "then I knew it was burnt and left."  Colt ultimately deposited several items he brought to D.C. with the couple who resided at the safe

---

[9] It should be noted that Sandlin told others that his parents "disowned" him following the riot, which presumably dissuaded him from returning directly to Memphis from D.C., though he ultimately did go back to Memphis, as described herein.

house—specifically, his taser, police baton, and a protective vest.  Sandlin wrote that he later

"hopped on a plane to head back to Memphis half expecting to be picked up at the airport."  In a

separate conversation that day, another third party told Sandlin that the FBI "came to interrogate"

the third party with whom Sandlin stayed on the 9th and told her that if Sandlin reached out to her

to tell Sandlin to "turn yourself in."[10]  This person then deleted some of his messages to Sandlin,

and Sandlin requested his Wickr username—apparently to continue communicating more

discretely.  On January 16, Sandlin asked another individual based in Las Vegas to have "our

un[n]amed mutual friend contact me via wickr."

On January 16, 2021, a vehicle registered to Sandlin and recovered during his arrest was

located in Shelby, Tennessee and later that day in Shawnee, Oklahoma.  On January 17, 2021,

Sandlin wrote an associate that he was driving back to Las Vegas and was "[i]n New Mexico now."

The next day, Sandlin wrote that he was in Vegas but "headed to LA Wednesday."  Also on January

18, he wrote another third party that he was "laying low. *I haven't slept in the same place more

than 1 night since it happened.*"  When the third party asked why, Sandlin directed him to contact

him on Wickr or Signal because he "can't talk here"—i.e., via Facebook Messenger.  On January

19, 2021, DeGrave conversed with an individual via Facebook Messenger regarding Sandlin's

whereabouts.  When asked if he had seen Sandlin, DeGrave said, "No we were supposed to get

breakfast but he ended up leaving early to go to another state."  He added that Sandlin "*[s]aid he's

keeping it moving*," and that he "was on ny post" and will "def[initely] get a charge."  Law

enforcement received a tip that Sandlin was staying with a friend near Tustin, California on or

about January 20, 2021, which was ultimately corroborated by a witness interviewed by law

enforcement.  That same day, law enforcement spoke with a witness affiliated with Sandlin's prior

---

[10] The FBI Washington Field Office has to date been unable to corroborate this alleged contact with its counterparts in Las Vegas.

residence in Memphis, TN, who stated that Sandlin had informed them he would be headed to California, and that Sandlin was a confrontational person and frequently armed.  Law enforcement located his vehicle in Hisperia, California on January 22, 2021, but were unable to apprehend him.

The defendant's Facebook return reveals that he encouraged several individuals on Facebook to download or communicate with him via encrypted messaging apps, such as Wickr and Signal, post-January 6 about the events at the Capitol.  In addition to the examples cited above, Sandlin, DeGrave, and Colt downloaded an encrypted messaging application after the Capitol riot to continue talking to each other, including about potentially selling their footage of the riot so they could get rich and be featured on podcasts.

On January 9 and 10, DeGrave privately messaged with a third party about providing footage to produce a documentary.  He told the third party to call him on wickr, and that it was "going to absolutely blow your mind what I will tell you."  DeGrave later stated that he would have to "talk my boy into it," "go to Idaho to get [the footage]," and that it was "with his attorney." The government understands that DeGrave was referring to footage of the insurrection within the possession of Colt, who lives in Idaho.  On January 14, 2021, Sandlin discussed his "footage" with an associate, noting that he had "a meeting with Dinesh Desuza [sic] this week"[11] and asking to "chat on signal."  Two days later, he told another associate that he would repay him money lent to him, as he was "selling footage of the event."  On January 16, 2021, Sandlin wrote a third party on Facebook that he was "already working out a Netflix deal on the footage I have."  In a jail call to his mother dated February 13, 2021, Sandlin confirmed that he did in fact meet with D'Souza and that he was also in contact with Joe Rogan, a comedian who runs the podcast *The Joe Rogan*

---

[11] Dinesh D'Souza is a right-wing commentator who has produced several documentaries, such as "2016: Obama's America" and "Hillary's America."  *See, e.g.*, Daniel Victor, *A Look at Dinesh D'Souza, Pardoned by Trump* (May 31, 2018), https://www.nytimes.com/2018/05/31/us/politics/dinesh-dsouza-facts-history.html.

