<pre>
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,      .
                                    .  Case Number 21-cr-88
 4            Plaintiff,            .
                                    .
 5        vs.                       .
                                    .
 6   RONALD L. SANDLIN,             .  April 6, 2021
                                    .  11:38 a.m.
 7            Defendant.            .
     - - - - - - - - - - - - - - - -

 8

 9                  TRANSCRIPT OF MOTION HEARING, VOLUME I
                    BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                       UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:      JESSICA ARCO, AUSA
                                 United States Attorney's Office
14                               555 Fourth Street Northwest
                                 Washington, D.C. 20530
15

16   For the Defendant:         JERRY R. SMITH, JR., ESQ.
                                 717 D Street Northwest
17                               Suite 310
                                 Washington, D.C. 20004
18

19

20

21   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               U.S. Courthouse, Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

25   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
</pre>

```
1                        P R O C E E D I N G S
2          (All participants present via video conference.)
3               THE COURTROOM DEPUTY:  Your Honor, we are in Criminal
4    Action 21 --
5               THE COURT:  Oh, wait.  Okay.  Can you hear me?  I
6    couldn't hear you.
7               THE COURTROOM DEPUTY:  We can hear you, Your Honor.
8               THE COURT:  Okay.
9               THE COURTROOM DEPUTY:  We are in Criminal Action
10   21-88, United States of America versus Ronald Sandlin.
11        If I can have the parties identify themselves for the
12   record beginning with the United States.
13               MS. ARCO:  Good morning, Your Honor.  Jessica Arco
14   appearing on behalf of the United States.
15               THE COURT:  Good morning, Ms. Arco.
16               MR. SMITH:  Good morning, Your Honor.  Jerry Smith for
17   Ronald Sandlin, who is appearing remote from the D.C. Department
18   of Corrections.
19               THE COURT:  All right.  Good morning, Mr. Smith, and
20   good morning, Mr. Sandlin.
21        So this is a video conference being conducted pursuant to
22   Chief Judge Howell's standing order relating to the pandemic.
23               THE COURTROOM DEPUTY:  Forgive me, Your Honor.  We
24   also have Pretrial Services on the line.
25               THE COURT:  Okay.  Is that Ms. Schuck?
```

1          THE COURTROOM DEPUTY:  Yes, Your Honor.

2          THE COURT:  All right.  Thank you.

3      Consent is not required to conduct a motion hearing by

4  video conference.  Still, Mr. Smith, can you tell me today

5  whether Mr. Sandlin does consent to proceed by video conference?

6          MR. SMITH:  Yes, Your Honor, we have discussed that,

7  and he does consent to proceed by video.

8          THE COURT:  All right.  Thank you.  But I do think it

9  is in the interest of justice to do so given the public health

10  risk and the fact that further delay would result in serious

11  harm to the interests of justice and the interests of the

12  defendant and the public.

13      So I have reviewed your briefs, including the supplemental

14  brief and the government -- the government's supplemental brief

15  and all of the exhibits and the videos that you submitted,

16  including the defendant's letters of support.  I'm familiar with

17  the arguments in the brief.

18      I have a number of questions for both sides, and I am

19  willing to hear any additional argument either of you would like

20  to make.  The parties do agree that I am reviewing the

21  magistrate's decision in Nevada de novo, so it is the

22  government's burden here.

23      So Ms. Arco, in light of that, why don't we start with you.

24  Are there additional points you would like to make or expand

25  upon from your briefs?

1          MS. ARCO:   Sure, Your Honor.   I think I can summarize

2     our arguments and interject a few additional factual points,

3     including one that came to my attention this morning.   I will

4     try to be as brief as possible.

5          We submit that the defendant should be held pending trial

6     for three different reasons, and we believe that we've met our

7     burden as to all three.

8          Starting with our lowest burden first, the facts show by a

9     preponderance of the evidence that the defendant is a flight

10    risk, that he is a demonstrated flight risk.   He's stated on

11    several occasions to others that he was on the run, that the FBI

12    was after him, that he hadn't slept in one place since

13    January 6th, that he was evading the feds, that charges had been

14    brought against his co-conspirator Josiah Colt and that charges

15    again him were imminent.

16         Even the State Department appears to believe he is a flight

17    risk, totally unrelated to this case, based on his

18    half-a-million-dollar tax burden, which is why the State

19    Department suspended his passport.

20         But as Your Honor knows, one does not need a passport or to

21    go through an official checkpoint to cross a border.   And as the

22    defendant stated in his letter to this Court, he was born in

23    Mexico, which according to my albeit cursory Internet searches

24    means that he enjoys Mexican citizenship.

25         Your Honor, to be frank, in light of the defendant's

documented, very heightened rhetoric in this case and efforts to

profit off of his conduct on the 6th by writing a book from

jail, by trying to sell his footage of the event, and by meeting

with famous documentarian Dinesh D'Souza, it would not surprise

me in the slightest if he absconded and tried to become the

Edward Snowden of the Capitol riots.

Finally, on the flight risk point, several of those who

submitted letters in support of the defendant which the

defendant put on the record have raised his battle with

depression.  We submit that his prior actions, exposure in this

case, as well as the tax matter, combined with his emotional

volatility deem him a flight risk in this case by a

preponderance of the evidence.

We also submit that the facts show by clear and convincing

evidence that he poses an unreasonable risk of obstructing

justice in this case, as well as a danger to the community, and

that no combination of release conditions would assure the

safety of the community or the integrity of this proceeding.

Our position is that taking the Capitol by force to disrupt the

Electoral College certification process is the ultimate

obstructionist act and indicative of a risk of future

obstructionist conduct, particularly where as here the defendant

has shown no remorse for his actions and, in fact, continues to

celebrate and tried to publicize his actions in the name of his

cause.

And on top of the charged conduct of obstruction of an official proceeding, the defendant has engaged in obstructive acts relevant to this proceeding, such as deleting evidence of the crimes he had just committed, including numerous live-stream videos from his Facebook.  The government understands from conversations with Facebook's general counsel's office that once these videos are gone they're gone unless, of course, someone happened to have recorded them, which was the case at least for a few of the defendant's live-stream videos that were posted publicly by others on the Internet.

Relevant to his obstruction risk, he admitted to his friends on countless occasions that he was evading apprehension for weeks.  He deposited items of evidentiary value, such as his laptop with footage of January 6th, with third parties.

Indeed, the government was just made aware this morning of another jail call which was provided to defense counsel immediately, as soon as I found out about this call, in which he stated he left his motorcycle jacket, which we understand he took with him to the Capitol, two knives, which again we understand he took two knives with him to the Capitol, and a firearm with the folks he stayed with upon first arriving in Vegas after leaving D.C.

In this call, he told his mother that he had let the female at this house borrow his firearm months earlier, quote months earlier, but we know that he had a pocket gun and two knives

1    with him in the D.C. area on the 6th.  And so it doesn't seem to

2    make sense that he would leave some weapons with this person but

3    not his gun, which we also know that he had.  In other words, it

4    appears he may have been lying to his mother or perhaps

5    signaling that this was the story he wanted to tell about the

6    whereabouts of his gun.

7           THE COURT:  Wait.  Ms. Arco, sorry to interrupt, but

8    this new evidence that you're presenting here, again, it's that

9    he left his jacket and two knives and a firearm with someone in

10   the Vegas area?

11          MS. ARCO:  Yes, Your Honor, and that we know that he

12   had the motorcycle jacket, two knives, and a pocket gun in the

13   D.C. area on the 6th and that it just doesn't seem to make

14   sense -- and in this phone call, he says that he let this person

15   borrow his gun months earlier, so prior to the 6th.

16          THE COURT:  So wait.  I'm confused.  In what phone

17   call?  This is a phone call from the jail to whom?

18          MS. ARCO:  From the defendant from jail to his mother,

19   and he's talking about items he deposited with a third party.

20          THE COURT:  Okay.  And he told her --

21          MS. ARCO:  He told her that he left his motorcycle

22   jacket with this person, he left two knives with this person --

23   persons actually, it's two individuals in this household, and a

24   firearm.  However, he notes in this call that the firearm he had

25   let this person borrow months earlier, our take on this is that

1    we know he had a pocket gun with him in the Capitol, likely did

2    not just leave it in a trash can somewhere.

3              THE COURT:  And what is the basis that you know he had

4    that with him in the Capitol?  My understanding --

5              MS. ARCO:  Not in the Capitol building, Your Honor, in

6    the D.C. area.  We know he had one knife with him on his person

7    on January 6th inside the Capitol.  The firearm --

8              THE COURT:  You do know that?  And what is the basis

9    of that?

10             MS. ARCO:  Credible witness testimony, Your Honor.

11             THE COURT:  And who?

12             MS. ARCO:  It's a confidential human source that at

13   this point we're not --

14             THE COURT:  Okay.  So someone has told you that he had

15   the knife in the Capitol?

16             MS. ARCO:  Yes, Your Honor.

17             THE COURT:  And did he show the knife?  Did he use the

18   knife in any way?  Or it was just --

19             MS. ARCO:  No, Your Honor, not that we are aware of.

20   We have no evidence suggesting that he wielded the knife inside

21   the Capitol.

22             THE COURT:  All right.  And with respect to the pocket

23   gun or any of the other firearms, were those, to your knowledge,

24   in the Capitol?

25             MS. ARCO:  To my knowledge, no, we have no evidence

1   that it was with him inside the Capitol, but he did bring it to

2   the D.C. area from Tennessee on January 6th.

3         THE COURT:  All right.  So this call with his mother,

4   this recent call that you've discovered is significant because

5   he is telling her one thing but telling someone else something

6   else?  Or is it just simply the fact that he gave evidence to

7   someone to keep that's relevant to this case?

