BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .   Case Number 21-cr-88
          Plaintiff,               .
                                   .
      vs.                          .
                                   .
RONALD L. SANDLIN,                 .   April 13, 2021
                                   .   12:36 p.m.
          Defendant.               .
- - - - - - - - - - - - - - - - - -


             TRANSCRIPT OF MOTION HEARING, VOLUME II
            BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                   UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the United States:      JESSICA ARCO, AUSA
                            United States Attorney's Office
                            555 Fourth Street Northwest
                            Washington, D.C. 20530


For the Defendant:          JERRY R. SMITH, JR., ESQ.
                            717 D Street Northwest
                            Suite 310
                            Washington, D.C. 20004




Official Court Reporter:    SARA A. WICK, RPR, CRR
                            333 Constitution Avenue Northwest
                            U.S. Courthouse, Room 4704-B
                            Washington, D.C. 20001
                            202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
1                        P R O C E E D I N G S

2          (All participants present via video conference.)

3              THE COURTROOM DEPUTY:  Your Honor, we are in Criminal

4     Action 21-88, United States of America versus Ronald Sandlin.

5          If I can have the parties identify themselves for the

6     record, beginning with the United States.

7              MS. ARCO:  Good afternoon, Your Honor.  Jessica Arco

8     appearing on behalf of the United States.

9              MR. SMITH:  Good afternoon, Your Honor.  Jerry Smith

10    for Ronald Sandlin, who is present by video from the Central

11    Treatment Facility.

12             THE COURT:  All right.  Good afternoon, everyone.

13         So this is a continuation of the April 6th detention

14    hearing.  Since that hearing, the government has submitted video

15    footage of Mr. Sandlin recorded at TGI Friday's just before he

16    and other related defendants entered the Capitol.  I have

17    reviewed that tape.  I have also reviewed the government's

18    supplemental filing it submitted yesterday with exhibits.

19         Mr. Smith, is there any additional evidence or argument you

20    would like to present at this time?

