UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Case No. 21-cr-88 (DLF) |
| RONALD SANDLIN and : | |
| NATHANIEL DEGRAVE, : | |
| : | |
| Defendants. : | |

**UNITED STATES' MOTION TO VACATE THE TRIAL DATE
AND EXCLUDE TIME UNDER THE SPEEDY TRIAL ACT**

The United States of America, by and through the United States Attorney for the District of Columbia, hereby moves this Court to vacate the trial date currently set for December 6, 2021, grant a 90-day continuance of the above-captioned proceeding, exclude the time within which a trial must commence under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* (hereinafter, "the STA"), and set a status hearing 90 days out to monitor the government's progress in meeting its discovery obligations in arguably the most complex prosecution in U.S. history. As further explained below, it is the government's commitment to ensuring that all arguably exculpatory materials are produced in a comprehensive, accessible, and useable format that primarily underlies the government's request to toll the STA.

Government counsel has conferred with counsel for defendant Sandlin, who has advised that he needs more time to consult with his client before providing their position. He expects to be able to do so at the next status conference set for September 21. In the past, however, counsel for defendant Sandlin has objected to tolling time under the STA. Counsel for defendant DeGrave, by contrast, has not objected to tolling time in the recent past and has informed the government that he does not oppose the instant motion.

In support of its motion, the government states as follows:

1

## FACTUAL BACKGROUND

The facts underlying this case have been discussed at length in numerous pleadings stemming from the detention proceedings. *See* Dkt. Nos. 16, 29, 30. In short, the defendants conspired with each other and Josiah Colt[1] to interfere with the peaceful transition of presidential power on January 6, 2021, and ultimately to storm the Capitol and obstruct the Electoral College vote certification proceedings. Hours before rioters first breached the Capitol, defendant Sandlin was calling on "other patriots" to "take the Capitol." The government has since uncovered another video, from the trash folder of defendant DeGrave's cell phone, showing DeGrave on Capitol Grounds, stating: "They just breached the Capitol building. That's it, bro. It's game time. We all armored up, we got a gas mask. This is what separates us true patriots from everyone else who is all talk… we out here taking action. It's Dr. Death in the building and it's about to go down." Once inside the Capitol, the defendants participated in assaults of two separate sets of U.S. Capitol Police officers guarding the exterior Rotunda doors and the doors to the balcony of the Senate floor, respectively.

## PROCEDURAL BACKGROUND

The defendants were initially charged by indictment, in separate cases,[2] with multiple felony and misdemeanor offenses stemming from their conduct at the Capitol on January 6. On September 15, 2021, a grand jury in the District of Columbia returned a superseding indictment against the defendants, joining them in a single case and charging them with violations of 18 U.S.C. §§ 1512 (conspiracy to obstruct an official proceeding); 1512(c)(2) (obstruction of an

---

[1] Colt has since pleaded guilty to obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c). *See United States v. Josiah* Colt, 21-cr-74, Dkt. Nos. 21-22.

[2] Prior to this week, the case against defendant DeGrave had been heard by Judge Friedman. *See United States v. Nathaniel DeGrave*, 21-cr-90.

official proceeding); 111(a)(1) (assaulting, resisting, or impeding certain officers); 231(a)(3) (certain acts during a civil disorder); and 1752(a) (unlawful entry and disorderly conduct on restricted grounds). The obstruction charge that each defendant faces carries a maximum statutory penalty of twenty years.

Both defendants have been held in pretrial detention since the date of their arrests. On April 13, 2021, this Court ordered defendant Sandlin detained pending trial, finding that "no condition or combination of conditions [of release] will reasonably assure … the safety of any other person and the community," and also that he was a flight risk. *See* 18 U.S.C. § 3142(e)(1). In arriving at this conclusion, the Court found that the defendants had "engaged in substantial planning for their trip to D.C.," and that "[t]heir messages suggest that they were preparing for violence." The Court also found that in a video the defendants recorded a few hours before the riot, defendant Sandlin "stated a clear intent to go into the Capitol and use whatever force would be necessary and he in fact did so." The Court thus found that his assaults on law enforcement in the Capitol were "not just violent, they were premeditated."