*Experience*.  He also requested that she contact publishers on his behalf, as he was writing a book about "the Capitol incident" and nearly finished with it.

A comparison of tips submitted to the FBI, publicly-available content from the defendant's Facebook account viewed by law enforcement, and the search warrant return on the account confirms that Sandlin deleted several posts, videos, and messages related to the insurrection and his involvement in it.  On January 9, the female who stayed in the hotel with them wrote Sandlin on Facebook requesting that he untag her from any Capitol-related posts and send her the videos he had posted and later took down because she had "a lot of explaining to do to certain people" and would not be able to respond to them "[u]ntil I can see what was said in them . . . ."  She also wrote, "For the love of god … tell me that your friend['s] gun was not brought to that capitol. My fingerprints are on that fucking gun I just realized this. Because when I first got into the airport and got in the car I remember your friend driving had asked me if I could put it into his little case thing."  Sandlin responded that "[t]hat gun wasn't taken to Washington DC. To be 100% clear," at which point the female requested to talk "on video."  Sandlin and the female then appear to have video chatted for approximately nine minutes.  Later that day, Sandlin wrote her again that there were "no guns taken to the rally."

Multiple messages after the riot reflect a clear lack of remorse for and even pride in his actions on January 6.  For example, he told one friend on Facebook that he "did it for god and country and I'm ready to face my consequences like a man I believe god is on my side."  To another individual, he stated, "I'm a true patriot I'll do my time proudly," and to another he said, "I did this for my country."  In one notable exchange, Sandlin wrote that his "lawyer said worst case scenario 1 year in federal prison. I need to los[e] some weight anyway and it's a small price to pay for my country."

In one notable exchange from January 9, 2021, with an individual who had originally planned to travel to D.C. with the trio but backed out at the last minute, Sandlin wrote, "Josiah is a hero.  I'm a patriot and I'm fine with whatever happens.  For god and country.  We have a noble and just cause."  He later wrote, "I'm prepared to face my decisions like a man.  I crossed the rubicon and so did Josiah and there's no turning back now," adding that he had "conviction about my cause."

v.  *Arrest*

On January 28, 2021, cell-site data for Sandlin's phone received pursuant to a search warrant led investigators in the FBI Las Vegas division to locate and visually identify Sandlin's vehicle parked outside the Las Vegas apartment complex where DeGrave was confirmed to reside. That same day, Sandlin was spotted leaving the apartment and taken into custody by the FBI.  A complaint and arrest warrant for DeGrave were also issued on January 28, 2021, and DeGrave was arrested at his residence.

vi.  *Jail Calls*

In response to legal process, the detention center in Las Vegas where Sandlin was housed following his arrest provided law enforcement with copies of recorded jail calls made by Sandlin. On February 6, 2021, Sandlin called an individual he referred to as "Mom."  In the conversation, Sandlin asked his mother if she had spoken with "Rob" about "my stuff," which she confirmed she had and then asked what he needed.  Sandlin told his mother, "I need my laptop, very important."  Sandlin's mother asked where it should go, and Sandlin replied: "It should go to you, what do you mean where should it go?"  Sandlin then provided the following instructions: "Everything there needs to go to you, ok, it is very important."  He indicated that the laptop has a "video of me and Josiah and Nate praying for no violence and that we have a peaceful resolution

of that event." Sandlin's mother confirmed that she had spoken with Rob already and was going to make arrangements to get it. Sandlin also instructed his mother to purchase "three external hard drives" because he was going to need "video evidence sent to my attorney." He added he had "leverage" on the footage, and that the footage also "paints me in a different light."

On February 9, 2021, Sandlin made another call to his mother, asking if she had made contact with "Mr. R, Mr. Rob," in reference to the third party whom Sandlin indicated on the February 6, call had his "stuff." His mother replied in the affirmative, to which Sandlin responded, "alright that is all that needs to be said."

## Argument

There are four factors under § 3142(g) that the Court should consider and weigh in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. §3142(g). As discussed in more detail above, the Court may also consider whether the defendant poses a serious flight risk or a serious risk of obstructing justice. *See* 18 U.S.C. § 3142(f)(2); *Robertson*, 608 F. Supp. 2d at 92. In consideration of these factors, the government respectfully submits that there are no conditions or combinations of conditions that can effectively ensure the safety of any other person and the community, the integrity of this proceeding, or the defendant's appearance in court.