8         MS. ARCO:  It's that and then -- I don't think I'm

9   making myself well understood, and that is my fault.  But the

10  other point, I guess, I'm trying to make is that because he is

11  saying that he had left this firearm with this person months

12  earlier but we know he took a firearm to the Capitol, it seems

13  like he was signaling that this is the story I'm telling, I did

14  not have a firearm with me at the Capitol but he ended up giving

15  this person a firearm.  So that is our belief, but I don't

16  have --

17        THE COURT:  Mr. Smith can correct me if I'm wrong, but

18  I have a sense from the briefing that the defense is not

19  disputing the proffer that the firearm was taken to D.C., just

20  that it wasn't taken into the Capitol, but I will let him

21  address that.  But is that inconsistent with what you think the

22  defendant's position is at this point, Ms. Arco?  I didn't think

23  they were disputing that there were guns that came to D.C., but

24  that they just didn't go into the Capitol with him.

25        MS. ARCO:  I think that's right, Your Honor.  I know

1   they're disputing that or they appear to dispute on multiple

2   occasions in the briefing that he was inside the Capitol,

3   despite surveillance footage showing him in the Capitol, but I

4   do not recall the specific point about denying that he brought a

5   gun to the D.C. area.  I believe that's right, Your Honor.

6           THE COURT:  And help me understand that point.

7   They're disputing that he was inside the Capitol?

8           MS. ARCO:  That was my take from the briefing, Your

9   Honor.

10          THE COURT:  I didn't read it that way.  But the videos

11  show him clearly inside the Capitol.  So I didn't read the

12  briefs that way.  But again, Mr. Smith can address that.

13      Go ahead, Ms. Arco.  Sorry to interrupt you.

14          MS. ARCO:  No, I understand.

15          THE COURT:  The facts are very -- there's a lot of

16  facts going on, and so I'm having a hard time keeping it all

17  straight, what actually happened and -- what was said versus

18  what actually occurred.

19          MS. ARCO:  Understood.  It's difficult for me as well.

20      And just on that point, I think I had taken Mr. Smith's

21  brief to be quibbling or at least trying to be ambivalent about

22  whether, in fact, he was in the Capitol despite surveillance

23  footage.  That was the point I was trying to make.

24          THE COURT:  I thought there was some dispute about

25  whether maybe he had forced his way in when the others were

1    trying to come in the other door.  I did pick up on that, but he

2    can clear that up.

3        So you said there are three reasons.  You said there is a

4    risk of flight, and then your dangerousness argument stems

5    principally on the risk that he will obstruct justice; correct?

6        MS. ARCO:  There's -- I would actually separate those

7    out into two separate risks, Your Honor.  So we would say that

8    there would be the obstruction of justice risk, which based on

9    case law in this circuit I understand that you could hold him

10   fully on an obstruction of justice risk, separate and apart from

11   any, you know, danger to the community concern -- that if you

12   were to find that no conditions of release would be able to

13   address that concern, you could still hold him purely on the

14   obstruction of justice.

15       So if I may just finish our argument on the obstruction

16   point.  In this same call, this jail call that I just discovered

17   this morning, he told his parents that he and his other

18   co-conspirator Mr. Nathaniel DeGrave, who is also detained, had

19   figured out a way to keep communicating with each other from

20   jail.  We know from a separate call that this mechanism was by

21   writing letters to and from or perhaps calling Mr. DeGrave's

22   girlfriend as an intermediary.

23       THE COURT:  Okay.  On that point -- and you did

24   emphasize that in your brief, I think, or--

25       MS. ARCO:  I might have mentioned it at the last

1    hearing, Your Honor.

2           THE COURT:  All right.  On this point, the fact that

3    he and DeGrave may be communicating through a third party, is

4    that -- in and of itself, that doesn't necessarily show

5    obstruction.  Is there anything about the content of those

6    messages that you know from your source or the girlfriend or

7    whoever about what they're saying?  It could simply be, "I'm

8    sorry I got you into this.  I'm going to plead guilty."  We

9    don't -- do you know what he's saying in those messages?

10          MS. ARCO:  Agreed, Your Honor, we do not know the

11   content.  I'm raising this to illustrate the point that

12   Mr. Sandlin is very savvy and has come up with creative ways to

13   communicate with other key witnesses and co-defendants in this

14   case.  That's purely the reason that I bring it up.

15          THE COURT:  All right.  But you know nothing about the

16   content?

17          MS. ARCO:  At this point, no.  We are trying to

18   determine the content.

19          THE COURT:  And to date, has there been any court

20   order that prevents him from communicating with the

21   co-defendants in this case?

22          MS. ARCO:  No, Your Honor.

23          THE COURT:  All right.

24          MS. ARCO:  We also know that he was using encrypted

25   messaging apps to communicate with his co-conspirators and

1    others about the events on the 6th prior to his arrest.  And

2    again, we would submit that he is very savvy and that these

3    actions serve as a predictor that he will attempt to communicate

4    with key witnesses in this case through third parties even if

5    instructed not to do so.

6         THE COURT:  Okay.  Let me stop you there.  On

7    encrypted messages, do you have any knowledge of the content of

8    those messages?

9         MS. ARCO:  We know that at least one point they were

10   discussing -- Mr. Colt, Mr. DeGrave, and Mr. Sandlin were

11   discussing potentially selling their footage of the event.

12        THE COURT:  Okay.  And the relevance that you think --

13   the fact that they're trying to profit off this event, the

14   relevance that the government sees with that is that it shows a

15   greater risk of flight in this case or dangerousness or both?

16     I can understand you may not like it, but how does that

17   affect the determination I need to make on risk of flight or

18   dangerousness?  Is it the Snowden point, that he is going to

19   flee to Mexico?

20        MS. ARCO:  It's partially that, Your Honor.  I think

21   Chief Judge Howell stated in the *Chrestman* case that one who,

22   particularly in these Capitol riot cases, fails to express any

23   remorse for their conduct is an additional indicator that they

24   will not be deterred --

25        THE COURT:  No, I understand that.  But profiting or

1    selling a book or, you know, writing videos, whatever about it

2    is not necessarily a lack of remorse.  We don't know what those

3    things will ultimately say.

4         MS. ARCO:  I think based on his statements to others

5    leading up to his arrest on Facebook, that he was a true

6    patriot, that what he did was a small price to pay for his

7    country, et cetera, et cetera, just shows the level of his

8    rhetoric and his determination for his cause, and therefore, it

9    seems that he would not be deterred from engaging in

10   obstructionist conduct or potentially fleeing, to my point

11   earlier, in order to continue publicizing and celebrating his

12   cause.

13   And through the use of encrypted messaging applications to

14   communicate with third parties, again, I am only bringing these

15   up to show that he is very intelligent and savvy, and to the

16   extent he were inclined to tamper with key witnesses in this

17   case, including those who have been on -- Mr. Colt has never

18   been detained in this case, has been released, and a fourth

19   individual who traveled with them who has not been charged who

20   he could seek to influence as well.

21   We're just saying that these mechanisms of trying to

22   communicate with others undetected show a future risk that he

23   may evade court orders.

24        THE COURT:  Everything you're saying to me is

25   plausible that this all could happen, but do you have any

1   evidence at all that he has in any way threatened a potential

2   witness?

3            MS. ARCO:  No, Your Honor.

4            THE COURT:  Not at this point?

5            MS. ARCO:  No, Your Honor, no evidence of any threats.

6   The leverage point that I brought up at the last hearing and

7   that Mr. Smith responded to and addressed in his briefing,

8   again, we do not yet have this footage.  We are attempting to

9   obtain the footage.  As you can imagine, there are quite an

10  amount of bureaucratic hurdles in order to obtain evidence from

11  an attorney's office.

12       My understanding when I first heard that call was that he

13  had footage of the three of them in prayer with a bible that he

14  thought would be helpful to him and paint him in a different

15  light.  He said "I also have" and then describes some other

16  footage.  I thought he was talking about two separate sets of

17  footage, but if that is not the case, he knows what he was

18  talking about, and hopefully we will know what he is talking

19  about because we will have obtained the footage through the

20  legal process.

21       That is my only other point on that, Your Honor.

22            THE COURT:  Okay.  So you're interpreting his comment

23  about leverage not to apply to the video that showed them

24  praying that there wouldn't be violence?  You think there's a

25  separate video that you're trying to obtain that will show

1     something that will suggest he is trying to pressure another

2     individual to not cooperate?  Is that --

3          MS. ARCO:  I'm not sure, Your Honor.  I don't know

4     what is on the other footage.  I just know that when I heard the

5     term "leverage" a red flag went up, and it seemed like they were

6     two separate sets of footage.  So I am not sure.

7          THE COURT:  And you say you're trying to obtain that?

8     Any idea when you might?

9          MS. ARCO:  We have requested approval to obtain it

10    from a lawyer's office.  It has to go through a certain office

11    at Main Justice in order to get that approval, and we are in the

12    process of getting that approval to get a subpoena for the

13    attorney's office, Your Honor.

14         THE COURT:  Okay.  So back again to your three points,

15    risk of flight, obstruction of justice, and then separately just

16    general dangerousness, that he might try to engage in something

17    like the January 6th events again?

18         MS. ARCO:  Sure.  So briefly, Your Honor, we believe

19    that all but one of the 3142(g) factors weigh heavily in favor

20    of detention:  The nature and seriousness of the charged

21    conduct, the weight of the evidence.

22         With respect to the defendant's history and

23    characteristics, we understand he has a limited criminal

24    history, of course, but we would submit that his post-offense

25    characteristics, which we believe reflect obstructive conduct,

1    weigh in favor of detention.