21             MR. SMITH:  No, Your Honor.  I guess in regards to the

22    government's supplemental filing, the way I read the

23    supplemental filing, they point out that at the last hearing

24    Mr. Sandlin had expressed that in regards to the conduct he is

25    accused of on January 6th that it was shameful.  Then they give
```

1    these text messages that he had sent from the jail on the text

2    system they have where he had talked about, you know, making a

3    movie of the events on January 6 with his story and that he was

4    going to write a book and make a movie.  They say this shows

5    that he really wasn't being honest when a week later he said

6    that he felt the conduct he is accused of is shameful.

7         I think it's probably important to stress that when you

8    look at the text messages -- it's one message that the

9    government is talking about, that text from March 30th.  In

10   regards to the movie, he talked about how he is going to have

11   Leonardo DiCaprio play him in the movie, and he makes a

12   little -- the little smily face thing you make with a colon and

13   a dash and a closed parenthesis.

14        So I think it's one thing, like a lot of stuff Mr. Sandlin

15   says, when you look at them in context, it's not intended to be

16   taken as seriously as the government seems to take it.  And I

17   think that also informs the TGIF video.

18        I guess that's the main point I want to make in regards to

19   Mr. Sandlin.

20             THE COURT:  All right.  Thank you, Mr. Smith.  I have

21   to say that the TGI Friday's video is perhaps the most troubling

22   piece of evidence against Mr. Sandlin.  Why shouldn't I take

23   that video seriously, given that he stated a clear intent to go

24   into the Capitol and use whatever force would be necessary and

25   he in fact did so?

1          MR. SMITH:  What he stated in the -- he says, "We

2     might have to take the Capitol."  It was stated conditionally,

3     and obviously, the events unfolded as they did.  And I can

4     understand why that troubles Your Honor.  I think still the

5     point I would make or reemphasize here is this still is the day

6     of the incident, and it's after he is -- by the context of the

7     video, he says something on the video, he's already been to the

8     mall.  And obviously, it's -- that's sort of what -- the events

9     at the mall that happened before he made the video clearly

10    informed what he says about "we might have to occupy the

11    Capitol."

12         Again, this is someone who is caught up, I believe, in the

13    events of the day.  This is not someone who went there to go

14    into the Capitol, even -- well, and the government has recently

15    turned over some jail calls of Mr. Sandlin that I've listened to

16    this morning.  This is after the event, obviously after he's

17    been arrested.  But even then he's talking about how nobody,

18    including himself, all the people there didn't go to D.C. that

19    day expecting that what did happen was going to happen.  Again,

20    it's him being caught up in the moment.

21         And even before the --

22         THE COURT:  It's hard to reconcile that with the

23    advanced planning and all of the weapons and the gear he had.

24         MR. SMITH:  Most of that stuff was not his, and the

25    government's own evidence, the only thing -- they have no

1    evidence, not only no evidence, they have evidence that the only

2    thing he took with him into D.C. that day apparently was a

3    knife.  And again, we don't know what kind of knife.  We don't

4    know what the source of that information is.  But there's

5    absolutely no evidence that he took any protective gear, any

6    weapons.  There's no evidence of him wearing any weapons,

7    wearing any body armor.  I think he might have a pair of knee

8    pads perhaps, but other than that, there's no evidence of head

9    gear, no protective gear.

10        And again, even when they were in the chat way before when

11   they were planning and loading up their Amazon cards that he was

12   making these sort of absurd -- he's going to get a spear, he was

13   going to get a -- there was something else crazy, obviously a

14   joke.  I forget what it is now.  A boomerang.  In that same

15   conversation, he talks about how "I'm not going for a fight."

16   In a more serious vein now, he talks about how "I'm not going

17   for a fight."

18        So I think all of that informs how he went to the mall that

19   day.  I don't think he was going to go into the Capitol.  I

20   don't think he had any weapons on him.  I don't think he was

21   looking for a fight.

22            THE COURT:  I know that he didn't brandish the knife,

23   he didn't use the knife, but do you dispute the government's

24   proffer that he carried a knife?

25            MR. SMITH:  I'm not in a position -- they're just

saying that somebody said he had a knife.  They're not telling us who.  They're not telling us what that person's basis of knowledge is.  So I don't know what to say about it other than that.

THE COURT:  You don't have any evidence to the contrary you are offering now?