Judge Friedman, in ordering defendant DeGrave detained pending trial, made similar findings, stating that "[t]he plans that Mr. DeGrave discussed with Messrs. Sandlin, and Colt to purchase weapons and transport them to Washington, D.C. further establish that he did not arrive at the Capitol with the intent to protest peacefully, only unwittingly to get swept up in the violence." Judge Friedman ultimately concluded that "stringent release conditions would not assure the integrity of the judicial proceeding" or "prevent Mr. DeGrave from committing acts of violence if he were to be released." *U.S. v. DeGrave*, 21-cr-90, Dkt. No. 38. Both defendants appealed, and the Court of Appeals affirmed both detention orders.

Even though the investigation into the defendants' charged conduct and the Capitol Breach is ongoing, the most substantial evidence specific to their participation in the events of January 6 has been produced.  The government continues to uncover videos depicting the defendants in the Capitol, however, including as recently as two days ago.

Apart from the individual files of the assigned FBI agent and government counsel, the government is in possession of a broad array of discoverable material among which may be interspersed arguably exculpatory material.  These documents include, for example, thousands of hours of video footage from multiple sources (e.g., Capitol surveillance footage, body-worn-camera footage, results of searches of devices and Stored Communications Act accounts, digital media tips, Parler video, and news footage); hundreds of thousands of investigative documents including but not limited to interviews of tipsters, witnesses, investigation subjects, defendants, and members of law enforcement; and financial, travel, and communications records.  The government has filed three memoranda regarding its ongoing and diligent efforts to produce discovery from these voluminous materials (the "Discovery Status Memoranda"), incorporated herein by reference.  S*ee* Dkt. Nos. 41, 43, 48.

On August 10, 2021, after the parties, which did not yet include defendant DeGrave, announced they were unable to agree to a pretrial disposition of the charges in the indictment, the Court set this case for trial on December 6, 2021, over the government's objection.

**ARGUMENT**

This Court has already stated that this case is "unusual and complex" and "anything but typical in terms of the amount of data collected."  Hr'g Transcript 22 (Aug. 24, 2021).  The Court also implicitly recognized that resources are stretched thin in light of "the number of cases that the government is processing simultaneously," a finding that almost certainly applies to

counsel for both defendants, who are juggling the representations of multiple January 6 defendants. *See id.* It also acknowledged that the government was reviewing the voluminous evidence collected in all Capitol Breach cases for potential *Brady* materials relevant to individual defendants. *See id.* at 23. Finally, the Court found that "in order to effectively represent Mr. Sandlin, the defense does need to review this forthcoming discovery." *Id.* As discussed in greater detail below, defense counsel admits as much in his recent discovery letter making "specific *Brady* requests." *See* Def's Notice of Filing Discovery/Brady Letter ("Discovery Letter"), Dkt. No. 42.

For the reasons described below, the United States seeks to vacate the trial date and continue this matter to permit the government to continue its collection, review, cataloging, and production of discoverable materials pursuant to Federal Rule of Criminal Procedure 16(a) and the *Brady* doctrine.[3] Although the government has been diligent in its efforts to comply with unprecedented discovery obligations, given the nature and volume of material, its review of potentially discoverable material will not be completed by the time of the currently scheduled trial.

Accordingly, the government requests that the Court set a status hearing in 90 days to monitor the government's progress in complying with its discovery obligations. If, at that time, the government needs additional time to complete its discovery obligations or defense counsel needs additional time to complete its review of the discovery, the Court may then entertain any

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

requests for an additional ends-of-justice continuance. If the parties' discovery obligations are nearly complete at that time, the Court should set a trial date.[4]

The government's need for reasonable time to address unprecedented complex discovery obligations warrants the requested continuance and exclusion of time under the STA, even over the defendant's objection. In fact, much longer continuances have been granted in cases involving far less complexity in terms of the volume and nature of data. Further, the STA expressly contemplates that warranted periods of delay may lengthen the period of pretrial detention of a defendant.