District courts apply a de novo standard of review in evaluating a magistrate judge's detention decision. *United States v. Karni*, 298 F. Supp. 2d 129, 130 (D.D.C. 2004). Even under de novo review, the defendant has failed to proffer any reason to disturb the decision of the magistrate judge in the District of Nevada ordering the defendant detained.

## I.     Serious Risk of Non-Appearance

The government's proffered facts clearly trigger a detention hearing under 18 U.S.C. § 3142(f)(2)(A), as he poses a serious risk of flight.  In his own words, the defendant was "on the run" after he left D.C.  As early as January 7, he stated that he and his co-conspirators were "at risk for serious jail time," "looking at charges," and that the FBI was after them.  On January 8, the defendant acknowledged that charges against him were "imminent," and that Colt already had an arrest warrant.  The defendant crossed the country several times—from D.C. to Vegas to Memphis to Vegas to California and back to Vegas, at least—in an attempt to evade the "Feds." The defendant admitted that he had not "slept in the same place more than 1 night since [the riot at the Capitol] happened."  Not only is he a serious risk of flight, he is a demonstrated risk of flight.

To his credit, the defendant's Facebook search warrant did contain evidence suggesting he had been making plans to move back to Las Vegas prior to January 6.  The government understands, however, that no firm plans had been made—i.e., no lease had been signed.  More importantly, his own statements contradict his purported benign reasons for his interstate travel following his participation in the riot at the Capitol.

Also relevant to the risk of flight analysis, the defendant appears to be struggling financially, as evidenced by his numerous pleas to others to lend him money after the riot and his $500,000 debt in back taxes, according to the Nevada Pretrial Services Report.[12]  This tax burden combined with his history of depression and significant exposure in this case, particularly when compared with his limited criminal history, amplifies his risk of non-appearance.

For the above reasons, the government submits that the defendant is a demonstrated flight risk by a preponderance of the evidence and thus should continue to be detained pending trial.

---

[12] The U.S. Attorney's Office in DC does not have access to this report, though it was described in the defendant's initial detention hearing in Las Vegas.

## II.      Serious Risk of Obstruction of Justice

The government's proffered facts also trigger a detention hearing under 18 U.S.C. § 3142(f)(2)(B).  *See, supra*, section II (citing recent oral rulings on detention in *United States v. Riley*, 21-cr-69 (D.D.C. 2021) (Mehta, J.) and *United States v. Calhoun*, 21-cr-116 (D.D.C. 2021) (Friedrich, J.)).  They also show, by clear and convincing evidence, that no combination of release conditions will "reasonably prevent the defendant from obstructing justice" and thus ensure the integrity of this proceeding.  *See Robertson*, 608 F. Supp. 2d at 92.

Taking the Capitol by force to disrupt Electoral College vote count proceedings is the ultimate obstructionist act.  This is precisely what the defendant intended to do, incited others to do, and did himself.  He and his co-conspirators engaged in extensive planning and amassed weapons and paramilitary gear in advance of the insurrection on January 6.  They got in a rental car and drove multiple weapons, including the defendant's pocket gun and folding knife, cross country to the D.C. area.

In the weeks leading up to the riot, Sandlin announced he was going to D.C. to "stop the steal" and "stand behind Trump when he decides to cross the rubicon," and that he was "ready for the boogaloo"—i.e., civil war.  On January 6, immediately preceding the riot, the defendant made his intentions crystal clear:  he called on his fellow "patriots" on social media to "take the Capitol," noting that 1 p.m.—when Congress was due to meet and certify the Electoral College vote count—was "game time."  He repeated his battle cry of "freedom is paid for with blood" several times.  Simply put, he incited violence.  These acts render the defendant a danger to the community and our democratic institutions, including this Court.

Even after January 6, when the nation was reeling and the import of his actions should have become clear, the defendant decided that they were instead something to celebrate and

publicize.  As discussed above, he engaged in talks with third parties to sell footage of the insurrection and produce a documentary, presumably to glorify his and his co-conspirators' actions and further his political agenda.  Even post-arrest, from jail, he is seeking to profit from his actions by publishing a book about the "Capitol incident."  The defendant clearly has not internalized how abhorrent his conduct was that day and has yet to accept responsibility, unlike many other Capitol riot defendants.  To the contrary, the defendant boasted of his conduct, stating that he was a "true patriot," and that serving time in prison was "a small price to pay for my country."  There is also evidence that the defendant is an adherent to QAnon conspiracy theory, which presumably continues to cloud his judgment.