2         The crimes in this case are very serious, including violent

3    assault on federal officers and one assault that Your Honor was

4    able to witness on the videos provided to chambers.  He

5    attempted to rip the helmet off of an officer who was out-

6    numbered by the mob who was surrounding him as that officer was

7    trying to prevent further breach of the Capitol from rioters on

8    the outside.  I just don't understand why he would have done

9    this if not to attempt to injure that officer and render him

10   vulnerable and exposed.

11        Your Honor has also been provided the video showing the

12   defendant as a part of a group that overwhelmed three

13   officers -- excuse me.  With respect to the other charged

14   assault, he was the first aggressor in that group as he tried to

15   wrestle the doors to the Senate chamber open, and videos show

16   and several witnesses recall that the defendant's fist connected

17   with that officer's head.  He was ultimately successful in

18   fulfilling the breach because the doors were, in fact, opened,

19   the officers retreated, and folks indeed entered the Senate

20   chamber balcony.  Fortunately, the senators had been long gone

21   by then.

22             THE COURT:  Ms. Arco, I did see the footage, and it is

23   certainly disturbing and alarming.  I'm curious, was either

24   officer physically hurt as a result of Mr. Sandlin trying to

25   remove the helmet or the punch of the other --

1         MS. ARCO:  No, no documented medical injuries, Your

2  Honor, no.

3         THE COURT:  Okay.

4         MS. ARCO:  And Your Honor has been provided with video

5  showing the defendant as a part of a group that overwhelmed

6  three officers at the rotunda exterior doors, pushing against

7  them and forcing the doors open, a quite traumatic scene

8  allowing hundreds of other rioters to breach the Capitol.  You

9  might have noticed as well, the defendant can be seen yelling

10  throughout the scene leading up to this mob push.

11         THE COURT:  And Ms. Arco, in that video, that is the

12  video where he appears to grab the helmet?

13         MS. ARCO:  Yes.  Immediately prior to that, he is a

14  part of the crowd that slowly forces the doors open behind the

15  officers, and he is seen -- again, he is seen yelling throughout

16  the scene and appears to be riling up the crowd is our take.

17        And this is consistent with his prior call on federal

18  patriots to take the Capitol, to occupy the Capitol, with his

19  battle cry that he kept repeating on numerous occasions that

20  day, that freedom is paid for with blood.  He also has the point

21  of view of himself as a modern day revolutionary.

22        In light of his rhetoric and state of mind in which he has

23  continued to bolster his conduct as that of a patriot, as a

24  small price to pay for this country, we would submit that the

25  risk of him inciting and/or committing further violence in

1    support of his ideology is fairly high.  And this position,

2    again, we would say is consistent with Chief Judge Howell's view

3    in the *Chrestman* case cited in our briefing.

4         Finally, Your Honor, we submit that there are no conditions

5    of release that will reasonably address the risks, as I've

6    outlined.  GPS monitoring is not infallible, unfortunately.

7    Ankle monitor bracelets die.  Law enforcement and pretrial

8    monitoring is subject to human error.  And importantly, from an

9    obstruction risk perspective, Pretrial Services does not do

10   Internet or device monitoring, our understanding is.  And with

11   the composition of the defendant's parents' household, which we

12   understand is a family compound --

13        THE COURT:  Wait.  Slow down, Ms. Arco.  So your

14   understanding is that there is not the ability to monitor.  Are

15   you speaking of this district?  Because I checked, and

16   apparently, the Western District of Tennessee can do computer

17   monitoring.

18        MS. ARCO:  It was my understanding from this district,

19   yes, Your Honor.

20        THE COURT:  So Western District of Tennessee can

21   monitor the computers.

22        MS. ARCO:  Okay.  I was not made aware.

23        THE COURT:  All right.  I just wanted to make sure you

24   didn't have information different than what I had received.

25        MS. ARCO:  No, Your Honor.  That was from the District

1    of Columbia.

2         THE COURT:  If he were to be released, he would be

3    supervised by Pretrial Services in the Western District of

4    Tennessee.

5         MS. ARCO:  Understood, Your Honor.

6       Finally, the defendant is very clever, as he is able to

7    communicate with key witnesses through third parties from jail

8    and direct that items of evidentiary value should be stored from

9    jail.  We would submit that one can only imagine what he would

10   be able to do from the outside.  Therefore, we would request

11   that he be held pending trial.

12       Thank you.

13        THE COURT:  All right.  And Ms. Arco, with respect to

14   what you're concerned about that he might do on the outside, the

15   government's got some very strong evidence here of him

16   attempting to obstruct proceedings and assaulting Capitol police

17   officers.

18       Is it fair to say that your concern is that there would be

19   a potential witness that he could threaten or intimidate in some

20   way who would testify in this case?  Is that what you're getting

21   at?

22        MS. ARCO:  Yes, Your Honor, particular to nondetained

23   persons that he traveled with.  We understand -- I'm sorry.

24        THE COURT:  That would be Mr. Colt and the other

25   person he picked up at the airport?

1        MS. ARCO:  Yes, Your Honor.  We do not share that same

2   risk really with respect to Mr. DeGrave.  We understand that

3   they are already under a joint defense agreement and have been

4   communicating regularly throughout their jail stay.

5        THE COURT:  But yet, you're concerned about those

6   communications that he's having with DeGrave?

7        MS. ARCO:  Again, I think we don't know the content of

8   those communications.  It's more the clever mechanisms to

9   continue communicating with him that we believe just show how

10  savvy Mr. Sandlin is.

11       THE COURT:  Okay.  With respect to dangerousness --

12  and this is not the danger based on your obstruction of justice

13  argument but just the general danger he might present in terms

14  of any future January 6-like event.  And if you could just

15  expand on that a little bit more.  I know in the recent D.C.

16  Circuit case, *Munchel*, the Court did emphasize the transition of

17  power's come and gone, January 6th was a unique event.

18     Do you have any evidence based on any of Mr. Sandlin's

19  postings or any information that you've gleaned from individuals

20  who associated with him that he has plans to participate in

21  future protests or anything resembling the events of

22  January 6th?

23       MS. ARCO:  No evidence of any future plans, Your

24  Honor, but we would say that based on his prior conduct and

25  again his lack of remorse for his actions on that day and very

heightened rhetoric and ideology and this apparent sense of

himself as being a revolutionary and trying to change the course

of history that day, I don't think it would be out of the

question that he could be a part of something, some attempt to

do something similar in the future in support of his ideology.

THE COURT:  Okay.  Aside from communicating with

DeGrave, Colt, and this third person, do you have any evidence

he played any sort of leadership role in the events of

January 6th?

MS. ARCO:  No, Your Honor.

THE COURT:  Do you have any evidence that he is tied

to any malitia group?

MS. ARCO:  No, though I will note in one post that was

actually in Mr. Colt's complaint and, I believe, indictment

there's a photograph that -- that either Colt or Mr. Sandlin

posted on Facebook.  It's a picture of Colt holding a firearm in

what appears to be a hotel bed.  Mr. Sandlin said, "Getting

ready for the boogaloo on January 6th."  "Boogaloo" apparently

is a term for civil war that is used in some circles, and

there's a group known as the Boogaloo Boys.

There's also another post on Sandlin's Facebook.  It's hard

to tell if he posted it himself or it was reposted by someone on

his Facebook or he reposted it himself, and it appears to depict

a picture, like a cartoonish picture of the Boogaloo Boys.

Beyond that, we have no indication that he was a part of

1    any kind of malitia group.

2              THE COURT:  Okay.  And with regard to the firearms, do

3    you have any evidence that he has unlawfully possessed firearms

4    in the past?

5              MS. ARCO:  I would have to double-check, Your Honor.

6    I know the District has very stringent gun laws.  I don't

7    believe he carried -- we have no evidence that he carried it on

8    January 6th, no evidence that he carried it in the District on

9    January 5th, but we know he was, of course, in transit with it

10   from Virginia into the District where he stayed very, very

11   briefly at an Airbnb in D.C., and then they ultimately went to a

12   hotel in Maryland.  And so whether or not that carrying of his

13   gun violated D.C. laws on that, I unfortunately don't --

14             THE COURT:  What about in his past when he lived in

15   D.C. or in Las Vegas?  Any of those --

16             MS. ARCO:  We are not aware of any such illegal

17   possession of firearms, Your Honor.

18             THE COURT:  All right.  He has -- aside from a DUI

19   arrest in, I think, 2003, some years ago, he has no prior

20   criminal record.  Are you aware of any violence in his

21   background apart from January 6th?

22             MS. ARCO:  We heard from a witness that he is

23   frequently confrontational -- excuse me, confrontational and

24   frequently armed, but other than that, no, Your Honor.  I don't

25   have details or examples of what they meant by

"confrontational."

THE COURT:  Do you know, does he have a permit to carry a firearm legally?

MS. ARCO:  I am not sure, Your Honor, but my understanding is that yes, he did have a permit, and that's just based on -- I'm sorry.  There was an amount of feedback.

My understanding is that he likely has a permit just based on his openness with which he puts on his Facebook that this is his everyday carry, et cetera, et cetera, and that was in the briefing.  But that's just an assumption, Your Honor.  I don't know that for sure.

THE COURT:  All right.  And your concern, which I do share, about the deletion of some posts and videos, this is on Facebook?

MS. ARCO:  Yes, Your Honor.

THE COURT:  And so the government has been able to retrieve the posts but not all of the videos because -- or none of it?

MS. ARCO:  None that have not been submitted via tipsters who contemporaneously recorded, screen-shotted these videos and evidence or that, you know, were posted publicly by others to the Internet.  For example, there are videos of him from his Facebook that were in a *New York Post* article.  Someone else on Twitter, I believe, also had videos of him from his Facebook as well before he had the opportunity to delete them or

because someone else had contemporaneously recorded them.  But they did not show up on his Facebook return.