MR. SMITH:  I have no evidence to the contrary that I'm offering, but it's pretty weak evidence, not knowing who it is, not knowing what their basis of knowledge is for making that assertion, and even not knowing what kind of knife we're talking about.  If we're talking about a 6-inch hunting knife, that's one thing.  If we're talking about a 2-inch buck knife, that's another thing, and there's no context to explain that.  So I'm not sure how powerful of evidence that is.

Again, there's no evidence -- of all the videos they have purportedly of Mr. Sandlin in the mall, there's no evidence of him doing anything with remotely resembling a weapon.  He's never brandishing anything.  He's never reaching into his pockets.  There's all kinds of video, and he just doesn't employ a weapon during the whole time that he's there.

So again, I don't -- I'm not sure what the knife thing is all about.  If he did have guns, he didn't bring them into the mall, which shows that's not -- that wasn't his plan.  He wasn't going there for a fight.  He was going -- if he had guns and he was going for a fight, he would have taken guns, but he didn't.

1          THE COURT:  Well, as I said at the last hearing,

2   Mr. Smith, I was kind of following that line, especially when

3   you consider Mr. Sandlin's record here with no criminal history

4   and no violence.  And then you watch the TGI Friday video, and

5   that's -- my sense was that he decided when he got to D.C. this

6   is out of control, this is -- I don't want violence, and yet in

7   that video, he clearly states multiple times he's prepared to

8   take the Capitol and use violence, and he called on others in

9   the D.C. area to do the same.

10      And that's really -- it's hard to divorce that from the

11   planning and the leadership role he played on the front end and

12   then what he did that day and then what he did afterwards in

13   terms of not coming forward and the messages saying I'm -- you

14   know, clear intention, I think, to hide.  It's very hard to say

15   he got caught up in the events of that day and that's just a

16   one-off, you know, aberrational act, given the degree of

17   premeditation both before he came to D.C. and then that day in

18   D.C. that's so disturbing.

19          MR. SMITH:  May I ask Your Honor, what makes you think

20   he was espousing violence in the video?

21          THE COURT:  Well, let me see.  The quote that he says

22   multiple times about, you know, "freedom is paid for with

23   blood," and he urged others to come forward, and the whole --

24   whether he ties it all together in a chain, it's clear, you

25   know, he's willing to occupy the Capitol if necessary, he's

1    willing to fight to take the Capitol, he's willing to do what it

2    takes, he's willing to pay the price and the sacrifice, and he's

3    up for it, and he invites everyone else to join him.

4        It's really -- it's hard to draw any other conclusion than

5    that he went in there ready to fight and be physical and then in

6    fact he did.

7        MR. SMITH:  Your Honor, I know the "freedom is paid

8    for with blood" is a dramatic quote.  But I think what he's

9    talking about is about sacrifice, not about inflicting violence

10   on others.  He's not talking about making other people pay with

11   their blood.  He's talking about a personal sacrifice, that we

12   may have to occupy the Capitol.  This isn't --

13       THE COURT:  You don't think he means the sacrifice is

14   that he may be arrested?  He uses the same language when he's on

15   the run, "I'm prepared to serve, whatever it takes."  He says

16   even now, a week ago in jail, "I feel I'm here for a reason.

17   I'm willing to do this."  It's like he's viewing what he's doing

18   as important sacrificial work that he needs to do for the

19   greater good, and in doing that, he's using violence to do so,

20   which is really concerning in terms of where his head is.

21       MR. SMITH:  Your Honor, can you see me?  I seem to

22   have lost -- I can hear you, but I have lost my video.

23       THE COURT:  I can see you, but take your time.

24       MR. SMITH:  I apologize.  I'm not the most tech-savvy

25   person.  But if everybody can see me, I'm fine.  I don't know

1   why the video just went away.

2          THE COURT:  Do you want to try to call back in?

3   Because it's hard to respond when you can't see other people.

4          MR. SMITH:  Let me see if I can refresh my page and

5   what happens.  Please bear with me.

6       Okay.  I can see you now.  I don't know why it did that.

7          THE COURT:  Okay.

8          MR. SMITH:  Again, I do think this was Mr. Sandlin

9   being caught up in the moment.  I don't think that's what he

10  went there for.  I do -- I know that Mr. Sandlin has a very --

11  he can be very dramatic.  That's the way he is.  Again, I don't

12  think this is a guy causing -- this is not, you know, calling

13  for the killing of enemies of the republic.  This is more like,

14  you know, Patrick Henry calling for sacrifice, which I think is

15  an entirely different thing.

16      And I think you've got to look at Mr. Sandlin, just sort of