I. **The Government's Approach to Discovery Is Intended to Ensure that All Arguably Exculpatory Materials Are Produced in a Comprehensive, Accessible, and Useable Format.**

The Capitol Breach involved thousands of individuals inside and outside of the Capitol, many of whom overwhelmed and assaulted law enforcement officers. According to a Washington Post analysis of the events, the mob on the west side eventually grew to at least 9,400 people, outnumbering officers by more than 58 to one.[5] As these individuals attacked the Capitol, members of Congress, including the Vice President in his capacity as President of the

---

[4] The ongoing pandemic may also serve as a basis to toll time under the STA. In recognition of the current high rate of transmission of the Delta variant in the District of Columbia, Chief Judge Howell issued Standing Order 21-47 on August 25, 2021, limiting the number of jury trials that may be conducted at one time until at least October 31, 2021. Chief Judge Howell found that "for those cases that cannot be tried consistent with those health and safety protocols and limitations, the additional time period from August 31, 2021 through October 31, 2021 is excluded under the Speedy Trial Act as the ends of justice served by the continuances to protect public health and safety and the fair rights of a defendant outweigh the best interest of the public and any defendant's right to a speedy trial, pursuant to 18 U.S.C. 3161(h)(7)(A)." As set forth in Standing Orders Nos. 20-9, 20-19, 20-29, 20-62, 20-68, 20-89, 20-93 and 21-10, the Court previously found that due to the exigent circumstances created by the COVID-19 pandemic, the period from March 17, 2020 through August 31, 2021, would be excluded in criminal cases under the STA.

[5] *See* Bennett et al., *17 Requests for Backup in 78 Minutes*, WASH. POST (Apr. 15, 2021), *available at* https://www.washingtonpost.com/investigations/interactive/2021/dc-police-records-capitol-riot/?itid=sf_visual-forensics.

Senate, worked to certify the Electoral College vote of the 2020 Presidential Election until doing so became unsafe due to the breach of the Capitol.

While it may be tempting to view many of the charged cases as individual matters with straightforward discovery, the reality is that these cases are bound by interrelated facts and shared evidence.  Each defendant's conduct was enabled because of the collective efforts of the mob.  Thus, within the thousands of hours of video footage depicting the conduct of other rioters or law enforcement officials, or the hundreds of interviews with rioters and law enforcement officials, *inter alia*, there may be information that is also arguably relevant to potential defenses.  For example, some defendants have requested any information that arguably shows law enforcement officers authorized the entry of alleged rioters.  Other defendants have suggested that the crowd was peaceful and that acts of violence have been exaggerated or mischaracterized by the government.  Given the volume of material, and because "[d]efendants are in a better position to determine what evidence they believe is exculpatory and will help in their defense,"[6] the government intends to provide all defendants with all data that may contain information that is arguably material to their defenses, and in a manner that will facilitate the search, retrieval, sorting, and management of that information.

Importantly, the volume of discoverable materials is unrelated to the government's entirely justified decision to prosecute cases arising out of the Capitol Breach simultaneously and

---

[6] *United States v. Meek,* No. 19-cr-00378-JMS-MJD, 2021 WL 1049773, at *5 (S.D. Ind. 2021); *see also United States v. Ohle*, No. S3 08 CR 1109 (JSR), 2011 WL 651849, at *4 (S.D.N.Y. 2011) (not reported in F. Supp. 2d) ("placing a higher burden on the Government to uncover such evidence would place prosecutors in the untenable position of having to prepare both sides of the case at once. Indeed, the adversarial system presumes that the defense will be more highly motivated to uncover exculpatory evidence, so if anything, the onus is on defense counsel to conduct a more diligent search for material potentially favorable to his client. This is especially true considering that, if exculpatory evidence exists, the defense is in the best position to know what such evidence might be and where it might be located.").

is only marginally impacted by the ongoing investigation and arrests. A large portion of the discoverable material was created on January 6, when the events were captured by the U.S. Capitol Police's extensive camera system, body-worn cameras of responding law enforcement, and news agencies that captured the riot as it unfolded. As noted above, the rioters themselves created an enormous digital footprint on January 6, when they recorded each other on their cell phones and cameras and described their conduct through copious digital communications and social media posts. Given the overt nature of this investigation, had the government failed to move quickly to collect such evidence, it would surely have risked the loss or destruction of terabytes of evidence.[7]

Since January, the government has worked diligently to obtain, organize, review, and make accessible voluminous data. As elaborated in the Discovery Status Memoranda, performing the required tasks correctly and comprehensively takes time. We are using Relativity as a platform to manage, review, and share documents. Before documents are loaded to our Relativity workspace, we must ensure that we have the password for protected documents, that the documents were provided in a format that will open, and that we remove irrelevant software and system files that would only cloud the workspace and confuse reviewers. Once the