Finally, the defendant has engaged in obstructive acts relevant to *this* proceeding, which serve as an additional indicator of the likelihood that he would attempt to obstruct justice in this case if he were released.  He deleted several posts, videos, and messages related to the insurrection and his involvement in it.  In other words, he destroyed evidence.  He crisscrossed the country in an attempt to evade apprehension.  He deposited items of evidentiary value—e.g., his laptop with footage of the insurrection and "leverage" on it—with a third party.  Although it is unclear what exactly the defendant meant by "leverage,"[13] presumably he was referring to damning evidence against his two co-conspirators.  Furthermore, the defendant was clearly savvy and determined enough to encourage several individuals on Facebook to download or communicate with him via encrypted messaging apps to discuss the events of January 6, which should give this Court great concern from an obstruction risk perspective.  He even communicated with his two co-conspirators via an encrypted messaging app after January 6 about disseminating video footage of the insurrection for profit.

---

[13] According to dictionary.com, the noun "leverage" is defined as "the power or ability to act or to influence people, events, decisions, etc.; sway."

For the reasons outlined in this memorandum, including his prior obstructive acts and demonstrated lack of respect for institutional processes, it is hard to see how the Court could have confidence that the defendant will not continue to engage in obstructionist behavior were he to be released, or that he will comply with the orders of this Court. The government thus submits that because no combination of release conditions will reasonably prevent the defendant from obstructing justice and thus ensure the integrity of this proceeding, he should remain detained pending trial.

### III.     Nature and Circumstances of the Offenses Charged

On January 6, 2021, the defendant assaulted multiple law enforcement officers attempting to protect the Capitol and members of Congress inside. His role in contributing to the chaos that day is not hyperbole—the defendant himself can be seen on surveillance footage as part of a violent crowd pushing three outnumbered officers against a door and forcing that door open,[14] allowing the mob outside to gain unlawful entry into the U.S. Capitol and putting law enforcement officers and members and staff of Congress at grave risk.

Shortly after this mob rush, the defendant reached out and attempted to rip the helmet off of one of the USCP officers who was surrounded and cornered by the mob as they stormed their way past him. There is no conceivable reason to do this other than to attempt to expose the officer and render him vulnerable as the mob surrounded him. Had the defendant succeeded in ripping off his helmet, the officer could have suffered grave injuries, as other officers did that day.

On yet another occasion, the defendant tussled with officers to keep the door to the Senate Chamber open, which led others to attack the officers as well. He took a swing at one

---

[14] Sandlin's participation in this assault was only recently discovered and thus he has not yet been charged in relation to this incident.

officer, and his fist connected with the back of the officer's head near his ear.  The officers, outnumbered, ultimately retreated, leaving the doors to the Senate Chamber unguarded.  The defendant's actions thus partly enabled other rioters to commit criminal acts inside the building, including in the Senate Chamber where Congress just moments before had been conducting its constitutional duty to certify the results of the 2020 election.  Surveillance footage paints a picture of the defendant as seeking out violence at every available opportunity.

The defendant's actions prior to the riot are perhaps even more disturbing.  The defendant and his co-conspirators amassed weapons and paramilitary gear, which they drove cross country to the D.C. area.  He was prepared for "the boogaloo"—civil war.  This is not the behavior of someone who intends only to protest peacefully.  His actions leading up to the riot demonstrate planning, coordination, and determination to engage in violent conduct that day to "stop the steal" and prevent the certification of the electoral college results deeming Joe Biden the winner of the 2020 presidential election.  The defendant incited others to "occupy the Capitol" and to pay for "freedom … with blood."  He sought out violence, and he ultimately succeeded.

Chief Judge Howell recently detained a Capitol riot defendant in part because "any indication that a defendant engaged in prior planning before arriving at the Capitol, for example, by obtaining weapons or tactical gear, suggests that he was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process," and that such "motives and steps taken in anticipation of an attack on Congress speak volumes to both the gravity of the charged offense, as a premeditated component of an attempt to halt the operation of our democratic process, and the danger a defendant poses not just to the community in which he resides, but to the American public as a whole."  *United States v. Chrestman*, 21-cr-218, ECF No. 23, at 15.  Such is the case here.  Chief Judge Howell detained

that defendant after considering "[e]vidence of coordination with other participants before, during, or after the riot indicates that a defendant acted deliberately to amplify and assure the success of the breach of the Capitol," or "urging rioters to advance on the Capitol or to confront law enforcement," adding that the "presence of either of these factors enhances the defendant's responsibility for the destabilizing events of January 6 and thus the seriousness of his conduct." *Id.* at 15-16.  Both of these factors are present here.  As part of a mob, the defendant forced both exterior and interior doors open, allowing others to breach the Capitol and the Senate Chamber within.  Before the riot, he implored others to "take the Capitol," emphasizing that "freedom is paid for with blood."