THE COURT:  The evidence that the government has presented that showed that he criss-crossed the country, and I think your evidence is quite strong that, regardless of whether he knew there was a warrant for his arrest, that he was trying to avoid being arrested and appreciated that there was a high likelihood he would be, but isn't that evidence -- you've mentioned that as one of the grounds for your concern that he will obstruct justice, but isn't that really evidence that I should be considering in assessing whether he is a risk of flight?  Isn't his own flight relevant to his risk of flight as opposed to his obstruction of justice in these proceedings?

MS. ARCO:  Oh, absolutely, and I'm sorry if I misstated that or was not clear on that.  We absolutely believe that that evidence shows that he has demonstrated, in fact, a risk of flight because he did, in fact, flee.  And all of that evidence, Your Honor, came from his Facebook account and from private messages with others that he did not believe for whatever reason those came through, and then also throughout some of those conversations with those individuals he is speaking with after the 6th, sometimes he directs them to download the Wickr encrypted messaging app so they can continue speaking presumably more freely about either what he's doing or the offense of the 6th.

1          Based upon the context, it seems pretty clear.

2          THE COURT:  Am I correct that you stated that you did

3     have some knowledge that some of the encrypted messages related

4     to these efforts to get publicity or a book deal or something

5     like that?

6          MS. ARCO:  Yes, based on the order of the

7     conversation, they're clearly talking about the footage and

8     attempting to sell the footage, and then the conversation -- or

9     chat over Wickr, basically let's continue the conversation over

10    an encrypted messaging app.

11         THE COURT:  But when they've said let's continue the

12    conversation over whatever encrypted app, aside from discussing

13    book deals and related other opportunities, you don't have any

14    other information about what they may be saying on these

15    encrypted apps?

16         MS. ARCO:  No, Your Honor, we don't.  The only thing,

17    as I mentioned before, we are aware that Mr. Sandlin discussed

18    with Mr. Colt and Mr. DeGrave at one point this effort to sell

19    the footage.  But that is the only content of which we are aware

20    that occurred on these other encrypted messaging apps.  The

21    other is based on what we understand from the context of

22    conversations that occurred on Facebook.

23         THE COURT:  All right.  And you have stated your

24    concern about risk of flight.  Aside from his criss-crossing the

25    country, which is significant, do you have any other reason to

1    believe that he is likely to flee the country, other than the

2    fact that he does have the ability to go to Mexico?  He

3    certainly doesn't appear to have the financial means to run, but

4    you're concerned that he will get a book deal and, therefore,

5    have a lot of money?

6           MS. ARCO:  That is one option, yes, Your Honor.  And

7    given this possibility and given the incredible tax burden he's

8    facing, given his state of mind, his rhetoric, it would -- as I

9    mentioned before, it wouldn't surprise me if that was a route he

10   decided to take, particularly given his exposure, his criminal

11   exposure, his civil exposure, and just where his state of mind

12   appears to be at recently, in his recent history.

13          THE COURT:  Anything else, Ms. Arco, you would like to

14   add?

15          MS. ARCO:  No, Your Honor.

16          THE COURT:  Okay.  Mr. Smith?

17          MR. SMITH:  Yes, Your Honor.  Should I address

18   Ms. Arco's points?

19          THE COURT:  It would be helpful particularly for you

20   to address those points that -- the new points she has raised

21   today and some of these areas that we've discussed.  I can

22   prompt you with questions if you don't remember them all.

23          MR. SMITH:  I scribbled down everything she said.  I

24   can go through it.

25          THE COURT:  I've read all the materials you've

1   submitted.

2           MR. SMITH:  I know you have.

3           THE COURT:  We can do it either way.

4           MR. SMITH:  Let me do it this way, then.  I will try

5   to address the points she made as best I can.  And it seems that

6   risk of flight is probably something that is concerning Your

7   Honor, and that's the first reason she brought up for why he

8   should be detained.

9       This thing of being the new Edward Snowden seems fairly

10  preposterous to me.  He was born in Mexico, but he left as an

11  infant, was adopted in this country.  He has lived in this

12  country all of his life.  He has no connections to Mexico except

13  a birth mother that he hasn't seen in 33 years.  So the idea of

14  him fleeing to Mexico seems fairly farfetched.

15      He has very loving family, they're undoubtedly listening in

16  to us now, here in the Western District of Tennessee.  He's

17  lived in Long Beach, California, and then Las Vegas the entirety

18  of his life.  That's where all his friends are, and apart -- and

19  his parents are actually from there, too.  It's only recently

20  they've moved to the Western District of Tennessee.  But this is

21  where his connections are.  This is where his life is.

22          THE COURT:  In the Western District of Tennessee or

23  Long Beach?

24          MR. SMITH:  Really, he was born -- when he was

25  adopted, he went to Long Beach as a child, and that's where he

was raised.  His dad was an aerospace engineer in Long Beach, and his mom is a Lutheran school teacher.  He was raised by them.  And then when he became an adult and moved out of the house, he lived for a while with his girlfriend in Long Beach, and then they moved to Las Vegas, which I think is about four hours away from Long Beach, and that's where he spent the past five years up until just very recently.

He went through a bad patch, and just before last summer, I guess, he decided to go live near his parents in Memphis.  His grandfather, who also lives with his parents, was dying.  So he decided he wanted to go be near them.  He got an apartment in Memphis, but then he wasn't there very long.  His grandfather passed away, and he decided to moved back to Las Vegas and began making plans to do that.  I think he realized that's sort of where his life was.

And he had put those plans into place even before January 6th.  He was looking at listings, and it's in the Facebook chats, looking at listings for apartments.  He bought a trailer to move his stuff.  This was all before January 6th.

But what I'm asking -- he doesn't have a place right now in Las Vegas, and his parents live -- and he was living with them. When the events of January 6th happened, he was in the process of moving back.  That's where I would ask Your Honor to put him. I think there's a number of advantages to that.  One is they live kind of out in the middle of -- what they call the middle

1    of nowhere.  It's near Memphis, but it's considerably on the

2    outskirts.  I'm avoiding saying the town because I know people

3    are listening, but it's a very small town about 50 miles outside

4    of Memphis.

5        He could be monitored with electronic monitoring.  I'm very

6    glad to hear that the western district would have the ability to

7    put devices on his computer to monitor his Internet activity,

8    and we, of course, would have no objection to those.  We can

9    understand how Your Honor would want that.

10            THE COURT:  Is he -- sorry to interrupt, Mr. Smith.

11   Is he working right now?

12            MR. SMITH:  Yes and no.

13            THE COURT:  Not at the moment, but if he were

14   released, would he intend to work?

15            MR. SMITH:  Yes, he would.  And that's another thing

16   with the computer.  His area of expertise is online businesses.

17   He, obviously, has this huge tax burden, but he had a very

18   successful business doing online marketing, and that's what he

19   would do now.  He's already -- he was lining up something to do

20   more online marketing.  I could explain the details of it if

21   Your Honor is interested.

22       But this is what he has done really -- I mean, it all

23   started really, the way he explains it to me, when he started

24   this bike non-profit when he was just moving out of his parents'

25   house as a very young man.  He got involved in starting this

non-profit for bicycles, to help homeless and low-income people
where they got bikes and gave them to people and trained people
to be bike mechanics.  The whole idea was to uplift the
community, and he was good at it.  He got an arts college to
donate an abandoned building.  He was -- using the Internet and
stuff, he got people to contribute bikes and bike parts.  He was
very savvy at this kind of stuff.  So he was able to get this
nonprofit, him and a friend, up and running.  It's still in
existence today.  You can look it up, Pedal Movement.  It's an
impressive place and really is something to really uplift the
community.

        So he sort of developed these skills and took them and
developed this online marketing, which for quite a while was a
pretty successful business.  He did have a bad downturn in
business which undoubtedly is why he's got this heavy tax
burden.  At one point he was employing -- I think he told me he
had seven or eight employees and was running a $50,000-a-month
payroll.  So it was a significant business.

                THE COURT:  And that turn for the worse occurred,
what, several years ago?

                MR. SMITH:  I think more recently.  Mr. Sandlin can --

                THE COURT:  My understanding from the Pretrial
Services report in Las Vegas is that the tax bill related to, I
don't know, 2017 or 2018, something like that, the $500,000 tax
bill.

1          MR. SMITH:  I'm sorry, Your Honor.  I don't know.  If

2    that's what Your Honor read, I'm not disputing that.

3          THE COURT:  I can't recall.  I don't have it right in

4    front of me, but I was thinking it was a few years ago.

5          MR. SMITH:  That could be.  I'm just going by what I

6    was told.  I've never seen the bill.  The way I understood it is

7    his business kind of took a downturn within, I thought, the

8    fairly recent past.

9          And what he would do now, what he was planning to do was to

10   start another more modest online marketing company.  He's got

11   several -- it has to do with developing athletic and leisure

12   wear that he would work on, and he's got inventory --

13         THE COURT:  Not to interrupt you, but my law clerk

14   tells me that Pretrial Services said the tax bills were from

15   2015 to 2016.

16         Despite the tax bill, Mr. Smith, your understanding is he

17   continued to have a striving business after that that took

18   another hit with the pandemic?

19         MR. SMITH:  I guess.  I didn't realize the tax bill

20   was that far.  Maybe he didn't pay his taxes and that's what

21   sort of helped to cause the business to go under, not having

22   paid the taxes like he was supposed to during that period.  I'm

23   sorry, Your Honor.  I just don't know.  That would make sense to

24   me, but I'm speculating, I suppose.

25         THE COURT:  What kind of assets does he have right

now?

MR. SMITH:  Not very many, Your Honor.  He's got a truck, his personal belongings.  That's really all I can think of off the top of my head.