17  the context of how he speaks.  He's prone to grandiose

18  statements.  That's what he sort of does.  It's the same with

19  this movie.  He makes a statement but then talks about how

20  Leonardo DiCaprio is going to play him.  It's a bit -- there's

21  an element of tongue in cheekness to it, deliberate tongue in

22  cheekness to it.

23          THE COURT:  Yet, he did take a swing at a police

24  officer, and he yanked on the helmet of another in the midst of

25  a mob.  He does act on his dramatic words, and that's -- it's

1    very hard to tease out and say well, he really didn't mean that

2    when in fact he did take steps to do just what he was

3    advocating.

4        And I've been receptive to your argument based on his

5    background.  This is a very difficult decision.  But when you

6    link together the preplanning and what he said just before he

7    went to the Capitol and then what he did in the Capitol and then

8    what he did when he left the Capitol, it doesn't give me a lot

9    of confidence that he's not going to pose a risk.

10            MR. SMITH:  Your Honor, I hear what Your Honor is

11   saying.  I still believe that even if that is the case there are

12   conditions of release that can be fashioned.  I mean, we're open

13   to, you know, fairly restrictive conditions, if that means

14   getting Mr. Sandlin out.  So I think even with Your Honor's

15   concerns, that conditions of release can be fashioned that will

16   assuage Your Honor's fears.

17       His parents are here.  I don't know if Your Honor can see

18   them, Lee and Steve Sandlin.  He would obviously live with them.

19            THE COURT:  I do see them.  Thank you for being here.

20       I would not be considering release at all but for their

21   willingness to step up, and I know they would do everything in

22   their power to ensure that he complies with conditions of

23   release that I set.  But he's a grown man, and it's -- there are

24   limits is my concern.

25            MR. SMITH:  I understand that, Your Honor.  He is very

close to his family, and for what it's worth, I don't think he

would betray their trust in him.  That's just my -- he wouldn't

do that.  I mean, that has some element of coercion over him,

too.  And for what it's worth, we could electronically monitor

the computers.  They do live in a fairly remote setting.  I

understand it's somewhat -- 40, 50 miles outside of Memphis,

Tennessee, in a fairly rural area.  We're not opposed to, you

know, significant travel restrictions and monitoring of his

Internet usage, which I think should go a long way, especially

the monitoring of the Internet usage should go a long way to

making Your Honor confident that he's not going to do this kind

of thing again.

        And I don't think he is going to do this kind of thing.  He

told you last time he was done with politics for now, and he's

told me he just wants to sort of rebuild his life right now.

        So I continue to ask Your Honor, obviously, to release

Mr. Sandlin on conditions because I really do believe that

conditions of release can be fashioned here that will assure the

safety of the community, which I understand is Your Honor's

chief concern.

        THE COURT:  All right.  Mr. Smith, with regard to the

allegations of abuse that Mr. Sandlin made last hearing, I trust

that if you believe they're credible allegations you will bring

it to my attention and the appropriate folks at D.C. Jail,

namely the general counsel to the Department of Corrections, so

1   they can do the appropriate investigation.

2       I understand that the alleged assault that he provided

3   specific allegations about is in fact under investigation, and

4   of course, there is a grievance procedure that he can follow.

5   And I just want to encourage you to bring any of that to my

6   attention and to the attention of the general counsel at the

7   D.C. Jail if you are aware of specific credible allegations of

8   abuse.  I certainly want to address that, and I'm sure the

9   Department of Corrections does as well.

10      Do you have any other information to provide?

11          MR. SMITH:  Not at this time, Your Honor, but I'm

12  aware of what Your Honor said and cognizant of it.

13          THE COURT:  Okay.  Ms. Arco, anything else you would

14  like to add before I rule?

15          MS. ARCO:  Just briefly, Your Honor.  We don't have

16  additional specific factual allegations to add to the record

17  that aren't cumulative of what we've already put on the record,

18  but I just wanted to echo some of your sentiments, I think, that

19  the key to this case is Mr. Sandlin's mental state.

20      Obviously, he's very smart and very dedicated and very

21  passionate.  And while he may engage in hyperbolic rhetoric, he

22  has acted on that rhetoric in the past and is savvy enough to be

23  able to circumvent various logistical obstacles to achieve his

24  ends.

25      And therefore, we are concerned that if he were to be

released he would be able to do that and circumvent conditions

of release to achieve his end, which recently in this past week

he seems to be seeking to publicize his conduct and is

celebrating, and that doesn't give the government any confidence