---

[7] The attack on the U.S. Capitol and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process." *See* Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.
Moreover, the prompt filing of charges against numerous offenders was a necessary general deterrent to those plotting future, similar attacks. As for specific deterrence, the prompt filing of criminal charges against the defendants—whom this Court and Judge Friedman previously determined were dangers to the community—was vital to protect the community from them.

documents are loaded, we must deduplicate them so that they are not analyzed or reproduced multiple times.  We must also review documents to identify items that must be excluded or redacted.  These processes are necessary to avoid production of unorganized data dumps, unreadable files, and unusable databases, or a failure of the government to take adequate steps to prevent both victims' and defendants' private information from being shared with hundreds of defendants.[8]

The processing and production of thousands of hours of digital evidence is also complex and time-consuming.  As elaborated in the Discovery Status Memoranda, we are using evidence.com as a platform to manage, review, and share digital media evidence.  On Friday, September 3, 2021, the government amended its contract with Axon Enterprise, Inc. ("Axon"), to fund a defense environment or "instance" of evidence.com administered by the Federal Public Defender for the District of Columbia.  Other than body-worn-camera footage, digital evidence must first be transmitted to our vendor from law enforcement for ingestion into our instance of evidence.com.  The act of transmitting terabytes of digital information can take weeks.  Such information may then require additional processing, *e.g.*, conversion from a proprietary format, before it can be ingested into evidence.com.[9]

---

[8] Under our plan, document productions from Relativity will be made on a rolling basis, and we are prioritizing the processing and production of documents that have been requested by Capitol Breach defendants.  Ultimately, we will also make any documents we produce available to a defense Relativity workspace.  This will allow Capitol Breach defense teams to leverage Relativity's search and analytics capabilities to search the voluminous documents for information they believe may be material to their individual cases.

[9] Under our plan, as such material is organized, we will share it to the defense instance of evidence.com on a rolling basis.

The government's approach to the production of voluminous discovery in the Capitol Breach cases is consistent with the *Recommendations for Electronically Stored Information (ESI) Discovery Production* developed by the Department of Justice and Administrative Office of the U.S. Courts Joint Working Group on Electronic Technology in the Criminal Justice System.[10]  It is also the generally accepted approach in cases involving voluminous information. Notably, every circuit to address the issue has concluded that, where the government has provided discovery in a useable format, and absent bad faith such as padding the file with extraneous materials or purposefully hiding exculpatory material within voluminous materials, the government has satisfied its *Brady* obligations.  *See United States v. Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (the "government's duty to disclose generally does not include a duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence") (internal citations omitted); *United States v. Stanford*, 805 F.3d 557, 572 (5th Cir. 2015) ("We have previously rejected such 'open file' *Brady* claims where the government provided the defense with an electronic and searchable database of records, absent some showing that the government acted in bad faith or used the file to obscure exculpatory material.").[11]  The rare

---

[10] *See* https://www.justice.gov/archives/dag/page/file/913236/download.

[11] *See also United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) ("The government is not obliged to sift fastidiously through millions of pages (whether paper or electronic). . . [and] is under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence.") (quotation marks and citations omitted); *Rhoades v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011) (rejecting *Brady* claim on the ground that the defendant "points to no authority requiring the prosecution to single out a particular segment of a videotape, and we decline to impose one"); *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010) ("As a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence"); *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009) (same), *aff'd in part, vacated in part on other grounds*, 561 U.S. 358 (2010); *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005) ("*Brady* and its progeny . . . impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed."); *United States v. Jordan*, 316 F.3d 1215, 1253-54 (11th Cir. 2003) (defendant's demand

cases where courts have required the government to identify *Brady* within previously produced discovery are the exceptions to this widely observed rule.  For example, in *United States v. Saffarinia*, 424 F. Supp. 3d 46 (D.D.C. 2020), in which the court ordered the government to identify any known *Brady* material within its prior productions that involved over a million records and defense counsel was working "*pro bono* with time constraints and limited financial resources," the court acknowledged that "persuasive authority has articulated a 'general rule' that 'the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence.'"  *Id*. at 84 n.15 (quoting *Skilling*, 554 F.3d at 576).