On January 6, the defendant combined his criminal intention to interfere with the functioning of Congress with an assault on the law enforcement officers trying to protect that function.  As a result, the nature and circumstances of the charged offenses overwhelmingly weigh in favor of detention.

## IV.     Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also clearly favors detention.  As noted above, the defendant is captured on U.S. Capitol surveillance cameras attacking law enforcement officers on at least two occasions.  Videos captured by the media and on social media corroborate the identification of the defendant as the person assaulting officers in the bright orange sweatshirt that day.  His own statements on social media corroborate his obstructionist intent.  This factor thus weighs in favor of detention.

## V.     Defendant's History and Characteristics

As evidenced by the multiple letters of support attached to his motion, the defendant is clearly loved and has made significant contributions to society over the course of his life.  The

29

government does not discount this, and it certainly would be relevant at sentencing. But this Court, in determining whether the defendant poses a danger to society and/or an obstruction or flight risk, must weigh these sentiments against his more recent, extremely troubling conduct. His actions reflect an emotionally volatile person with clouded judgment, which is unsurprising in light of his adherence to the QAnon conspiracy theory movement that believes America is run by a cabal of pedophiles who run a child sex-trafficking operation. *See* CBS News*, supra*, at 9.

The government also recognizes that the defendant has limited criminal history.[15] However, the defendant's actions leading up to and on January 6 should give this Court great concern about the danger he would pose to the community if released, particularly in light of his preparation for violence and lack of remorse for, and even pride in, his actions. Indeed, his failure to "exhibit[] any remorse for what occurred at the Capitol" provides "no evidentiary basis to assume that defendant will refrain from similar activities, if instructed, in the future." *See Chrestman*, 21-cr-218, ECF No. 23, at 28. To this day, the defendant seeks to publicize and profit from his participation in the Capitol riot. And, as discussed above, he has engaged in obstructive acts such as deleting evidence and encouraging others to download encrypted messaging applications to discuss the events at the Capitol. His post-offense characteristics certainly militate in favor of detention, even if his pre-offense characteristics do not.

## VI.     Danger to the Community

The fourth factor, the nature and seriousness of the danger to any person or the community posed by a defendant's release, also weighs in favor of the defendant's detention. The charged offenses involve assaultive conduct as part of a violent mob. He intended to obstruct the certification of the Electoral College results, and he succeeded.

---

[15] The Pretrial Services Report reflects one DUI arrest in 2013 with no known disposition.

The danger the defendant caused as an active member of a violent mob cannot be understated.  The entry of likely hundreds of rioters into the Capitol building and their destructive actions can be attributed, at least in part, to his role in overwhelming law enforcement and forcing an exterior door of the Capitol open.  While thankfully it does not appear the officers he assaulted suffered serious injuries, his actions contributed to the overwhelming of law enforcement and their retreat from guarded spaces, such as the Rotunda entrance and Senate Chamber.  His actions and statements illustrate that he is a danger to our society and a threat to the peaceful functioning of our community.

## Conclusion

For the above reasons, the Government submits that there is clear and convincing evidence that the defendant poses a serious risk to obstruct justice and is a danger to the community, and that there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community or the integrity of this proceeding, if he were to be released.  The government also submits that he is a risk of non-appearance by a preponderance of the evidence.  The Court should therefore deny his motion for bond.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

By: */s/ Jessica Arco*_____
Jessica Arco
Special Assistant U.S. Attorney
D.C. Bar No. 1035204
U.S. Attorney's Office for the District of Columbia
555 Fourth Street NW, Fourth Floor
Washington, DC 20530
Jessica.arco2@usdoj.gov

202-431-5198

Date:  March 23, 2021

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel, Jerry Ray Smith, Jr., Esq., this 23rd day of March 2021.

/s/_____

Jessica Arco
Special Assistant United States Attorney