THE COURT:  And how had he been living before his arrest?

MR. SMITH:  He was doing this business that I was telling you about, this online marketing business.  I think he might have been getting unemployment for a while, too, but he was trying to start up this online marketing business that had to do with athletic and leisure wear.  He was making some money doing that, but it wasn't particularly successful.

But he's hoping if he gets out he can get that to grow.  I mean, he's a man of -- that's what he would propose.  If Your Honor would like for him to try some other employment, I'm sure he would try, but that's what he's good at, and I think it could probably generate income for him.

I feel like I've run off course here.

THE COURT:  I'm sorry.  I interrupted you.  Go ahead and take a look at your notes.

MR. SMITH:  I was talking about the flight risk.  I don't think he's Edward Snowden, and I don't think he's going back to Mexico.  I know the government thinks that he criss-crossed all across the country and that he was, you know, trying to evade arrest.  I think it is important to note that he

didn't know there was a warrant out for him.  He was, obviously,
suspicious that there might be, but he didn't know, and there's
no way he could know.  It was under seal.  And the Facebook
messages show that he's unsure if there's a warrant out for him.
He's asking people for advice about how to find out if there's a
warrant.

THE COURT:  Don't you think the Facebook postings show
he is clearly trying to avoid law enforcement?  Whether there
was a warrant or not, he's saying, "You're not harboring a
fugitive.  I don't have a warrant yet."  He's not voluntarily
surrendering.

MR. SMITH:  No, but he's not clear there's anything to
voluntarily surrender to.

THE COURT:  Other individuals came forward and said,
"Is there a warrant for me?"  He certainly could have and didn't
do that.

MR. SMITH:  I agree, Your Honor, and Ms. Arco sent me
the phone call that she was talking about earlier today with the
firearm that was in somebody else's custody.  Part of the end of
that conversation, Mr. Sandlin is talking about how he got
advice from this friend Keith, who I understand is a guy who
works for a law firm, he's not a lawyer, about how they probably
wouldn't be going after what Mr. Sandlin in the phone call
refers to as the higher marquis guys and that he, therefore,
thinks -- he, therefore, thinks there's a chance that this whole

thing might blow over.

This is not a guy who is trying to avoid a warrant that he thinks is out there.  It's a guy who is trying to lay low in the hopes that there isn't a warrant and that there never will be a warrant.  I do think that's different than trying to flee justice or flee the consequences.  And even in the Facebook chats, he talks about how he is going to have to pay the price, he recognizes that, for his actions.  That's not a man who is trying to flee justice.

But there is a difference.  There is a difference between hoping there's no warrant and hoping that there will never be a warrant and laying low and actually thinking there is a warrant out there for you and running from it.  I think there's a categorical difference.  Yeah, it would be better if he had maybe gone and turned himself in, but that's asking a lot of someone sometimes.  What if there is no warrant?  What if you're not a suspect and you turn yourself in and all of a sudden you advertise that you're a suspect?

So it's not an illegitimate thing for him to think, especially since he didn't know there was a warrant out there for him --

THE COURT:  Once the *New York Post* article came out with the video of him and all of that, is that not when he started deleting stuff?

MR. SMITH:  You know, I'm not sure about the timing on

1    that.  I haven't been able to find deletions with the Facebook

2    return that Ms. Arco has sent to me.  I've been able to find

3    three messages that he has unsent, but I don't see any evidence

4    of deletions.  I'm not sure they would even exist.  I think the

5    only reason the government even knows that there may have been

6    deletions are that tipsters saw like videos of what we're

7    talking about really, tipsters had seen videos apparently on his

8    Facebook page and had downloaded them and put them on media or

9    turned them over to the government.  And then so the government,

10   when they get the Facebook return, is able to say we've got

11   these videos from tipsters, and they're not on Mr. Sandlin's

12   Facebook return, therefore he must have deleted the videos.  I

13   mean, I think that's their logic.  And they're trying to say

14   well, there may be other videos out there, but there may not be.

15           THE COURT:  Mr. Smith, sorry to interrupt.

16       Let me ask Ms. Arco, did I not read in your brief that

17   after the *New York Post* article he deleted evidence?  Was it not

18   as clear as I seem to recall?

19           MS. ARCO:  I would have to -- I can briefly review --

20           THE COURT:  Regardless of what your brief stated or

21   how I could have misconstrued what you said, do you have any

22   evidence about when exactly he did remove the posts that you say

23   were at one time on his Facebook page and then no longer there?

24   Do you have any sense at all of when he removed those, from

25   witnesses or otherwise?

1          MS. ARCO:  Yes, Your Honor.  So in the Facebook

2     return, there are some public posts where other users, his

3     Facebook friends are commenting on him having taken down videos

4     that were, you know, publicizing his illegal conduct in the

5     Capitol that day.  That appeared to occur fairly immediately

6     after January 6th, so in the 24 to 48 hours in terms of the

7     actual videos.

8          So I do believe that there are, as Mr. Smith flagged,

9     evidence of where he sends a message to someone and then unsends

10    it, unsends it is how it appears in the Facebook return, which

11    is, we understand, when someone deletes their message after

12    they've sent it.  And I believe that occurred in the later days

13    and weeks after, but I can --

14          THE COURT:  It's not critical.  I had thought that it

15    was tied to the *New York Post* article.

16          And the only point I'm making, Mr. Smith, is at least as of

17    that time it's clear to him that he is a likely target of the

18    investigation, and he continues at that point to duck and hide;

19    right?

20          MR. SMITH:  I guess, Your Honor, but I mean -- and

21    back to the deletion thing, Ms. Arco said they can tell by

22    Facebook friends commenting on what appears to be a video or

23    something that got deleted.  It's not Facebook friends exactly.

24    It's people who are seeing it on Facebook, and some of the

25    comments are pretty hostile.  Even if he took videos down, it

1    might not be because he is trying to avoid law enforcement

2    seeing them; it's he is trying to avoid being harassed on

3    Facebook.

4         THE COURT:  No, I get that point.  I'm just making the

5    point about moving around the country at a time when he knows

6    that he is likely to be arrested.  At some point it's pretty

7    clear that he's not a little guy anymore when he's highlighted

8    in that article and he's aware of it.

9         But I get your point that his deletions may have been to

10   destroy evidence but they may also have been to take him out of

11   the public eye and he was getting harassed because of them.

12        MR. SMITH:  There's actually no evidence that anything

13   was actually -- I mean, the videos that they can tell are not

14   there anymore are videos that are out there in the public

15   domain.

16        THE COURT:  Sorry.  I didn't hear the beginning of

17   that.

18        MR. SMITH:  The videos that they say they know he's

19   taken down from Facebook or they say they know he's taken down

20   from Facebook are videos -- the only way they know it is because

21   those videos are out there in the public domain, and they can

22   compare them to what's on the Facebook return.  So it's not like

23   they got destroyed.

24        THE COURT:  Well, there may -- Ms. Arco's point is

25   they don't know what they don't have.  But they've got pretty

 1    strong evidence, video evidence of him in the Capitol to prove

 2    their case.  I get that point.

 3        My biggest concern here, Mr. Smith, is the potential that

 4    he might obstruct justice in some way.  I do think there's a

 5    flight risk, too.  I think that probably could be mitigated

 6    through electronic bracelet and a third-party custodian, at

 7    least one.

 8        I mean, the Edward Snowden point is an interesting one.  I

 9    don't know that the government has convinced me of that based on

10    what they've said so far.

11        But the real issue in my mind is, is he going to be a

12    danger to the community and, in particular, threaten or

13    intimidate any potential witnesses in his case.

14            MR. SMITH:  If I may, may I ask Your Honor what

15    makes -- I don't think he will do that, but is there some

16    specific --

17            THE COURT:  Well, it's the evidence -- the encrypted

18    messaging, for example, that's concerning.  I do think the fact

19    that the Western District of Tennessee can monitor his computer

20    is helpful, but how sophisticated is he with computers and --

21            MR. SMITH:  I don't know.  I mean, I think he is, to

22    some extent, computer savvy.  I don't know.  I have had child

23    pornographers who are very tech savvy on supervised release, but

24    I know the Probation Office can monitor their activities, and

25    that does seem to work.

1        THE COURT:  Mr. Smith, can you turn up your volume a

2   little bit?  I'm having a hard time hearing you.

3        MR. SMITH:  I'm sorry.  People usually tell me to turn

4   down my volume.  I apologize.

5        THE COURT:  I can hear you now.

6   Mr. Smith, you've presented a number of compelling letters

7   from friends, from co-workers, mentees, family members that

8   present a very different picture of Mr. Sandlin.  He has no

9   prior criminal record.  He has no violence in his record that I

10  am aware of.  Help me understand what happened to him.

11       MR. SMITH:  That, I don't know, Your Honor.  But I

12  think you're on the right track, though.  And here's what I

13  think, I mean, especially when you look at who Mr. Sandlin is

14  prior to January 6th and especially when you look at the events

15  of January 6th, even in the Facebook chat and preplanning, yes,

16  they're coming to D.C. to participate in a protest, but even the

17  flyers that they're putting out from the 5th and the 6th in the

18  Facebook chat are all flyers for legitimate events, rallies on

19  the steps of the Capitol, steps of the Supreme Court, steps of

20  the Lincoln Memorial.

21       It appears they're coming to D.C. -- and I know the

22  government talks about how they loaded up paramilitary gear and

23  all that, but even the Facebook chats, clearly he's joking about

24  that.  They say maybe he carried a knife into D.C.  They don't

25  explain what their source is for that.  They don't explain what

kind of knife.  Even they admit -- even they admit they don't

have any evidence that he had a gun, and I think they even have

evidence that he didn't bring a gun to D.C., and he didn't.