that he will not engage in future obstructive and/or dangerous

conduct.

Thank you.

THE COURT:  All right.  Thank you.

And Mr. and Mrs. Sandlin, I want to thank you for being

available here today.  I appreciate it very much.  This is an

extremely difficult case, and I know this is difficult for you

and Mr. Sandlin as well.

But I am prepared to rule.  In the interest of time, I'm

not going to review all of the standards under the Bail Reform

Act that we are all familiar with, nor am I going to describe

the general events that took place on January 6th.  Instead, I

will focus on those facts that relate specifically to

Mr. Sandlin and the detention determination.

At the outset, let me make clear, I do believe that the

government has presented evidence that justifies holding a

detention hearing on two bases:  Risk of flight and obstruction.

Though the offenses with which Mr. Sandlin is charged are very

serious felony offenses, at least some of them -- none of them

give rise to a presumption of detention under the Bail Reform

Act.

In deciding whether to detain Mr. Sandlin, I must weigh four factors under Section 3142(g) of the Bail Reform Act. First, the nature of the offenses charged. While Mr. Sandlin is innocent unless and until he is proven guilty by a jury, a grand jury has found probable cause that he, among other things, attempted to obstruct an official proceeding of Congress and assaulted Capitol police officers on January 6th, 2021.

The government has produced evidence which shows that Mr. Sandlin organized in advance of the January 6 events a group of individuals to travel to D.C.  This group included Nathaniel DeGrave and Josiah Colt, defendants in related cases, as well as a fourth individual who Mr. Sandlin picked up at Reagan National Airport on January 5th.

Mr. Sandlin and two of these individuals, Mr. DeGrave and Mr. Colt, engaged in substantial planning for their trip to D.C. Private Facebook messages reveal that the group discussed shipping guns to Mr. Sandlin's residence in Tennessee.  They also considered purchasing other items, including a boomerang and a 100-watt laser.  In the end, they purchased a Glock holster, gas mask, and a $70 mask/helmet set that Mr. DeGrave appears to have worn inside the Capitol on January 6.

They also took other items, firearms, ammunition, bear mace, a Taser gun, an expandable baton, knives, body armor, and walkie-talkies, with them to the D.C. area.  Their messages suggest that they were preparing for violence, though there's no

evidence that Mr. Sandlin, Mr. DeGrave, or Mr. Colt or the fourth individual carried any firearms inside the Capitol.  The government does, however, proffer based on an unnamed witness that Mr. Sandlin carried a knife that day.

Social media posts in advance of the trip also show that Mr. Sandlin raised money for a documentary that would feature the group's exploits in D.C., and he can be seen on tape filming the events of that day.  Indeed, on January 6th, before he entered the Capitol along with the rest of the mob, he taped a video in which he urged other patriots watching to be willing to take the Capitol.  He also repeated a phrase he had used in earlier social media posts, "Freedom is paid for with blood."

When Mr. Sandlin arrived at the Capitol on January 6th, he was prepared to fight, and that is in fact what he did.  Video footage from that date clearly shows that Mr. Sandlin was a part of a violent mob that stormed the Capitol to prevent the certification of the 2020 presidential election.

Inside the Capitol, Mr. Sandlin, along with Mr. DeGrave, joined an aggressive, forceful crowd that over powered Capitol police officers who were defending an exterior door of the Capitol.  This large crowd pushed the officers and kept pressure on the door until a larger group of protestors could enter the Capitol building.  Video footage of the scrum shows Mr. Sandlin pulling on one of the officers' helmet in an apparent attempt to remove it.

1    Afterwards, he made his way to the Senate.  As he reached

2    the hallway outside the Senate gallery, Capitol police officers

3    were working to secure the doors to the upper balcony of the

4    Senate chamber.  Video footage shows Mr. Sandlin attempting to

5    wrestle one of the doors away from and punching one of those

6    officers in an apparent attempt to gain access to the Senate

7    gallery.  Around the same time, Mr. Sandlin demanded access to

8    where the senators were being kept and warned officers

9    that "we've already forced our way into other places."

10         MR. SMITH:  I can't hear.  I apologize.  I can't hear

11    anything.

12              MS. ARCO:  It appears the judge is frozen.

13         (Pause.)

14              THE COURT:  All right.  My apologies.  My Internet

15    connection is not strong this morning.

16         Mr. Hopkins, can you tell me where I was when I began to

17    freeze?

18              THE COURTROOM DEPUTY:  Honestly, it's hard, Your

19    Honor.

20              MS. ARCO:  I could tell you, Your Honor.  You had just

21    said "forced our way into other places."

22              THE COURT:  Had I reached the weight of the evidence?

23              MS. ARCO:  No, Your Honor.