      The defendant's various requests for voluminous information in this case demonstrate that he agrees with the government's approach to discovery and, further, understands the unprecedented scope of materials at issue.  In a discovery letter dated August 11, 2021, counsel for defendant Sandlin made "specific *Brady* requests" for "statements captured on recordings" and evidence of the "involvement of government agents."  Discovery Letter, at 1.  Such evidence, which defense counsel alleges is *Brady* material, includes "statements made by [defendant Sandlin] that were captured on audio and visual recordings" and "statements made by others in Mr. Sandlin's presence" that could support that he believed "that the counting of the votes [wa]s not going to occur or had been suspended for reasons unrelated to the storming of the Capitol by protesters."  *Id.*  Defense counsel also included in his specific *Brady* request "all evidence and information in the government's possession that would tend to indicate that government agents or actors … suggested, encouraged, or induced people to storm the Capitol, participated in the storming of the Capitol themselves, or otherwise facilitated the storming of

---

that the government "identify all of the *Brady* and *Giglio* material in its possession," "went far beyond" what the law requires); *United States v. Yi*, 791 F. App'x 437, 438 (4th Cir. 2020) ("We reject as without merit Yi's argument that fulfillment of the Government's obligation under *Brady* requires it to identify exculpatory material.").

11

the Capitol by action or declining to take action." *Id.* at 2. At the most recent status conference, defense counsel raised the issue of potential footage within the government's possession that may show different angles of the assaults charged in this case because "other arrested defendants … are all there filming it on their cameras and stuff." Hr'g Transcript 7 (Aug. 24, 2021). He added, "I need that." *Id.*

Confirming the enormity of the government's discovery challenges in these cases, defense counsel also acknowledged at the last hearing that "you can't see a video that you look at in this case where there is not at least multiple people filming it on their cameras or their GoPros or whatever device they use." Hr'g Transcript 7 (Aug. 24, 2021). The government's collection of Parler videos alone amounts to approximately 20 terabytes of data. Although the government's prosecution team in this case, assisted by the discovery team for the Capitol Breach cases, is working diligently to review this mountain of data, they cannot identify and produce all information that might be responsive to defense counsel's request before the currently scheduled trial date. The process outlined in the government's Capitol Breach discovery plan will accomplish that task, but not before the currently scheduled trial date. *See* Discovery Status Memoranda, Dkt. Nos. 41, 43, 48.

## II.  An Ends-of Justice Tolling of the Speedy Trial Act is Warranted.

Given the due diligence the government has applied and continues to apply to meet its discovery obligations, as set forth above and as previously set forth in our Discovery Status Memoranda and elaborated upon in prior hearings, the government has established that the requested ends-of-justice continuance is warranted under the STA.

The STA requires the district court to "exclude" from "the time within which . . . the trial . . . must commence":

> Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his *counsel or at the request of the attorney for the Government*, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C.A. § 3161(h)(7)(A) (emphasis added).

As the Supreme Court has observed, the STA "recognizes that criminal cases vary widely and that there are valid reasons for greater delay in particular cases." *Zedner v. United States*, 547 U.S. 489, 497 (2006). "Much of the Act's flexibility is furnished by § 3161(h)([7]), which governs ends-of-justice continuances." *Id*. at 498. "Congress clearly meant to give district judges a measure of flexibility in accommodating unusual, complex, and difficult cases." *Id*. at 508. Congress recognized "that the many sound grounds for granting ends-of-justice continuances could not be rigidly structured." *Id*.

Although the "substantive balancing underlying the decision" to grant an ends-of-justice continuance is "entrusted to the district court's sound discretion," *United States v. Rice*, 746 F.3d 1074, 1078 (D.C. Cir. 2014), the requirement of express findings imposes "procedural strictness" on the court. *Zedner*, 547 U.S. at 509 (2006). Those findings "must indicate [the court] 'seriously weighed the benefits of granting the continuance against the strong public and private interests served by speedy trials.'" *Rice*, 746 F.3d at 1078 (quoting *United States v. Bryant*, 523 F.3d 349, 361 (D.C. Cir. 2008)).