But he came to D.C. to participate in the protest.  He

wasn't loaded for bear.  He wasn't wearing protective gear.  He

didn't have weapons.  He wasn't looking for a fight or looking

for --

THE COURT:  But he did -- did he not bring the weapons

to D.C. and some other items?

MR. SMITH:  They say he did.  They say they have, I

guess, a witness who says he brought these things to the D.C.

area, and presumably, it's the same witness who says that he had

a knife in D.C., which leads me to conclude that the only

evidence they had he brought anything into D.C. is that knife,

and they don't even say what kind of knife.

THE COURT:  But do you dispute any of that proffer by

the government?

MR. SMITH:  I don't dispute it, Your Honor.  I guess

I'm not going to agree to it.  But I don't have any reason to

think it's not true.  I'm not trying to say that.  But I don't

know what the source is.  I understand from Ms. Arco today that

it's a witness whose identity they don't want to reveal.  But I

don't know if it's an eyewitness or an ear witness or what the

basis of knowledge is beyond that.  But I'm not disputing that

at this point, that they may have brought this stuff into

1    D.C. -- not into D.C., excuse me, into the D.C. area.  But I

2    think the evidence is he didn't bring anything into D.C.

3        I guess the bigger point I'm trying to get to is I think he

4    came here to D.C., not for a fight, not to get into a fight, not

5    to get hit, not to hurt anybody, but to participate in the

6    protest.  It's clear from those flyers I put in one of my

7    filings.  They're interested in these events on the 5th and the

8    6th that are legitimate-seeming events.  I mean, people are

9    speaking, high-profile people, and they appear to be, I'm

10   guessing, legitimate permitted events.

11       And that's clearly his mind-set as of the 5th and probably

12   going into the morning of the 6th.  I know on the 6th they have

13   the video at TGIF where he says -- he starts talking about we

14   may have to occupy the Capitol, but that's clearly -- from the

15   video, it's clear he has been to the mall, been to the rallies,

16   and has heard something that's -- that's the first time he's

17   ever said anything about occupying the Capitol or doing anything

18   illegal.  It's on January 6th.  And then, of course, the events

19   unfold at the Capitol.

20       And then after the --

21           THE COURT:  Mr. Smith, there is this documented

22   evidence that they talk about buying all this gear; right?

23           MR. SMITH:  The Facebook chat, yes, Your Honor.

24           THE COURT:  So if you give him credit that he didn't

25   go into the Capitol with any of these guns or whatever other

1    gear they brought with them to D.C., how can I be convinced that

2    if he's on release, whatever changed with him in the last year

3    or so, that there's not a risk that he is going to conduct

4    himself as he did on this occasion?  That's the concern.

5         MR. SMITH:  And I understand that, Your Honor.  The

6    point I was trying to get at, he does seem to me precisely one

7    of those people that got swept up into the events of

8    January 6th.  When he came to the Capitol, even on the 5th, the

9    morning of the 6th, he is not thinking about engaging in any

10   kind of illegal activity.  It's only during the events of

11   January 6th that he gets caught up in all of this and goes

12   forward and then, according to the videos, goes into the Capitol

13   and all that.

14        THE COURT:  There was a level of planning ahead of

15   time; right?  It wasn't like it was spur of the moment.

16        MR. SMITH:  No, they were planning to go to the

17   Capitol to participate in the protests that were going on, not

18   in the illegal protest but in like the flyers say, the events

19   that were scheduled for the 5th and the 6th of January.  That's

20   what they're sharing even as of the morning of the 6th, are the

21   flyers for these events, and that's what their plan was.

22        And certainly for Mr. Sandlin's -- I mean, he wasn't

23   wearing any protective gear or anything trying to protect

24   himself.  That's what he was planning to do.  Something happened

25   there on January 6th while he was at the mall that got him

started down this road.

THE COURT:  Correct me if I'm wrong.  I think the government's proffered that they brought guns, ammunition, bear mace, stun gun, body armor, baton, walkie-talkie, and knives to D.C.

MR. SMITH:  D.C. area.

THE COURT:  Right.  So that's not going to a rally.

MR. SMITH:  No, but they didn't bring it into -- there's no evidence --

THE COURT:  My only point is, contrary to what you're saying, it's like he had a change of heart perhaps that day that he's not going to do the more extreme stuff that he was thinking about doing perhaps before, or else why would he have brought the stuff.  Right?

So I don't think he's like these folks that got swept up in that very moment.  To the contrary, I think he's one who might have put on the brakes when he got here and said I'm going to not take the weapons, that's too risky, but he was still pretty revved up and was certainly very aggressive once in the Capitol, the way in which he interacted, berated, and assaulted the Capitol police officers.

MR. SMITH:  That's an interesting point, Your Honor. I hadn't looked at it that way.  I mean, I hear what you're saying.  On the other hand, if he did show that kind of restraint where he put the brakes on and didn't bring the stuff

into D.C., that says something kind of important about him, too.
It does show a degree of restraint and a degree of ability to
control his actions, which I think may actually inure to his
benefit.

THE COURT:  To his credit, the government says they
have no evidence, at least they haven't presented any or are
unaware of any at this point that he is tied to any of these
sort of malitia groups, but he did buy into some of this QAnon
conspiracy stuff.

So again, what -- his mental state, I appreciate that his
parents stand behind him and they're supportive and they're very
reliable people who are willing to step up and serve as a
third-party custodian, and I appreciate I could release him on
electronic bracelet.

But to what extent can I be assured that he's not going to
do something off the wall?  And his mental state, I know he's
struggled with depression.  This seems something more than just
depression.

MR. SMITH:  Your Honor, I guess all I can say is that
I do think there are conditions of release that you can put in
place to mitigate the danger, especially the monitoring of the
computer.  If he is going to engage in any of these kinds of
activities in the future that Your Honor is worried about, he is
going to have to do it on the Internet.  I can't imagine another
way to do it.  All of this stuff seems Internet based.  And

having that monitoring on the Internet, I think, would provide a

significant degree of assurance to Your Honor.  I'm very glad

that the western district can do that.  That's the way I think

Your Honor can be sure.

I mean, I know Mr. Sandlin has told me numerous times that

he's done with politics and that he doesn't -- that's what he

tells me, and I believe him.

THE COURT:  Does he express remorse?

MR. SMITH:  Yes, Your Honor, he does.  He feels

like -- well, he feels like he got swept up in things and that

he's ruined his reputation and that it's going to be really hard

for him to rebuild his life.  He's expressed that to me a number

of times.  And he does want to -- that's what he's talked to me

about.  He just wants to be able to rebuild his life and put

this behind him.  He's said on a number of occasions he's done

with politics.  I think he feels like he got, I don't know,

manipulated or he bought into something he shouldn't have bought

into, and he kind of almost feels ashamed for what happened.

THE COURT:  Tell me your perspective about this

transcript that I haven't seen about this most recent call

regarding the knives and firearm and jacket.  Is that evidence

that he has hidden?

MR. SMITH:  No.  I only got to listen to it for like

one listen-through, and I was doing other things.  Apparently,

in the phone call, he says -- I think it's to what would be his

mom, that he has stuff, including a firearm, with people he identified as Nate and I believe it's Keith, and he wants his dad to get the firearm, and I think he wants his dad to come and get his truck and get the firearm.  And in the phone call, he says, "The reason I want you to have the firearm is because if I get released they're going to want me to turn over my weapons, and I want to have the weapons to be able to turn over to them. I don't want them floating out there with other parties."  He explicitly says that on the phone call.  Being a responsible gun owner, he even gives his mother elaborate instructions about how you are supposed to transport a firearm.  You're supposed to put it in a case, lock it, take the bullets out, and then you're supposed to put that in a locked compartment in the trunk to make it legal to transport in that area, I guess Nevada and California.

But that's what the gun is all about.  I don't know about this well, he said he loaned it to him two months earlier and he's signaling that this is a fake story that they can tell.  I mean, he's talking to his mother, and she's not going to be party to some fake story.

And that's what he's talking about.  He's talking about getting this firearm to his dad so that he can turn it over -- turn it over to the police because he knows if he gets released he is going to have to turn over his firearms.  That's what it's all about.  That's it.

1    THE COURT:  Ms. Arco, I have not seen the transcript.

2  Do you disagree at all with the way in which Mr. Smith is

3  paraphrasing it?

4    MS. ARCO:  I don't think what he said just now about

5  the gun and directing his father to pick up the gun so that he

6  could self-surrender it should he be released, that is -- that

7  is accurate.  Again, my point was he deposited, we believe,

8  evidence of items that were with him in D.C. in January with the

9  individuals, actually the female and one of the males, and that

10  was his first stop in Vegas after he -- when he went straight

11  from D.C. to Vegas, and that we think that the knives that he

12  deposited with the person, that they are the knives he brought

13  with him to D.C.

14    THE COURT:  Doesn't the government concede that

15  ultimately his plan was to move to Vegas?  Would it not make

16  sense to leave these things in Vegas if that's where you

17  anticipate you're moving to?

18    If he's trying to get them to give them back and surrender

19  them, it's hardly evidence that he is trying to obstruct justice

20  in this case at this point.

21    MS. ARCO:  We would say that when he gave them to

22  these folks, it was in the couple days after the riot and that,

23  obviously, he has had a lot of time in jail to think about what

24  he wants done with these items of evidentiary value.  At the

25  time that he went there, he apparently didn't know if he was

1     going to be detained or not, and so therefore, he laid low.

2          THE COURT:  Did he have an apartment or some other

3     place that it would have been natural to take them?  Where was

4     he supposed to leave those at that time?

5          MS. ARCO:  I don't have an answer to that, Your Honor.

6     I just know he deposited them with third parties and then

7     continued to move around.