24              THE COURT:  I was just going on.  All right.  Let me

25    see.  Is Ms. Wick on the line?

1          COURT REPORTER:  Yes, Your Honor.  Just one second.

2      (Record read by the court reporter as requested.)

3          THE COURT:  As I was saying, I find that both the

4   nature and circumstances of the charged offenses and the way in

5   which Mr. Sandlin committed them weigh in favor of detention.

6      By the way, if I should have an issue with the Internet

7   again, I'm asking Mr. Hopkins to give me the call-in, and I will

8   call to finish the ruling if we continue to experience this.

9      But let me move on to the second factor, the weight of the

10  evidence.  That also weighs in favor of detention.  Video

11  footage, including footage taken by Mr. Sandlin as well as

12  social media posts and witness testimony, document the events of

13  January 6th, including Mr. Sandlin's advanced planning and his

14  assaults inside the Capitol.

15     Against these two factors, both of which weigh in favor of

16  detention, I must also consider Mr. Sandlin's history and

17  characteristics and the nature and seriousness of the danger to

18  the community that his release would pose.

19     Mr. Sandlin's history and characteristics weigh largely in

20  favor of release.  Aside from a DUI arrest years ago,

21  Mr. Sandlin has a clean record.  Not only does he not have any

22  felony or misdemeanor convictions, he has no history of any

23  violence in his background, nor is there any evidence that he

24  has been a member of a malitia group.

25     And as the government acknowledges, Mr. Sandlin has a long

history of helping others.  Among other things, he moved to Tennessee to take care of an ailing grandparent.  He started a successful non-profit through which he provided bikes and training to underprivileged youth in California.  He has provided jobs and mentoring to young professionals.  And he has provided support for and taken care of animals in shelters.

Mr. Sandlin also started a successful Internet marketing business, though that business appears to have struggled in recent years.  According to a District of Nevada Pretrial Services report, Mr. Sandlin owes $500,000 in taxes, and as a result, the government has suspended his passport.

Letters submitted by friends, family, and people who Mr. Sandlin has helped over the years show that he has their continued support.  These letters also suggest his recent activities are aberrational in character.

But the evidence also reveals that Mr. Sandlin took substantial steps to avoid being arrested.  Regardless of whether he knew there was an active warrant for his arrest, his social media posts and his movements after January 6th show that he spent days crisscrossing the country hiding from law enforcement.

Though Mr. Sandlin's history and characteristics are a mixed bag, considering his lack of criminal history and his widespread family and community support, overall they do weigh against detention.

1    The final factor I must consider is the nature and

2    seriousness of the danger to the community that Mr. Sandlin's

3    release would pose.  As the D.C. Circuit recently made clear in

4    *U.S. v. Munchel*, Number 21-3010, 2021 WL 1149196, to detain a

5    defendant on dangerousness grounds, the government must show

6    that the defendant poses a concrete prospective threat to public

7    safety, in other words an identifiable -- identified and

8    articulable threat to the community, and the government must

9    prove this by clear and convincing evidence.

10    The government argues based on Mr. Sandlin's actions

11    before, during, and after the events of January 6th that he

12    presents both a threat of future dangerousness and of

13    obstruction in this case.  The Court agrees.

14    Whether a defendant poses a particular threat depends on

15    both the nature of the threat identified and the resources and

16    capabilities of the defendant.  *Munchel* at 7.  Looking first at

17    the nature of the threat, as noted, video footage shows that

18    Mr. Sandlin was part of a crowd that helped a violent group of

19    protestors break through the exterior door of the Capitol on

20    January 6th.  He also attacked two Capitol police officers and

21    ventured to the Senate chambers searching for members of

22    Congress.  These actions put him in a very different category

23    than those who simply cheered on the violence or entered the

24    Capitol after others cleared the way.  *Munchel* at 8.

25    The government also points to specific evidence of

obstruction, some of which is more compelling than others.  I won't go through each argument the government has advanced here except to note that the evidence shows that after January 6th Mr. Sandlin deleted incriminating videos and Facebook posts and he used encrypted messaging applications to communicate with Mr. DeGrave, Mr. Colt, and others.

Together, the evidence of Mr. Sandlin's general dangerousness and his act of obstruction lead the Court to conclude that he presents a danger to the community.