The need for a reasonable period of time to address discovery obligations is among the well-recognized reasons that justify an ends-of-justice continuance. The courts have repeatedly upheld, against defense challenges, discovery-based continuances involving far less complexity

13

and far less data than exists in the Capitol Breach cases. *See, e.g., United States v. Bikundi*, 926 F.3d 761, 777-79 (D.C. Cir. 2019) (upholding ends-of-justice continuances totaling 18 months in health care fraud and money laundering conspiracy case involving two defendants in part because the District Court found a need to "permit defense counsel and the government time to both produce discovery and review discovery").[12]

While defendant Sandlin may decide to oppose this motion,[13] Section 3161(h)(7)(A) does not require defendant's consent for an ends-of-justice continuance, and this Court and should grant the continuance over a defense objection where, as here, the circumstances clearly warrant it. There is no requirement that a defendant personally consent to an ends-of-justice continuance; the only question is whether the district court has complied with the procedural requirements of section 3161(h)(7). *See United States v. Sobh*, 571 F.3d 600, 603 (6th Cir. 2009)

---

[12] *See also United States v. Bell*, 925 F.3d 362, 374 (7th Cir. 2019) (upholding two-month ends-of-justice continuance in firearm possession case, over defendant's objection, where five days before trial a superseding indictment with four new counts was returned, "1,000 pages of new discovery materials and eight hours of recordings" were provided, and the government stated that "it needed more than five days to prepare to try [the defendant] on the new counts"); *United States v. Vernon*, 593 F. App'x 883, 886 (11th Cir. 2014) (District court did not abuse its broad discretion in case involving conspiracy to commit wire and mail fraud by granting two ends-of-justice continuances due to voluminous discovery); *United States v. Gordon*, 710 F.3d 1124, 1157-58 (10th Cir. 2013) (upholding ends-of-justice continuance of ten months and twenty-four days in case involving violation of federal securities laws, where discovery included "documents detailing the hundreds financial transactions that formed the basis for the charges" and "hundreds and thousands of documents that needs to be catalogued and separated, so that the parties could identify the relevant ones") (internal quotation marks omitted); *United States v. Lewis*, 611 F.3d 1172, 1177-78 (9th Cir. 2010) (upholding ninety-day ends-of-justice continuance in case involving international conspiracy to smuggle protected wildlife into the United States, where defendant's case was joined with several co-defendants, and there were on-going investigations, voluminous discovery, a large number of counts, and potential witnesses from other countries); *United States v. O'Connor*, 656 F.3d 630, 640 (7th Cir. 2011) (upholding ends-of-justice continuances totaling five months and twenty days in wire fraud case that began with eight charged defendants and ended with a single defendant exercising the right to trial, based on "the complexity of the case, the magnitude of the discovery, and the attorneys' schedules").

[13] As noted above, counsel for defendant Sandlin has stated he needs more time to consult with his client before articulating their position on this motion.

("By its terms, § 3161(h)([7])(A) does not require a defendant's consent to the continuance 'if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.'"); *accord United States v. Jones*, 795 F.3d 791, 798 (8th Cir. 2015); *United States v. Williams*, 753 F.3d 626, 635 (6th Cir. 2014); *United States v. Lynch*, 726 F.3d 346, 355 (2d Cir. 2013); *United States v. Gates*, 709 F.3d 58, 65-66 (1st Cir. 2013) ("We hold . . . that in the ordinary course and within the confines of the STA exclusion provisions, defense counsel has the power to seek an STA continuance without first informing his client or obtaining his client's personal consent."); *United States v. Herbst*, 666 F.3d 504, 510 (8th Cir. 2012) ("Herbst's opposition to his counsel's request for a continuance does not prevent that time from being excluded from the speedy trial calculation."); *United States v. Stewart*, 628 F.3d 246, 254 (6th Cir. 2010) ("[W]here an attorney seeks a continuance without the client's approval, this court has held that the Speedy Trial Act 'does not require a defendant's consent to the continuance' in order for a judge to be able to grant a motion in furtherance of the ends of justice."); *see also United States v. Stoddard*, 74 F. Supp. 3d 332, 341–42 (D.D.C. 2014) ("Even assuming *arguendo* that Stoddard was not advised of his statutory Speedy Trial rights by his counsel and that his counsel consented to the tolling of the time without Stoddard's consent, Stoddard was not prejudiced by this error. The Court tolled the time under the Speedy Trial Act pursuant to 18 U.S.C. §§ 3161(h)(8)(A), (B)(i), (B)(ii) & B(iv)(2004). None of those provisions require the consent of the defendant."); *cf. Zedner*, 547 U.S. at 500-01 (holding the STA cannot be tolled by virtue of a defendant's waiver of its application).[14]