8          THE COURT:  All right.  I get your point about the

9     flight risk completely.  I don't get the point about the -- that

10    this is further evidence of obstruction given that he was moving

11    to Vegas, didn't have a place in Vegas to leave them, and now at

12    this time is telling his mom to get them so that he can turn

13    them over.  That doesn't seem to me very strong evidence of --

14    convincing evidence that he is going to obstruct justice in this

15    case.  To the contrary, it seems like he is waking up to what he

16    needs to do.

17      Mr. Smith, any other points you would like to make?

18          MR. SMITH:  No, Your Honor, I guess not.  I would be

19    glad to answer any questions.  I know Ms. Arco made a lot of

20    comments.  I don't feel like I responded to all of them, but I

21    don't want to be bringing up stuff that's not of concern to Your

22    Honor either.

23          THE COURT:  Well, I do -- to the extent you have more

24    points to make, I certainly want to hear them.  I think that

25    there's a lot to consider here.  And most significantly, I'm

having a very hard time reconciling Mr. Sandlin before the months leading up to January 6th and -- until that date and then Mr. Sandlin before that.  These letters are quite extraordinary and the degree to which they say he has helped other people and has been a model citizen.

Now, the tax stuff is a problem for sure, but he has done a lot to help, you know, ill family members and underprivileged kids and people who don't have jobs and animals, and he's done a litany of good works and seemed to have a fairly successful business with this -- the one question neither side has been able to give me much information on, which is the tax debt.  Any more light you can shed on that, Mr. Smith?

MR. SMITH:  No, Your Honor.  I'm sorry.  I haven't had an in-depth conversation --

THE COURT:  Mr. Sandlin is raising his hand.  Do you feel comfortable having him sharing?  Do you want to be put in a breakout room?

I am curious what happened.  My sense was this was tied to the pandemic, but then I just only saw the Nevada Pretrial Services report today, and when I saw the dates were several years ago, it didn't really add up with what I understood the facts to be.

So Mr. Hopkins, could you facilitate a brief breakout with Mr. Smith and Mr. Sandlin?

THE COURTROOM DEPUTY:  Absolutely.

1        MR. SMITH:  Thank you, Your Honor.  I appreciate that.

2     (Defense counsel and defendant conferred.)

3        THE COURT:  All right.  Mr. Smith?

4        MR. SMITH:  Thank you, Your Honor.  I appreciate you

5  doing that for us.

6     As far as the tax goes, Mr. Sandlin said with his business

7  it was doing well, but he made a risky investment at that time

8  that didn't pan out, and that caused him to fall behind on his

9  taxes, and that's why the business -- he said it sort of slowly

10 went down from 2016 until now, more of a slow decline, but he

11 got behind on the taxes because of a risky investment, and

12 that's what that had to do with.  I'm still a little unclear on

13 it, but that seems to be the general drift of things.

14     I do know that Mr. Sandlin expressed to me, and I'm fine

15 with it, that he wanted to address the Court and maybe answer

16 some of Your Honor's concerns about sort of his state of mind.

17        THE COURT:  All right.

18        THE DEFENDANT:  Thank you, Your Honor, for allowing me

19 to make this brief statement.

20     The purpose of my statement is to give insight into my

21 character and my state of mind to hopefully give you a solid

22 understanding of why I believe I should be awarded pretrial

23 release.

24     As talked about in this hearing, I was born in Mexico, but

25 currently, I have no ties to Mexico.  I barely speak Spanish.  I

have worked very hard to give back to my country and my

community, as my character letters show.  I have never been a

violent person.  I have never engaged in violence of any kind,

as my criminal record proves.

I'm confident I'm an excellent candidate for pretrial

release because of my lack of criminal history, excellent

character, and my deep respect for law and order.  If granted

pretrial release, I plan on using that time to rebuild my

business, my reputation, and my life.  I also plan on giving

back to my community in whatever capacity I am able to.

My reputation, which I carefully cultivated over many

years, has been ruined, and this pretrial release will give me

an opportunity to start the arduous, difficult, and painful

process of putting my life back together and reintegrating

myself as a contributing member to society.

Now, I understand Ms. Arco's job as a prosecutor is to make

me out as the domestic Osama Bin Laden and a flight risk, but I

can assure you and the Court that I am no danger to the

community.  I am no criminal mastermind.  And I most certainly

am not a flight risk.

The reason why I am not a flight risk, Your Honor, I

currently do not have a passport.  I am willing to submit to

ankle bracelet monitoring.  There is zero risk of me illegally

removing the ankle bracelet because I am acutely aware that the

FBI has the capability of tracking me down without an ankle

bracelet.  And I do not intend to test their ability.  I do not want to add fuel to the fire.  I just want this ugly chapter of my life to be over with as quickly as possible.

Also, due to the high-profile nature of my case, if I did try to flee, I would be all over the news and identified quickly.  I have an unmistakably large, fat, ugly old man head that sticks out like a sore thumb in the rural areas of Memphis, Tennessee, where I will be residing.  So how could I possibly be considered a serious flight risk?

On top of all the reasons just stated, I will be under the custodianship of my loving parents who live in a rural part of Tennessee where I will have limited interactions with the general public, and I will be spending most of my time with goats, chickens, and cotton fields.

I'm also willing to submit to web monitoring to show that I am not organizing or planning any sort of event or rally.  I have no machinations of becoming an activist in exile.  I'm done with politics, and I just want to focus on rebuilding my life and fighting my case.

The prosecutor quoting me saying that I have leverage, the context of that conversation is that I have leverage to proffer to the prosecutor in the form of evidence that will help me win my case.  I have no intention of obstructing justice, nor do I have the capacity to obstruct justice.  I do not possess the power, resources, or intimidation to do such a thing.  Like I

said before, I believe by committing to web monitoring that will

mitigate that risk and prove to the Court that I have nothing to

hide.

Your Honor, I currently sit in a cell alone for 23 hours

per day with very little interaction with any other inmates.  If

I'm not granted pretrial release, I'm looking at the prospect of

a year or more of what I consider to be considerable mental

torture.

Furthermore, recently, a fellow inmate, Ryan Samsel, who

was involved with the January 6th event, was severely beaten by

a corrections officer.  Ryan is now blind in one eye, suffered

skull fractures, a broken jaw, and a detached retina.

Myself and other inmates have been threatened with violence

from the staff here, and although we've made our complaints

through every channel made available to us, nothing has been

done, and the officers who are responsible for this heinous

crime are still the very officers who are currently tasked with

guarding us.  My own case manager said "welcome to jail" when I

brought up this violent incident to her.

Just this last Friday, an officer took down Richard

Barnett, a 60 year old man, by tackling him to the ground

because he dared to participate in a bible study.  The officer

then yelled out, "I hate all white people and your honky

religion."  He then restricted us to having one less hour

outside of our cell, Your Honor.  Your Honor, this is the first

1   time I've been allowed outside of my cell since Thursday.  This

2   is terrible.

3       For Ryan Samsel, the last time I talked to his wife,

4   Rachel, she told me that he had been moved to a hospital in a

5   District of Columbia intensive care unit, but they refused to

6   tell her which one.

7       Myself and fellow inmates who were involved in the January

8   6 incident are scared for our lives and safety, not from each

9   other, Your Honor, but from the corrections officers.  Even

10  making this statement is putting me at risk of violent

11  retaliation because the corrections officers are running a

12  regime of violence.  I don't understand how this is remotely

13  acceptable.

14      Your Honor, I'm only asking that you be fair in considering

15  my pretrial release, look at my lack of criminal history,

16  excellent character witnesses, my extensive volunteer work

17  helping the underprivileged, my willingness to submit to

18  tracking or monitoring that the Court deems appropriate to

19  mitigate any flight risk or obstruction of justice as the

20  prosecutor alleges.

21      And I would like to assert that my mental state of mind is

22  not on January 6th.  I realize the gravity of my situation.  I

23  realize -- I have remorse and regret for what I did.  I love my

24  country, and I do believe that what I did is shameful.

25      I'm confident that you will function as an unbiased arbiter

1    of justice.  Thank you very much, Your Honor.

2              THE COURT:  All right.  Thank you.

3         Mr. Smith, anything you want to add?

4              MR. SMITH:  No.  I do think it is important, Your

5    Honor, that as Mr. Sandlin just said, that he feels like his

6    conduct was shameful.  I do think that speaks to something about

7    him and what you can expect from him in the future.

8              THE COURT:  All right.  This back and forth we've had

9    this morning about the new call that I haven't seen the

10   transcript of and as well as the earlier call in which

11   Mr. Sandlin referred to -- used the term "leverage" with his

12   mother, Mr. Smith, you've heard Ms. Arco says the government is

13   trying to get that video.  Is there a second video?  Are you

14   willing to give that up to put to rest any concerns that he is,

15   in fact, trying to obstruct justice or intimidate witnesses?

16             MR. SMITH:  I guess here's the situation, Your Honor.

17   There was a laptop, and when he got arrested, he asked that the

18   laptop be given to his lawyer in Las Vegas because apparently it

19   had this video on it of him and Mr. Colt and Mr. DeGrave

20   praying.  And in that jail call, he is talking about -- he is

21   telling his mother, "You've got to get this laptop that's got

22   the video to my lawyer because it shows us praying before the

23   events of the Capitol, praying for peace, and this paints us --

24   people need to see this because it paints us in a peaceful

25   light," according to the conversation.  He's saying it shows

them praying in front of bibles and praying for a peaceful
resolution of the day's events, and he wanted that to get to his
lawyer so that his lawyer could then use that as evidence on his
behalf and Mr. Colt's and Mr. DeGrave's behalf.