Looking next at his resources and capabilities, the Court agrees with the defense that Mr. Sandlin's ability to commit any future acts of violence or obstruction could be hindered by stringent conditions of release, including by having Mr. Sandlin subject to GPS monitoring and computer monitoring, as well as Pretrial Services supervision in the Western District of Tennessee, and by having his parents, who are both upstanding citizens, serve as third-party custodians in this case.

Even so, the Court is not convinced based on Mr. Sandlin's actions before, during, and after January 6th that he would not pose a continued danger to the community.  Although he has no prior record, as I've noted, or violence in his background, the evidence clearly shows that he anticipated, planned for, and intended to use violence on January 6.  His actions within the Capitol were therefore not just violent, they were premeditated.

Social media posts before January 6 reflect that

Mr. Sandlin, Mr. DeGrave, and Mr. Cole purchased tactical gear and brought guns and other weapons with them to Washington, D.C., or at least the Washington, D.C., area.  Wisely, however, they left most of their gear behind when they stormed the Capitol.

But there's little question that Mr. Sandlin entered the Capitol prepared to fight and to use violence if necessary, and that is best illustrated by the video he made before he entered the Capitol.  In that video, which Mr. Sandlin later deleted from his Facebook account, he repeated no less than three times the phrase -- he posted on social media in the run-up to January 6 "freedom is paid for with blood."  He also made clear that he was ready to occupy the Capitol if necessary, that he was willing to fight to take the Capitol if necessary, and that he was prepared to sacrifice in some capacity if necessary.

And that is in fact what he did.  Mr. Sandlin entered the Capitol.  He assisted others in breaching the Capitol.  He removed -- tried to remove the helmet of an officer who was defending the Capitol against an angry mob of protestors, and he punched another officer who was defending the Senate chamber.

And after the events of January 6, he took steps to evade law enforcement and used encrypted communications, and he deleted incriminating evidence.

Unlike defendant Frederico Klein, who Judge Bates just moments ago ordered released from prison on stringent

conditions, having reviewed his order that just posted, it is clear that Mr. Sandlin engaged in -- is distinguishable from that defendant.  Specifically, Mr. Sandlin engaged in substantial planning before the January 6th attack on the Capitol.  He acted with premeditation.  He coordinated with other participants before the riot.  Indeed, he assumed a leadership role with respect to the group he led.  On January 6, before the attack on the Capitol, he urged others in the D.C. area to use violence to take over the Capitol.  And since January 6, he has taken steps to obstruct the investigation.

So even taking into account the uniqueness of the events of January 6 as well as Mr. Sandlin's lack of criminal record, absence of prior violence, his employment, and his record of service to others, the Court cannot conclude based on the aggravating facts that the proposed conditions of release will reasonably assure the safety of the community.

Considering all of the factors under Section 3142(g), there is clear and convincing evidence that Mr. Sandlin poses a concrete prospective threat to public safety that cannot be mitigated by supervision by Pretrial Services and the other conditions that I have considered.

Whether or not Mr. Sandlin presents a risk of flight is a closer call.  However, for many of the same reasons and in particular based upon his evasive movements across the country following January 6 and his $500,000 tax debt, the Court also

1    concludes that the government has shown by a preponderance of

2    the evidence that Mr. Sandlin also presents a risk of flight.

3        While his risk of flight could be mitigated somewhat by GPS

4    monitoring and having his parents serve as third-party

5    custodians, given the entirety of the evidence before me, as

6    I've explained, I'm not confident, despite Mr. Sandlin's

7    assurances to the contrary, that he would abide by these

8    proposed conditions and appear for all future court dates.

9        So this, Mr. Smith, does constitute my ruling on the

10   defendant's motion for bond.  I will put out a short paper order

11   denying the defendant's motion.

12       Have the parties discussed a future court date or what

13   makes sense at this point?  I know there's a wealth of discovery

14   to review, and Mr. Sandlin -- Mr. Smith, sorry, you may need

15   time to review this with Mr. Sandlin.  How do you suggest we

16   proceed, Mr. Smith?

17            MR. SMITH:  Thank you, Your Honor.  Right now the

18   government is not extending plea offers.  I understand the

19   authority to issue plea offers may come down the pike in the

20   fairly near future.  And there is obviously a lot of discovery

21   to go through.  On the other hand, Mr. Sandlin is being detained

22   and has significant speedy trial rights here.

23       What I would propose is we have a short continuance, maybe

24   a 30-day continuance for a status hearing.  We are willing to