---

[14] District courts routinely grant STA continuances over defense objections. *E.g., United States v. Grant*, No. CR 3:21-MJ-00144-CHL, 2021 WL 1762102, at *3 (W.D. Ky. May 4, 2021); *United States v. Williams*, No. 8:19-CR-40, 2020 WL 2499749, at *2 (D. Neb. May 14, 2020); *United States*

Further, the STA expressly contemplates continuances that will delay the trials of detained defendants. Pursuant to 18 U.S.C. § 3164:

(a) The trial or other disposition of cases involving—

    (1) a detained person who is being held in detention solely because he is awaiting trial, and

    (2) a released person who is awaiting trial and has been designated by the attorney for the Government as being of high risk,

shall be accorded priority.

(b) The trial of any person described in subsection (a)(1) or (a)(2) of this section shall commence not later than ninety days following the beginning of such continuous detention or designation of high risk by the attorney for the Government. *The periods of delay enumerated in section 3161(h) are excluded in computing the time limitation specified in this section.*

18 U.S.C. § 3164 (emphasis added). At the same time that the STA requires the trial of a detained person to commence within ninety days, it also *excludes* from this computation of time periods of delay enumerated in Section 3161(h). So long as this Court "seriously weigh[s] the benefits of granting the continuance against the strong public and private interests served by speedy trials," *United States v. Bryant*, 523 F.3d 349, 361 (D.C. Cir. 2008), the excluded periods must be omitted from the computation of ninety-day time limitation for bringing a detained defendant to trial.[15]

---

*v. Kingston*, No. 2-18-CR-00365JNPBCW, 2019 WL 1200254, at *4 (D. Utah Mar. 14, 2019), *aff'd sub nom. United States v. Dermen*, 779 F. App'x 497 (10th Cir. 2019); *United States v. Miller*, No. CR 16-40026-TSH, 2017 WL 11318728, at *2 (D. Mass. June 9, 2017); *United States v. Payne*, No. 2:16-CR-46-GMN-PAL, 2016 WL 7238921, at *3 (D. Nev. Dec. 12, 2016); *United States v. Cavalier*, No. 2:16-CR-046-GMN-PAL, 2016 WL 3381230, at *4 (D. Nev. June 13, 2016); *United States v. Villarreal*, No. CR 10-50082-JLV, 2011 WL 2182423, at *8 (D.S.D. June 3, 2011); *United States v. Leeper*, No. 08-CR-69S-5,12, 2009 WL 5171831, at *4 (W.D.N.Y. Dec. 23, 2009).

[15] *See also United States v. Theron*, 782 F.2d 1510, 1516 (10th Cir. 1986) ("Congress obviously contemplated some extension of the ninety-day limit on incarceration before trial when it incorporated the § 3161(h) exclusions into § 3164."); *United States v. Accetturo*, 623 F. Supp. 746,

## CONCLUSION

For the reasons described above, and any others that may be offered at a hearing on this matter, the United States respectfully requests that the Court grant its motion to vacate the trial date currently set for December 6, 2021, grant a 90-day continuance of the above-captioned proceeding, and set a status hearing to monitor the government's progress in meeting its discovery obligations.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

By:    /s/ *Emily A. Miller*
     Emily A. Miller
     Capitol Breach Discovery Coordinator
     D.C. Bar No. 462077
     555 Fourth Street, N.W., Room 5826
     Washington, DC 20530
     Emily.Miller2@usdoj.gov
     (202) 252-6988

By:    /s/ *Jessica Arco*
     Jessica Arco
     Trial Attorney – Detailee
     D.C. Bar No. 1035204
     555 Fourth Street, N.W.
     Washington, DC 20530
     Jessica.arco@usdoj.gov
     (202) 514-3204

---

765 (D.N.J. 1985) ("[T]he lengthy detention of a defendant under the Bail Reform Act due to a complex case is also specifically contemplated by the Speedy Trial Act."); *United States v. Babichenko*, No.: 1:18-cr-00258-BLW, 2019 WL 3558484, at *5 (D. Idaho Aug. 5, 2019) ("[A]pplication of the complex-case time frame under the Speedy Trial Act will sometimes lengthen the period of pretrial detention of a defendant.").