The lawyer's always had the computer.  And the government
would like the computer, and I understand why.  We were
resistant to turning it over outside of a warrant.  They had got
a warrant for it at the parents' place, and when they went to
search for it at the parents' place, the parents said -- I'm not
sure how it is.  They said, "we don't have it, it's at the
lawyers," which is where it was supposed to go all along.

So our thinking was they would go get a warrant for the
computer from the lawyer, and the lawyer said we will turn it
over pursuant to the warrant.  He's just keeping it safe in his
safe.  I guess we were reluctant to consent to it just for fear
that they might find something and then we wouldn't have a
Fourth Amendment right.

THE COURT:  Ms. Arco, is that what you're pursuing, is
a warrant?

MS. ARCO:  We were actually trying to pursue a
subpoena.  We understand that -- we know that this item is
within the possession of the attorney and that if we give the
attorney a subpoena for an item within his possession he would
have to respond to it.  So that was the approach that we were
taking.  This is the one that is under consideration from Main

1    Justice and that we are trying to follow up on.

2             MR. SMITH:  I'm fine with that.  I guess I'm the one

3    being a fly in the ointment here because I'm always overly

4    cautious, and I want to preserve my client's Fourth Amendment

5    rights.  I don't want to --

6             THE COURT:  I understand.  And I'm not pushing for

7    that.  I was just trying --

8             MR. SMITH:  We're not trying to conceal the laptop.

9    The laptop's with the lawyer, and I just want the government to

10   get it through the process.  My understanding is the only video

11   on it -- the only video that's discussed in the phone call is

12   this video of them praying, and that's -- and it's clear when

13   you listen to the leverage conversation, he talks about how

14   "it's important to get this video to my lawyer because it shows

15   us praying," and then he and his mom talk about something else,

16   and then a few minutes later, they come back and he reiterates,

17   "It's important that you get" -- he says, "There's leverage on

18   the footage," and he says "on the footage," clearly referencing

19   the video, and then he immediately starts talking about how if

20   people see him and Josiah and Nate praying that will be good for

21   their case.

22       Whether that's true or not, I don't know, but that's

23   clearly his state of mind.  And that's what the leverage -- it

24   seems clear to me from the context that's what he's talking

25   about as leverage, evidence that would help him and help his

1    co-defendants.

2              MS. ARCO:  May I briefly respond, Your Honor?

3              THE COURT:  Sure.

4              MS. ARCO:  Just on the footage point, we understand

5    that he has his cell phone and can be seen in certain videos,

6    including surveillance videos, with his GoPro and appears

7    recording throughout his time in the Capitol.  So this video

8    footage of them praying, this appears to have happened before

9    they went inside the Capitol.

10        So we believe that there is additional footage.  Whether or

11   not he's deleted it, whether or not it's on the laptop is

12   unknown to us, but I think it's safe to say that he identified

13   other footage besides the one video of them praying.

14             THE COURT:  If I were to decide to release

15   Mr. Sandlin, obviously, he would be subject to electronic

16   monitoring, having a third-party custodian, computer monitoring.

17        What other conditions would you think would be appropriate?

18             MR. SMITH:  Those are the main ones.  We'd have to get

19   him back to the western district.  I'm sure his parents will

20   text me right now when they hear me say this, but I had spoken

21   with them earlier about either both of them or his father

22   driving to D.C., and it could be arranged, I imagine, where they

23   can literally pick him up from the Central Treatment Facility

24   and take him straight back to Memphis.  I have a feeling my

25   phone will ping here in just a second when they hear me saying

1    this.

2         Obviously, the electronic and GPS position monitoring, the

3    devices on the computer to monitor his web activity, obviously,

4    I think those are key.  I don't think drugs or alcohol is an

5    issue here.

6         THE COURT:  The Pretrial Services report says he was

7    smoking marijuana daily.

8         MR. SMITH:  If you want to put drug testing on, that's

9    fine, if that would help.  Those are the big ones, Your Honor.

10   I think we're pretty much willing to agree to anything, though,

11   that Your Honor would think is necessary to assure the safety of

12   the community.

13        THE COURT:  Including home incarceration?

14        MR. SMITH:  I prefer for that not to be the case.  I

15   don't think that's warranted.  But if so, we'll take it.  But I

16   would ask Your Honor not to do that.

17        THE COURT:  Ms. Arco, I haven't decided, but if I were

18   to release Mr. Sandlin, are there additional conditions?  I

19   would assume the government would not want contact with

20   co-defendants except through counsel.

21        MS. ARCO:  That is correct, Your Honor.

22        THE COURT:  Obviously, to surrender any firearms.

23        MS. ARCO:  Yes, Your Honor.

24        THE COURT:  Don't come to D.C. except for court or to

25   meet with counsel.  Anything else?

1          MS. ARCO:  Yes, Your Honor.  We would request that he

2     not be permitted to contact key witnesses in this case,

3     particularly the fourth individual that he traveled with, apart

4     from communication through his counsel.

5          We would also request that he not be permitted to use

6     encrypted messaging applications.  I know if he is going to be

7     subject to device or web monitoring, one would think that it

8     would pick up on that, but with these encrypted apps, you never

9     know, and who knows which devices would be subject to monitoring

10    if he is able to get someone else's device and communicate that

11    way --

12         THE COURT:  Sorry to interrupt.  I have heard that --

13    Mr. Smith, this is an issue.  IPhones cannot have the computer

14    monitoring installed.  So if I were to release him -- and again,

15    I haven't decided, but if I were to release him, he would not

16    have access to an iPhone, and I wonder whether the access

17    couldn't be to a family computer or something to the extent he

18    needs to do work, whether it would need to be his own computer,

19    something that someone else had access to as well, namely the

20    third-party custodian.  That's something else that I would be

21    willing to consider.

22         MR. SMITH:  I'm afraid I don't quite understand what

23    Your Honor --

24         THE COURT:  Why does he need his own independent

25    computer?  Could he use one that's kind of, you know, a parent's

1    that's also available to him?

2              MR. SMITH:  He does want to work on his business stuff

3    on a computer.  I guess the issue there would be if the parents

4    are willing to give up a significant part of their computer time

5    to pursue that.  I could see that could probably be worked out.

6    I'm assuming they would be willing to do that.

7              THE COURT:  And I appreciate your concerns about the

8    parents' privacy.  If I were to consider releasing him, however,

9    I would want to speak to them.

10             MR. SMITH:  Yes, he can use the family computer.  I

11   just got a text.

12             THE COURT:  All right.  I would also want to speak to

13   them on the record about their obligations and their willingness

14   to step up.  This is a big responsibility, and I know

15   Mr. Sandlin would be grateful and I on behalf of the court would

16   be very grateful for their willingness to serve in this

17   capacity.  But I know it's a significant duty and one I want to

18   make sure that they're comfortable assuming.

19             MR. SMITH:  Certainly, Your Honor.

20             THE COURT:  Here's the issue.  I've received a text

21   from the courtroom deputy that there's another matter following

22   us here.  So I don't have the time to do that right now.  I am

23   asking him to find out the soonest available, including today or

24   tomorrow, time to come back.  I do know that -- because I had a

25   matter scheduled for Thursday at 10:00 a.m., at a minimum, I

1   could do that, but I'm also having him look to see if there's

2   anything sooner.  But since I have you all here now, would

3   Thursday at 10:00 a.m. be available to you both as a

4   continuation of this detention hearing?

5            MR. SMITH:  Yes, Your Honor.  I have to leave my

6   office at noon on Thursday to see a client down at Rappahannock

7   Regional Jail, but I can't imagine it would take more than two

8   hours.  So I think 10:00 will work.

9            THE COURT:  No, it would not.  Ms. Arco?

10           MS. ARCO:  That works for the government, Your Honor.

11           THE COURT:  All right.  Let me check one more thing

12  with the deputy.

13      Okay.  So he says we're confirmed for 90 minutes on

14  Thursday.  So that's a definite.  If something were to open up,

15  I will have him reach out to you all beforehand.

16      But Mr. Smith, if you could have them available in the

17  event I am deciding to release him, I would like to have a brief

18  colloquy with them, just basically what I've told you here.

19      In the meantime, I don't want things filed 30 minutes

20  before, but Ms. Arco, if there's something you would like to

21  submit with respect to the call you referenced or any additional

22  evidence that you gather between now and then -- I know your

23  investigation is ongoing -- that you want me to consider, by all

24  means file it.  The same goes for you, Mr. Smith.

25           MR. SMITH:  Thank you, Your Honor.

1          THE COURT:  But if you don't hear back from the

2     courtroom deputy, we are going to continue this at 10:00 a.m. on

3     Thursday by video conference.

4          MR. SMITH:  And I would just e-mail the Zoom

5     instructions to Mr. Sandlin's parents, and they would Zoom in

6     like we did?

7          THE COURT:  Right.  I think the courtroom deputy will

8     help you.  They can do it by phone or Zoom, whatever their

9     preference.  Again, it shouldn't be long.

10          MR. SMITH:  All right.  Thank you, Your Honor.

11          THE COURT:  Okay.  Anything else?

12          MS. ARCO:  No, Your Honor.  Thank you.

13          THE COURT:  All right.  Thank you all.

14       (Proceedings adjourned at 1:13 p.m.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

1
2
3        I, Sara A. Wick, certify that the foregoing is a
4  correct transcript from the record of proceedings in the
5  above-entitled matter.
6
7        Please Note:  This hearing occurred during the
8  COVID-19 pandemic and is, therefore, subject to the
9  technological limitations of court reporting remotely.
10
11
12  /s/ Sara A. Wick                    May 18, 2021
13  SIGNATURE OF COURT REPORTER         DATE
14
15
16
17
18
19
20
21
22
23
24
25