25   waive our speedy trial rights between now and then.  Hopefully,

I will get a lot more of discovery in the intervening 30 days.
It's possible that the government will give authority to do plea
offers.  So in 30 days from now, the lay of the land might be
markedly different than it is now.  So that's what I would
propose, Your Honor.

THE COURT:  All right.  Ms. Arco, I assume you agree
with that?

MS. ARCO:  Yes, we agree.  The only thing I would like
to add is that it's probably more realistic to ask for a 60-day
continuance in order to allow the government to provide
discovery that it has in its possession and continue to cull and
produce other discovery that certainly is looming.  I've
received several messages from colleagues saying Mr. Sandlin is
very easily identifiable in his orange sweatshirt throughout the
Capitol and that there are videos we are receiving from other
investigations of other Capitol riot defendants where he
appears, and I believe that that should be turned over to his
counsel as well, obviously.

And so for that reason and in order to get a better sense
of the plea authority in this specific case -- we have, I
imagine you might have heard, received some plea authority with
respect to misdemeanor offenses and some other offenses.
Although I don't have specific authority with respect to this
case, I do imagine that in 60 days we would be able to produce a
significant amount of discovery to Mr. Sandlin, as well as come

1    to a landing point on a plea offer.

2         THE COURT:  Mr. Smith, your position?  I know

3    Mr. Sandlin is detained, and he has been detained for some time.

4    Is that something you agree to at this point, or would you

5    prefer to set this for 30 days and reassess at that point?

6         MR. SMITH:  I would prefer the latter, Your Honor, 30

7    days and reassess.  I hate to burn judicial resources --

8         THE COURT:  I am very sensitive, and I just urge the

9    government, you've got to move.  You've brought this case, and

10   Mr. Sandlin is detained, and he has speedy trial rights.  And I

11   will -- I do believe for the reasons Mr. Smith stated, I think

12   that there's certainly a need for the government to produce and

13   the defendant to review discovery and that it's appropriate and

14   the ends of justice outweigh the best interests of the defendant

15   and the public in some period, some exclusion, 30-day exclusion.

16   Beyond that, I'm not going to make that finding now.  We will

17   readdress that in 30 days.

18        But Ms. Arco, I know your hands are tied, but the

19   government has to move.  These defendants may decide they don't

20   want all of this discovery even not yet viewed, in which case

21   I'm going to be prepared to set motions and trial dates at the

22   next hearing if that is Mr. Sandlin's desire.  So I'm just

23   letting you know that if he wants an early trial date he's going

24   to get one if there's a way to do that safely.

25        MS. ARCO:  Understood, Your Honor.

1          THE COURT:  All right.  Mr. Smith, I do find it is in

2     the interest of justice to exclude time.  Have you all -- you

3     haven't talked about a specific date, I assume.

4          MR. SMITH:  No, Your Honor.

5          THE COURT:  How about the end of the week of May 10th,

6     Mr. Smith, or would you prefer to go the following week?  I do

7     have a trial set for the following week right now.  It may go

8     away.  But if we were to do it the following week, I would ask

9     to do it either as early or as late as we can.

10          THE COURTROOM DEPUTY:  If I could interject, Your

11     Honor.

12          THE COURT:  Yes, Mr. Hopkins.

13          THE COURTROOM DEPUTY:  I'm looking at D.C. Jail's

14     calendar, and it looks like the 12th, which is a Wednesday, in

15     the afternoon seems to be pretty free.

16          THE COURT:  Would that work for you, Mr. Smith?

17          MR. SMITH:  It would, Your Honor.  I do have an 11:00

18     status hearing in another case, but I can't imagine it won't be

19     over by 1:00.

20          THE COURT:  All right.  Ms. Arco, would 1:00 p.m. on

21     May 12th work for the government?

22          MS. ARCO:  That works for the government, Your Honor.

23     Thank you.

24          THE COURT:  So I will exclude time from today until

25     May 12, 2021, in calculating the date for speedy trial, and at

1    that point, if the parties don't think that this is on track to

2    be resolved through a plea or don't -- Mr. Smith, if you don't

3    need additional time, we will talk about a motions hearing date

4    and trial date then.  So be prepared to discuss that.

5              MR. SMITH:  I understand, Your Honor.

6              THE COURT:  Okay.  Thank you, everyone.

7         (Proceedings adjourned at 1:15 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

1

2

3      I, Sara A. Wick, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7      Please Note:  This hearing occurred during the

8  COVID-19 pandemic and is, therefore, subject to the

9  technological limitations of court reporting remotely.

10

11

12  /s/ Sara A. Wick           April 16, 2021

13  SIGNATURE OF COURT REPORTER     DATE