## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Case No. 21-cr-88 (DLF) |
| RONALD SANDLIN and | : | |
| NATHANIEL DEGRAVE, | : | |
| | : | |
| Defendants. | : | |

### UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT SANDLIN'S MOTION TO DISMISS COUNT FIVE OF INDICTMENT

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to Defendant Sandlin's Motion to Dismiss Count Five[1] for Failure to State an Offense, filed on September 13, 2021. For the reasons that follow, the Court should reject the defendant's motion.

### FACTUAL BACKGROUND

The facts underlying this case have been discussed at length in numerous pleadings stemming from the detention proceedings. *See* Dkt. Nos. 16, 29, 30. In short, the defendants conspired with each other and Josiah Colt[2] to interfere with the peaceful transition of presidential power on January 6, 2021, and ultimately to storm the Capitol and obstruct the Electoral College vote certification proceedings. Hours before rioters first breached the Capitol, the defendants called on "other patriots" to "take the Capitol," stating that it was "game time." Once inside the

---

[1] Since defendant Sandlin filed his motion, a grand jury in the District of Columbia returned a Superseding Indictment against both defendants, which had the effect of converting Count Five of the original indictments against each to Count Two of the Superseding Indictment. *Compare* Indictment, Dkt. No. 6, at 3, *with* Superseding Indictment, Dkt. No. 46, ¶¶ 36-37.

[2] Colt has since pleaded guilty to obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c). *See United States v. Josiah* Colt, No. 21-cr-74, Dkt. Nos. 21-22.

Capitol, the defendants assaulted two separate sets of U.S. Capitol Police officers guarding the exterior Rotunda doors and the doors to the balcony overlooking the Senate floor, respectively.

## PROCEDURAL HISTORY

The defendants were initially charged by indictment, in separate cases,[3] with offenses stemming from their conduct at the Capitol on January 6. Both defendants have been held in pretrial detention since the date of their arrests, and this Court and Judge Friedman denied their motions for bond. The Court of Appeals affirmed both detention orders.

After extensive discussions between the government and defense counsel, both defendants rejected their plea offers. On August 10, 2021, the Court set this case for trial on December 6, 2021, over the government's objection.

On September 13, 2021, defendant Sandlin filed the instant motion. Two days later, a grand jury in the District of Columbia returned a superseding indictment against the defendants, joining them in a single case and charging them with violations of 18 U.S.C. §§ 1512(k) (conspiracy to obstruct an official proceeding); 1512(c)(2) (obstruction of an official proceeding); 111(a)(1) (assaulting, resisting, or impeding certain officers); 231(a)(3) (certain acts during a civil disorder); and 1752(a) (unlawful entry and disorderly conduct on restricted grounds).

## ARGUMENT

### I. LEGAL STANDARD

A defendant may move to dismiss an indictment or count prior to trial. *See* Fed. R. Crim. P. 12(b)(3)(B). A pretrial motion may challenge "a defect in the indictment or information" if "the basis for the motion is then reasonably available and the motion can be determined without a trial

---

[3] Prior to September 15, 2021, the case against defendant DeGrave had been heard by Judge Friedman. *See United States v. Nathaniel DeGrave*, No. 21-cr-90.

on the merits." *Id.* Although a court's supervisory powers provide the authority to dismiss an indictment, "dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015). An "indictment must be viewed as a whole" and the "allegations must be accepted as true" in determining if an offense has been properly alleged. *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011). The key question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.*

## II. COUNTS 1 (CONSPIRACY) AND 2 (OBSTRUCTION OF AN OFFICIAL PROCEEDING) SHOULD NOT BE DISMISSED.

Defendant Sandlin puts forth a litany of reasons why the obstruction count—i.e., current Count Two of the Superseding Indictment—should be dismissed.[4] His primary argument is that Section 1512 "does not apply to disruptive or even intimidating conduct directed at [an] official proceeding while it is occurring." Def's Mot. Dismiss 2. He also challenges the validity of the term "official proceeding" in the statute, claiming that the term is ambiguous and that Congress's constitutionally mandated process of counting the Electoral College votes and certifying the next President and Vice President of the United States was somehow not an "official proceeding." The defendant also argues that the statute is unconstitutionally vague as applied in this case, and that the rule of lenity demands dismissal of the obstruction charge. None of these arguments has merit.

### A. Congress's Joint Session on January 6 Was an "Official Proceeding."

Contrary to the defendant's claims, Congress's joint session meeting on January 6, 2021, to review, count, and certify the Electoral College vote constitutes an "official proceeding" under the definition of that term set forth in 18 U.S.C. § 1515(a)(1).

---

[4] Although the defendants have not yet challenged Count One of the Superseding Indictment (Conspiracy), the government understands that many, if not all, of the arguments set forth in the defendant's motion would apply to both Counts One and Two of the Superseding Indictment.

1.      Background

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote. Under the Twelfth Amendment, the state Electors must "vote by ballot," marking one set of ballots for the individual voted for as President and "distinct ballots" for the vice-presidential selection. U.S. Const. amend. XII. The Electors must then create "lists" of the presidential and vice-presidential candidates who received votes, "which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States." *Id.* These certified lists, or "certificates," are then opened by the Vice President, while acting as the President of the Senate, "in the presence of the Senate and House of Representatives," and "the Votes shall then be counted." *Id.*; U.S. Const. art. II, § 1, cl. 3

Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. Section 15 details the steps to be followed. Specifically, the President of the Senate opens the votes, hands them to two "tellers" from each House, who in turn create a new "list" that comprises "the votes as they shall appear from the said certificates." *Id.* During the reading of the certificates, the President of the Senate must open the floor to objections; any objection "shall be made in writing . . . and shall be signed by at least one Senator and one Member of the House of Representatives." *Id.* The President of the Senate is empowered to "preserve order" during the Joint Session. 3 U.S.C. § 18. Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once." 3 U.S.C. § 17. The Electoral Act, which specifies where within the chamber

Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

The defendants here are charged with violating Section 1512(c)(2) by corruptly obstructing, influencing, or impeding any official proceeding, as well as conspiring to do so. An "official proceeding" for purposes of Section 1512(c)(2) is defined in Section 1515 as:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) *a proceeding before the Congress*;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce.

18 U.S.C. § 1515(a)(1) (emphasis added).

> 2. <u>Congress's Joint Session to certify the Electoral College vote is a "proceeding before the Congress."</u>

Congress's meeting to certify the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress" under 18 U.S.C. § 1515(a)(1)(B) and therefore an "official proceeding" for purposes of Section 1512(c)(2). That conclusion flows principally from the obstruction statute's plain text. Skipping past the text, the defendant argues that Congress's intent and other language in the obstruction statute import a quasi-judicial requirement into the term "official proceeding." That argument is incorrect, but even if somehow valid, it still would not disqualify Congress's Joint Session on January 6.

Section 1515(a)(1)(B) defines "official proceeding" as a "proceeding before the Congress." To determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted). In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, or "a proceeding before the Congress." Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation omitted).

Congress's Joint Session to certify the Electoral College vote constitutes a "proceeding" under any interpretation of that term. In its broadest and most "general sense," a "proceeding" refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting *Proceeding,* Oxford English Dictionary, *available at* http://www.oed.com). The defendant cannot seriously contend that Congress's Joint Session to certify the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding under that broad definition.

A narrower definition of the term "proceeding" would look to the "legal—rather than the lay—understanding" of the term. *Ermoian*, 752 F.3d at 1170. This narrower definition includes the "business conducted by a court or other official body; a hearing." Black's Law Dictionary, "Proceeding" (11th ed. 2019). Taken with its modifier "official," the term "proceeding" thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170. Even under this narrower definition, Congress's Joint Session to certify the Electoral College vote—business conducted by an official body, in a formal session—easily qualifies.

The formality involved in the certification of the Electoral College vote places it well within the various categories of official proceedings, even under the narrower legal definition of the term "proceeding." Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for Congress's certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Required by law to begin at 1:00 pm on the sixth of January following a presidential election, Congress's meeting to certify the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body." *See* Black's Law Dictionary, "Proceeding." The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform"). Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared." *Id.* In short, Congress's Joint Session to certify the Electoral College vote is a "proceeding before the Congress" under Section 1515(a)(1)(B).

b. *Section 1515(a)(1) imposes no quasi-judicial requirement.*

The defendant argues that the context surrounding section 1512 shows that Congress intended to limit the definition of "official proceeding" in Section 1515(a)(1) to only a "court-like proceeding that has the ability to secure witness testimony and evidence for purposes related to the administration of justice." Def's Mot. Dismiss 19. But the language of Section 1515(a)(1)(B) is clear, and the defendant's proffered reasons to support his argument—case law interpreting Section 1515(a)(1)(C), the title and placement of Section 1512 within Title 18, and legislative history—all fail.

i. Section 1515(a)(1)(B) has no limitation on the type of congressional proceeding.

Section 1515(a)(1)(B) defines an "official proceeding" broadly as a "proceeding before the Congress." As an initial matter, it is difficult to imagine a proceeding more "official" than a constitutionally and statutorily prescribed Joint Session of the United States Congress that convenes once every four years.

Had Congress wanted to import a definition that more closely resembled a quasi-adjudicative setting, it needed look only a few provisions away to Section 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency. And to the extent that "before" refers to "some formal convocation of the agency in which parties are directed to appear," *see United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019) (internal quotation omitted), Congress's certification of the Electoral College vote involves a "formal convocation" of Congress to assess the ballots and "declare[]" the "result" of the presidential election. 3 U.S.C. § 16.

Under the defendant's logic, "a proceeding before the Congress" in Section 1515(a)(1)(B) should encompass only "court-like" congressional proceedings, such as congressional investigations or impeachments. *See* Def's Mot. Dismiss 19. But Section 1505 expressly criminalizes obstruction of "any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). Had Congress wished to limit the obstruction prohibition under Sections 1512 and 1515(a)(1)(B) to congressional investigations, it could have done so by borrowing the "inquiry" language of Section 1505. But it chose different terms, with different meanings. *See Russello v. United States,* 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."). Here, Congress enacted broader language ("a proceeding before the Congress") to cover a broader range of proceedings than only the "inquir[ies] and investigation[s]" envisioned in Section 1505. That broader definition in Section 1515(a)(1)(B) includes any "proceeding" conducted by "the Congress," including its formal Joint Session on January 6.

The defendant's narrowed reading of "proceeding before the Congress" in Section 1515(a)(1)(B)—in essence, importing an extra-textual quasi-judicial requirement—would undercut the broad statute that Congress enacted. In the defendant's view, for example, an individual who threatened a Senator and a Representative with injury unless each agreed to object to the Electoral College certification—even though each Member knew that the objections were frivolous—would not amount to obstruction under the statute. Nor would it appear to cover an individual who paid one of the tellers—appointed by the Senate and House of Representatives to handle the Electoral College votes—to falsify or destroy votes. Indeed, the defendant's motion

does not identify which congressional proceedings would fall within the ambit of his proffered narrowed definition, nor does it grapple with the anomalous result that follows from his argument: an investigation by a committee—not even a full House, let alone both Houses—would qualify as a "proceeding before the Congress," but a constitutionally required Joint Session to resolve disputes over and ultimately certify the result of a presidential election would not.

This crabbed approach fails to recognize that Congress's meeting to certify the Electoral College vote is an official proceeding that is "crucial to the conduct of government" and therefore "entitled to go forward free of corrupting influences that not only delay [it] but increase the chances of false and unjust outcomes." *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019). Whatever the outer limits of a "proceeding before the Congress" for purposes of the statute, Congress's Joint Session to debate and certify the Electoral College vote falls well within them.

> ii.   Case law interpreting Section 1515(a)(1)(C) is inapposite.

No court appears to have had occasion to interpret Section 1515(a)(1)(B)'s phrase "proceeding before the Congress," possibly because the phrase is unambiguous.

The defendant's reliance on cases interpreting Section 1515 (a)(1)(C) is misplaced because those decisions hinge on the phrase "which is authorized by law" that is absent from Section 1515 (a)(1)(B). *See* Def's Mot. Dismiss 20-21. In *Ermoian*, a decision cited by the defendant, the question was whether an FBI investigation was an "official proceeding" that was "authorized by law" under Section 1512 (a)(1)(C). 752 F.3d at 1170. A similar question was addressed in *United States v. Ramos*, cited by the defendant, and numerous other cases. 537 F.3d 439, 463 (5th Cir. 2008) (internal investigation conducted by Customs and Border Patrol); *see also United States v. Binette*, 828 F. Supp. 2d 402, 404 (D. Mass. 2011) (preliminary SEC investigation); and *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (review panel within the Bureau of Prisons).

Moreover, in the context of Section 1515(a)(1)(C), courts typically analyze the degree of "formality" in a law enforcement investigation to determine if it is an "official proceeding." *See, e.g.*, *Sutherland*, 921 F.3d, at 426 (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"); *Ermoian*, 752 F.3d at 1170-72 (same); *Ramos*, 537 F.3d at 463 (term "official proceeding … contemplates a formal environment"). There should be no question that Congress's constitutionally and statutorily required Joint Session was sufficiently "formal" to qualify as an "official proceeding."

> iii. The title and placement of Section 1512 does not impose a quasi-judicial requirement on the phrase "official proceeding."

The defendant asserts that Section 1512's title—"Tampering with a witness, victim, or an informant"—implies that the "official proceeding" definition in Section 1515 does not cover Congress's meeting to certify the Electoral College vote and instead only "refer[s] to a proceeding related to the administration of justice." *See* Def's Mot. Dismiss 23. But the title of Section 1512 says nothing about the definition of "official proceeding" in Section 1515.

First, his argument fails to heed "the wise rule" that neither "the title of a statute" nor "the heading of a section" can "limit the plain meaning of the text." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528-29 (1947). A statute's title cannot mention every term in the text; to attempt to do so "would often be ungainly as well as useless." *Id.* at 528. That is precisely why "matters in the text . . . are frequently unreflected in the headings." *Id.* Simply put, a section title is "not meant to take the place of the detailed provisions of the text." *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1169 (2014).

Second, the title of the legislation's section actually supports a broad interpretation of Section 1512(c). This provision was enacted in 2002 as part of the Sarbanes-Oxley Act, Pub. L.

107-204, specifically Section 1102 of the law, which is titled "Tampering with a Record or Otherwise Impeding an Official Proceeding." In other words, Congress evidenced its intent that "otherwise impeding an official proceeding" would indeed be a crime, a separate crime from "tampering with a record."

Third, the defendant's reference to other provisions in Chapter 73, which covers obstruction of justice offenses, have even less bearing on the plain meaning of Section 1512(c)(2). *See* Def's Mot. Dismiss 24. If anything, those neighboring provisions—which criminalize obstruction of other proceedings and investigations and protect judges, jurors, and witnesses— merely underscore how robustly Congress sought to penalize obstructive conduct across a vast range of settings and circumstances. That Congress wished to penalize efforts to obstruct everything from a federal audit to a bankruptcy to an examination by an insurance official only reinforces the fact that the *acts* of obstructing, influencing or impeding are more important than the particular type of federal proceeding being obstructed. *See Williamson*, 903 F.3d at 131.[5]

> c.   *Congress's certification of the Electoral College vote is quasi-judicial.*

The defendant's challenge also fails even if he is correct—and he is not—that for a proceeding to constitute an "official proceeding" under the obstruction statute, that proceeding must be "court-like." Far from a "purely ceremonial or ministerial" function, *see* Def's Mot. Dismiss 25, Congress's meeting to certify the Electoral College vote has features that resemble an adjudicative proceeding. It involves the convening of a Joint Session, a deliberative body over

---

[5] The defendant's reliance on legislative history, Def's Mot. Dismiss 23, is also flawed. For one, the "best evidence of [a statute's purpose] is the statutory text adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), so there is no reason to consider the obstruction statute's legislative history. Moreover, the legislative history recognized that the "term 'official proceeding'" in the obstruction statute is "defined broadly." S. Rep. No. 97-532, at 17 (1982).

which a government officer, the President of the Senate, "presid[es]." 3 U.S.C. § 15. That body convenes to render judgment on whether to certify the votes cast by Electors in the presidential election. As in an adjudicative setting, parties may lodge objections, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it. *Id.* And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result." 3 U.S.C. § 16.

**B.     Section 1512(c) is not unconstitutionally vague.**

The defendant argues that Section 1512(c) is unconstitutionally vague,[6] claiming that the terms "official proceeding" and "corruptly" are vague and thus does provide fair notice of the conduct it proscribes and invites arbitrary enforcement. This argument lacks merit.

1.     Background

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from "depriv[ing] any person of life, liberty, or property, without due process of law." An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). But the doctrine is narrow, and challengers raising vagueness arguments must overcome the strong presumption that duly enacted statutes are constitutional. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not

---

[6] Although not explicitly styled as such, the defendant appears to be making an as-applied challenge to the statute. *See* Def's Mot. Dismiss 2, 12-15.

automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.").

Accordingly, the void for vagueness doctrine "does not invalidate every statute which a reviewing court believes could have been drafted with greater precision." *Rose v. Locke*, 423 U.S. 48, 49 (1975) (per curiam). Rather, a statute is unconstitutionally vague only if it "proscribe[s] no comprehensible course of conduct at all." *United States v. Powell*, 423 U.S. 87, 92 (1975). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). This court has recently recognized a high bar for rendering a statute unconstitutionally vague, advising that:

> [N]o void for vagueness challenge is successful merely because a statute requires a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask. Instead, *unconstitutional vagueness arises only if the statute specifies no standard of conduct at all.*

*United States v. Gonzalez*, No. 20-cr-40 (BAH), 2020 WL 6342948, at *7 (D.D.C. Oct. 29, 2020) (internal citation and quotation omitted) (emphasis added); *see also United States v. Harmon*, No. 19-cr-395 (BAH), 2021 WL 1518344, at *4 (D.D.C. Apr. 16, 2021) (finding that defendant did not meet "stringent standard" to prevail on Rule 12 void-for-vagueness motion).

The defendant further posits that the obstruction statute is so vague that it allows arbitrary enforcement, and that "if the language in § 1512(c)(2) is read to reach beyond conduct that can affect an official proceeding by impacting the state and content of what it might consider in making its deliberations … it is hard see how § 1512(c)(2) would not be overly vague." Def's Mot. Dismiss 13. To evaluate whether a statute is so vague that it allows for arbitrary enforcement, a court looks to whether the statute has "establish[ed] minimal guidelines to govern law enforcement" because

a statute may "require law enforcement officers to use their discretion without being unconstitutionally vague." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983); *Agnew v. Dist. Of Columbia*, 920 F.3d 49, 55 (D.C. Cir. 2019). The statute here easily passes muster.

The D.C. Circuit's decision in *United States v. Bronstein*, 849 F.3d 1101 (D.C. Cir. 2017), illustrates the distinction between laws that require some degree of interpretation and laws that are unconstitutionally vague. In *Bronstein*, the defendants were prosecuted for disturbing a Supreme Court argument under a law that prohibited, among other things, making a "harangue" or "oration" within the Supreme Court building. *Id.* at 1104 (citing 40 U.S.C. § 6134). The district court held that those terms were unconstitutionally vague, but the D.C. Circuit reversed. *Id.*

As the D.C. Circuit explained, vagueness is not evaluated in a vacuum. Instead, courts are required to exhaust all the available tools for statutory interpretation before declaring a statute void for vagueness. "The vagueness analysis . . . turns on the tools of statutory interpretation." *Id.* A law is not vague merely because it requires some interpretation, for "[e]ven trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid." *Id.* at 1107 (quoting *Rose*, 423 U.S. at 50). Rather, "a statute is unconstitutionally vague if, *applying the rules for interpreting legal texts*, *its meaning specifies no standard of conduct at all*." *Id.* (internal citation, quotation, and alterations omitted) (emphasis added). Importantly, "when the vagueness doctrine assesses a legal term's meaning to 'ordinary people,' it is assessing meaning with the elementary rule of statutory interpretation: Words receive their 'plain, obvious and common sense' meaning, 'unless context furnishes some ground to control, qualify, or enlarge it.'" *Id.* at 1108 (citation omitted). A court therefore may strike a statute as unconstitutional only if "no construction can save" it. *Id.* at 1106 (internal citation and quotation omitted).

Thus, the challenge in *Bronstein* failed because the disputed statutory terms "harangue" and "oration" could easily be construed using ordinary tools of statutory construction. Because the court could discern a "core meaning" to the disputed terms by "[e]mploying the tools of statutory interpretation"—and because that core meaning "proscribes determinable conduct"—the statute was not unconstitutionally vague. *Id.* at 1104. Applying these principles to the statutory interpretation arguments outlined in this brief, Section 1512 is not unconstitutionally vague.

2. <u>The as-applied challenges to the statute should be rejected.</u>

A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Section 1512(c)(2) does neither.

a. *"Official proceeding" is not unconstitutionally vague as applied to these defendants.*

Defendant Sandlin alludes to an argument that strains credulity: that it is unfair to prosecute him for obstruction of an official proceeding because he was not on fair notice that Congress's Joint Session on January 6 constituted an "official proceeding." *See* Def's Mot. Dismiss 12-15. Even a layperson's common sense reading of "a proceeding before the Congress" would include a Joint Session called to certify a presidential election result. For this reason, and as discussed at length in Section II.A, *supra*, this claim should be dismissed out of hand.

b. *"Corruptly" is not unconstitutionally vague as applied to these defendants.*

Defendant Sandlin also implicitly argues that the "corruptly" term used in Section 1512(c)(2) is unconstitutionally vague because it does not provide fair notice of the conduct it proscribes and invites arbitrary enforcement. *See* Def's Mot. Dismiss 13-15.

Because "'corruptly'" is not defined in the statute, it is "understood . . . to have its ordinary meaning." *United States v. North*, 910 F.2d 843, 881 (D.C. Cir. 1990) (per curiam), *withdrawn and superseded in part by United States v. North*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam). In *Poindexter*, the D.C. Circuit suggested, while construing 18 U.S.C. § 1505,[7] that "corruptly" was "vague . . . in the absence of some narrowing gloss." 951 F.2d at 378 (internal quotation marks omitted). After surveying the obstruction statute's legislative history (including the "[o]rigins" of Sections 1503 and 1505) and case law interpreting Section 1505, the court reversed the defendant's conviction because Section 1505 failed to provide "constitutionally required notice" that the defendant's conduct—making false and misleading statements to Congress—fell within the statute's scope. *Id.* at 380, 386. The court disclaimed any conclusion that "corruptly" in Section 1505 was "unconstitutionally vague *as applied to all conduct*." *Id.* at 385 (emphasis added) (internal quotation marks omitted). The court also declined to adopt as a standard that "'corruptly' means that in acting, the defendant aimed to obtain an 'improper advantage for [himself] or someone else inconsistent with official duty and rights of others.'" *Id.* at 385-86 (quoting *North*, 910 F.2d at 881-82).[8]

Since *Poindexter*, many courts, including the D.C. Circuit, have upheld the term "corruptly" as passing constitutional muster in the context of related obstruction statutes.

---

[7] Section 1505 applies to "[w]hoever corruptly . . . influences, obstructs, or impedes or endeavors to influence, obstruct, or impede . . . the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress." 18 U.S.C. § 1505.

[8] Congress subsequently amended Section 1505 (and legislatively overruled *Poindexter*) by adding a definition of "corruptly": "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." *See* 18 U.S.C. § 1515(b).

*See, e.g.*, *United States v. Morrison*, 98 F.3d 619, 630-31 (D.C. Cir. 1996) (rejecting vagueness challenge to "corruptly" under Section 1512(b)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same). For purposes of Section 1512(c)(2), the term "corruptly" has been construed as having two components: (1) intent to obstruct, impede, or influence; and (2) wrongfulness. *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (to act "corruptly" is to act "with an improper purpose" and "with the specific intent to subvert, impede or obstruct") (quoting *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007)); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing" (internal quotation marks omitted)); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (upholding instruction defining "[c]orruptly" as acting "with the purpose of wrongfully impeding the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512(c) ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice.").

Here, the indictment alleges that the defendants intended to obstruct, influence, or impede the congressional proceeding and in fact did so. No one could think that forcing one's way into the Capitol to stop or delay Congress from meeting—and trying to intimidate Congress from formally certifying the Electoral College vote—was somehow legal. Indeed, defendants Sandlin and DeGrave entered the Capitol as alarm bells rang. They violently assaulted two sets of U.S. Capitol Police officers guarding important entryways, including to the Senate Chamber itself. While inside the Senate Chamber, defendant Sandlin wept with joy as he exclaimed "we took it," while defendant DeGrave

called on others to "take laptops" and "paperwork." They evinced no misunderstanding

of the unlawful actions they took on January 6. The defendants thus have "fair notice"

that their conduct was "corrupt[]" within the meaning of Section 1512(c)(2), as that term

has been defined and upheld by the appellate courts. *See, e.g.*, *Friske*, 640 F.3d at 1291.

Accordingly, the term "corruptly" does not render Section 1512 unconstitutionally vague.

    **C.**    **Section 1512(c)(2) is not limited to "suppression and corruption of evidence, testimony, and information that might be relevant to an official proceeding."[9]**

Section 1512(c)(2) provides that "[w]hoever corruptly . . . obstructs, influences, or impedes

any official proceeding" has committed a crime. A person violates that statute when, acting with

the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding.

*See* 18 U.S.C. § 1512(c)(2); § 1515(a)(1)(B). Nothing in Section 1512(c)(2)'s text, structure, or

history limits it to "conduct that can affect an official proceeding by impacting the state and content

of what it might consider in making its deliberations"—*i.e.*, obstruction tied to documentary or

other tangible evidence. *See* Def's Mot. Dismiss 9-12. Nor does the Supreme Court's decision in

*Yates v. United States*, 574 U.S. 528 (2015), which construed a different term in a different statute,

support imposing such an atextual limitation on Section 1512(c)(2). But even if such a limitation

existed, the statute encompasses the defendants' alleged conduct.

    1.    Section 1512(c)(2)'s text, structure, and history confirm that its prohibition on obstructive conduct covers the defendants' actions on January 6, 2021.

In Section 1512(c)(2), Congress enacted a comprehensive prohibition on conduct that

intentionally and wrongfully obstructs official proceedings. The ordinary meaning of "obstruct[],

influence[], or impede[]" encompasses a wide range of conduct designed to undermine an official

---

[9] *See* Def's Mot. Dismiss 4.

proceeding. That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, and burning a building to conceal the bodies of murder victims. *See, infra*, Section II.C.1.a. It also includes storming the Capitol to derail a congressional proceeding. A defendant who, acting with the necessary *mens rea*, obstructs (or attempts to obstruct) Congress's certification of the Electoral College vote violates Section 1512(c)(2).

> a. *Section 1512(c)(2)'s text and structure support the government's application of the statute to the defendants' conduct.*

Section 1512(c)(2)'s text and structure demonstrate that it serves as a comprehensive prohibition on corrupt conduct that intentionally obstructs or impedes an official proceeding. When interpreting a statute, courts look first to the statutory language, "giving the words used their ordinary meaning." *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted). If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted). Here, the meaning of "obstruct[], influence[], or impede[]" is controlled by the ordinary meaning of those words.

The verbs Congress selected in Section 1512(c)(2) reach broadly. For example, the words "obstruct" and "impede" can "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'" *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries). Similarly, "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on." *Influence*, Oxford English Dictionary, *available at* http://www.oed.com. By their plain meaning, then, the string of verbs in Section 1512(c)(2) are properly viewed as "expansive" in their coverage. *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013).

Section 1512(c)'s structure confirms that straightforward interpretation. Section 1512(c) consists of two provisions, both of which require the defendant to act "corruptly." First, Section 1512(c)(1) criminalizes "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." Section 1512(c)(2), by contrast, applies more generally to any acts that "otherwise obstruct[], influence[], or impede[]" an "official proceeding." The term "otherwise," consistent with its ordinary meaning, conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that Section 1512(c)(1) proscribes. *Burge*, 711 F.3d at 809; *United States v. Petruk*, 781 F.3d 438, 446-47 (8th Cir. 2015) (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or "differently," "*gives defendants fair warning in plain language*" that the obstruction prohibition in subsection (c)(2) applies "*without regard to whether the action relates to documents or records*" (internal quotation marks omitted) (emphasis added)); *see also United States v. Ring*, 628 F. Supp. 2d 195, 224 n.17 (D.D.C. 2009) (noting that Section 1512(c)(2) is "plainly separate and independent of" Section 1512(c)(1), and declining to read "otherwise" in Section 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering"); *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com (defining otherwise as "in another way" or "in any other way").

In this way, Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)(1)—obstruction of an official proceeding—but accomplished by a different *means*—*i.e.*, some conduct other than destruction of a document, record or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503, which criminalizes the *result* of obstructing the due administration of justice, provides both specific

means of accomplishing that result as well as a separate catch-all clause designed to capture *other* means). Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records under Section 1512(c)(1). *Petruk*, 781 F.3d at 447 (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)); *cf. United States v. Aguilar*, 515 U.S. 593, 598 (1995) (describing similar "[o]mnibus" clause in 18 U.S.C. § 1503 as a catchall that is "far more general in scope than the earlier clauses of the statute").

Consistent with that interpretation, courts have upheld convictions under Section 1512(c)(2) of defendants who attempted to secure a false alibi witness while in jail for having stolen a vehicle, *Petruk*, 781 F.3d at 440, 447; disclosed the identity of an undercover federal agent to thwart a grand jury investigation, *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009); lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-09; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *Volpendesto*, 746 F.3d at 286; and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (unpublished).

Section 1512(c)(2) likewise applies to the defendants' alleged conduct, which involved forcing their way into the restricted Capitol building, and ultimately the Senate Chamber itself, to prevent a Joint Session of Congress from certifying the results of the 2020 Presidential election. In so doing, the defendants hindered and delayed—*i.e.*, obstructed and impeded—the certification of the Electoral College vote, an "official proceeding." *See* 18 U.S.C. § 1515(a)(1)(B). Because construing Section 1512(c)(2) to reach that conduct would neither "frustrate Congress's clear

intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

By contrast, reading Section 1512(c)(2) as limited only to obstructive acts akin to the document destruction or evidence tampering captured in Section 1512(c)(1) suffers at least three flaws. *First*, it would give rise to unnecessarily complex questions about what sort of conduct qualifies as "similar to but different from" the proscribed conduct "described in [Section 1512](c)(1)." *See United States v. Singleton*, No. 06-CR-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished) (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-CR-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceedings [*sic*] through his conduct in relation to a tangible object"). Under the defendant's limited construction, for example, Section 1512(c)(2) may not encompass false statements made to obstruct a proceeding, though courts have widely upheld convictions for such conduct. *See Petruk*, 781 F.3d at 447 (collecting cases).

*Second*, limiting Section 1512(c)(2) in that way would effectively render that provision superfluous in light of the comprehensive prohibitions against document and evidence destruction in both Sections 1512(c)(1) and 1519. *See Yates*, 574 U.S. at 541 n.4 (plurality opinion) (Section 1512(c)(1) provides a "broad ban on evidence-spoliation" (internal quotation marks omitted)). By contrast, the straightforward interpretation that treats Section 1512(c)(2) as a catch-all for corrupt obstructive conduct not covered by Section 1512(c)(1) would "give effect to every clause and word" of Section 1512(c). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (explaining that limiting catch-all

provision in Section 1503's omnibus clause to obstructive acts "directed against individuals" would render that catch-all superfluous because "earlier, specific[] prohibitions" in Section 1503 "pretty well exhaust such possibilities" (internal quotation marks omitted)); *United States v. Watt*, 911 F. Supp. 538, 546 (D.D.C. 1995) (rejecting interpretation of Section 1503 omnibus clause that would "serve no other purpose than to prohibit acts already prohibited in the first part of the statute" because that reading would "reduce[] the omnibus clause to mere redundancy").

Nor does the fact that Congress adopted a more general catch-all in Section 1512(c)(2) render superfluous other obstruction prohibitions found in Chapter 73, the criminal code's chapter on obstruction of justice. Instead, the catch-all in Section 1512(c)(2) serves to capture "known unknowns." *See Yates*, 574 U.S. at 551 (Alito, J., concurring) (quoting *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009)). Indeed, "the whole value of a generally phrased residual clause . . . is that it serves as a catchall" to ensure that the full range of conduct Congress sought to regulate comes within the statute, including "matters not specifically contemplated" by more specific provisions. *Beaty*, 556 U.S. at 860. In any event, "[r]edundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there." *Id.* at 253-54.

Judicial treatment of the nearby omnibus clause in Section 1503, which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice," 18 U.S.C. § 1503, is instructive. Drafted in "very broad language," this omnibus clause or "catchall provision," *see Aguilar*, 515 U.S. at 599, principally operates to criminalize obstructive conduct that falls outside the narrower prohibitions within

Section 1503 and neighboring prohibitions. *See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 168-70 (3d Cir. 2013) (removing gold coins from safe-deposit box); *United States v. Frank*, 354 F.3d 910, 916-19 (8th Cir. 2004) (removing car to avoid seizure); *United States v. Lefkowitz*, 125 F.3d 608, 619-20 (8th Cir. 1997) (instructing employee to remove documents from house); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-98 (9th Cir. 1982) (corruptly warning suspect about impending search warrant to prevent discovery of heroin); *Howard*, 569 F.2d at 1333-34 (attempting to sell grand jury transcripts). No court, however, has held that the omnibus clause's broad language, which necessarily encompasses Section 1503's narrower prohibitions, renders those narrower prohibitions superfluous. *Cf. Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005) ("The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either."). The same is true for the catch-all provision in Section 1512(c)(2).

*Third*, importing into Section 1512(c)(2) a nexus-to-tangible-evidence-or-documents requirement would require inserting an extratextual gloss that would render the verbs in Section 1512(c)(2) nonsensical. *See Dean v. United States*, 556 U.S. 568, 572 (2009) (courts "ordinarily resist reading words or elements into a statute that do not appear on its face" (internal quotation marks omitted)). The *actus reus* that those verbs encompass is obstructing, influencing, and impeding; a defendant cannot "obstruct" a document or "impede" a financial record. *Cf. Yates*, 574 U.S. at 551 (Alito, J., concurring) (rejecting interpretation of "tangible object" in Section 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at 544 (plurality opinion) ("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon.").

Because "the statutory language provides a clear answer," the construction of Section 1512(c)(2) "ends there" and resort to legislative history is unnecessary. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999); *see Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) ("Congress's authoritative statement is the statutory text, not the legislative history." (internal quotation marks omitted)); *see also United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 251-52 (S.D. Tex. 2020) (declining to consider Section 1512's legislative history in rejecting claim that statute was limited to document destruction). Regardless, the legislative history of Section 1512(c)(2)—particularly when considered alongside the history of Section 1512 more generally—provides no support for a conclusion contrary to the government's position.

When Congress originally enacted Section 1512 in 1982, that legislation did not include what is now Section 1512(c). *See* Victim and Witness Protection Act of 1982, Pub. L. No. 97-291, § 4(a), 96 Stat. 1248, 1249-50. Its title then, as now, was "Tampering with a witness, victim, or an informant." *Id.*; 18 U.S.C. § 1512. As that title suggests, Section 1512 as originally enacted targeted conduct such as using intimidation, threats, or corrupt persuasion to prevent testimony or hinder, delay, or prevent communication of information to law enforcement or the courts, as well as intentionally harassing another person to hinder, delay, or prevent that person from taking certain actions. *See* Pub. L. No. 97-291, § 4(a) (now codified as Sections 1512(b) and (d)). For example, Section 1512 as enacted in 1982 included a prohibition on using intimidation, physical force, or threats, with the intent to "cause or induce any person to . . . alter, destroy, mutilate, or conceal an object with intent to impair that object's integrity or availability for use in an official proceeding." *Id.* § 4(a) (originally § 1512(a)(2)(B); now codified at § 1512(b)(2)(B)).

Twenty years later, following the collapse of the Enron Corporation, Congress passed the Sarbanes-Oxley Act of 2002. Pub. L. No. 107-204, 116 Stat. 745; *see Yates*, 574 U.S. at 535 (plurality opinion). That legislation, which principally aimed to "prevent and punish corporate fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions," S. Rep. No. 107-146, at 2 (2002), included several different provisions, *id.* at 11 (describing different components of the law); *see also* 148 Cong. Rec. H4683-84 (daily ed. July 16, 2002) (outlining new provisions). Foremost among them were two new criminal statutes, 18 U.S.C. § 1519 and 18 U.S.C. § 1520, which were intended to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146, at 14. The Senate Judiciary Committee Report on the Act discussed those two provisions in detail. *See id.* at 14-16.

By contrast, the Sarbanes-Oxley Act's legislative history provides limited explanation of Congress's objective in enacting Section 1512(c). The only discussion of Section 1512 in the Senate Judiciary Committee Report, for example, noted that the pre-existing prohibition in Section 1512(b) made it a crime to induce "another person to destroy documents, but not a crime for a person to destroy the same documents personally"—a limitation that "forced" prosecutors to "proceed under the legal fiction that the defendants [in then-pending *United States v. Arthur Andersen*] are being prosecuted for telling other people to shred documents, not simply for destroying evidence themselves." S. Rep. No. 107-146, at 6-7. Similarly, Senator Hatch observed that the legislation "broaden[ed]" Section 1512 by permitting prosecution of "an individual who acts alone in destroying evidence." 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch). At a minimum, nothing in these passing references casts doubt on the plain meaning of Section 1512(c)(2), which is reflected in the interpretation described above.

Section 1512(c) also differed from the newly enacted Sections 1519 and 1520 in that Congress added the former to an existing statutory section: Section 1512.  *See Yates*, 574 U.S. at 541 (plurality opinion) (noting that, unlike Section 1519, Section 1512(c)(2) was placed among the "broad proscriptions" in the "pre-existing" Section 1512).  Moreover, although Section 1512(c) as enacted in the Sarbanes-Oxley Act recognized two distinct prohibitions, *see* Pub. L. No. 107-204, § 1102, 116 Stat. 807 ("Tampering with a record *or* otherwise impeding an official proceeding") (emphasis added; capitalization altered), Congress did not amend Section 1512's title.  That title, "Tampering with a witness, victim, or an informant," § 1512, thus encompassed the pre-existing provisions aimed at a defendant's obstructive conduct directed toward another person,[10] but did not reflect the newly enacted prohibitions in Section 1512(c) that criminalized a defendant's own obstructive act, either through destroying documents (§ 1512(c)(1)) or otherwise impeding an official proceeding (§ 1512(c)(2)).  *See Yates*, 574 U.S. at 541 n.4 (plurality opinion) (noting that Congress added Section 1512(c)(1), which covered evidence-spoliation, to Section 1512 "even though § 1512's preexisting title and provisions all related to witness-tampering").

Section 1512(c)'s legislative and statutory history thus offers two reasons to interpret Section 1512(c)(2) consistently with its plain text and structure.  First, Section 1512(c) aimed at closing a "loophole" in Section 1512: the existing prohibitions did not adequately criminalize a defendant's *personal* obstructive conduct *not* aimed at another person.  *See* 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch).  Read together in this light, Section 1512(c)(1)

---

[10] *See* 18 U.S.C. § 1512(a) (applies to killing, attempting to kill, or using physical force or the threat of physical force against a person to prevent testimony or induce a witness to withhold information); § 1512(b) (applies to using intimidation, threats, or corrupt persuasion against a person to prevent testimony or hinder, delay, or prevent communication of information to law enforcement or the courts); § 1512(d) (applies to intentionally harassing another person to hinder, delay, or prevent that person from taking certain actions).

criminalizes a defendant's firsthand destruction of evidence (without having to prove that the defendant induced another person to destroy evidence) in relation to an official proceeding, and Section 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that *otherwise* impedes or influences an official proceeding (though not necessarily through another person). *See Burge*, 711 F.3d at 809-10. Second, no substantive inference is reasonably drawn from the fact that the title of Section 1512 does not precisely match the "broad proscription" it in fact contains, given that the Sarbanes-Oxley Act unequivocally and broadly entitled the new provisions now codified in Section 1512(c), "Tampering with a record *or* otherwise impeding an official proceeding." Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered). Section 1512's title is more limited simply because Congress did not amend the pre-existing title when it added the two prohibitions in Section 1512(c) in 2002. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (describing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text").

> 2.   Section 1512(c)(2)'s *mens rea* and nexus requirements limit
>       the statute's reach and guard against arbitrary enforcement.

Under Section 1512(c)(2), a felony obstruction offense does not exist unless the defendant acts "corruptly" and targets his conduct at a specific "official proceeding." These two requirements, which require the government to prove a stringent *mens rea* and a nexus to an official proceeding, limit the statute's reach and guard against arbitrary enforcement. *Cf. United States v. Jeter*, 775 F.2d 670, 675 (6th Cir. 1985) (Section 1503 "contains a clear *mens rea* requirement that limits its scope to those who 'corruptly' or *intentionally* seek to obstruct"). Under these standards, rioters, like the defendants, who intended and with consciousness of wrongdoing engaged in specific acts to obstruct and impede the certification proceedings violate the statute.

a.     The statute's mens rea *requirement cabins its application.*

To prove a defendant acted "corruptly" for purposes of Section 1512(c)(2), the government must prove the defendant acted wrongfully and with intent to obstruct, impede, or influence.  *See, supra,* Section II.B.2.b (collecting cases).  These *mens rea* standards supply meaningful limitations on the exercise of prosecutorial discretion in matters arising under Section 1512(c)(2).

That the term "corruptly" requires the government to prove that a defendant acted not only with intent to obstruct but also with "consciousness of wrongdoing" ensures that Section 1512(c)(2) "reaches only" those who have committed felony obstruction.[11] *Arthur Andersen LLP v. United States*, 544 U.S. 696, 706 (2005).  That limitation is particularly important where, as here, the defendants are alleged to have obstructed a congressional proceeding.  *See North*, 910 F.2d at 882 (noting that an "executive branch official" or "political activist" may seek to persuade a representative to "stop[] spending her time pursuing a certain investigation" but instead pursue "some other legislative endeavor"; that conduct could be viewed as "endeavoring to impede or obstruct the investigation, but it is not necessarily doing so corruptly").

To prove that an attempted or actual obstruction of a congressional proceeding amounts to felony obstruction in violation of 18 U.S.C. § 1512(c)(2), the government must therefore adduce evidence establishing beyond a reasonable doubt that a defendant acted intentionally and with "consciousness of wrongdoing."  *Andersen*, 544 U.S. at 706.  That standard could be met where, for example, evidence showed that defendants transported weapons and paramilitary gear across the country to D.C. in anticipation of violent confrontations on January 6, Superseding Indictment,

---

[11] Although Section 1512(c)(2)'s statutory text does not include the modifier "knowingly," the statute does require that the defendant "engage in conduct knowingly."  *Gordon*, 710 F.3d at 1151; *Friske*, 640 F.3d at 1291.

at ¶¶ 19-22, dressed in protective gear, helmets, gas/face masks, and carried knives and walkie talkies, *id.* at ¶ 26, recorded videos of themselves shortly before they breached the Capitol encouraging other "patriots" to "take the Capitol" and that it was "game time," *id.* at ¶¶ 24-27, stormed past barricades and police officers looking for "the Senate Room," *id.* at ¶ 28, and penetrated the Capitol building, where they assaulted two separate sets of law enforcement officers, enabling dozens of other rioters to breach the building and the Senate Chamber itself, *id.* at ¶¶ 29-30—all while a larger crowd was forcing entry into the Capitol building "by breaking windows, ramming open doors, and assaulting" law enforcement officers in a manner that led to the evacuation of a Joint Session that was in the process of certifying the Electoral College vote, *id.* at ¶¶ 4, 8-9. While other fact patterns may pose more challenging questions concerning whether a defendant acted with the degree of "culpability . . . require[d] . . . to impose criminal liability," *Aguilar*, 515 U.S. at 602, the "outer limits of [the corruptly] element need not be explored here," *Andersen*, 544 U.S. at 706.[12]

---

[12] The "high maximum[] and no minimum[]" penalty provision that Congress enacted in Section 1512(c)(2), moreover, acknowledges that obstruction offenses "may run the gamut from major to minor," and places faith in district court judges to "recognize differences between such cases" and to "try to make the punishment fit the crime." *Yates*, 574 U.S. at 569-70 (Kagan, J., dissenting); *see Apprendi v. New Jersey*, 530 U.S. 466, 481 (2000) (nothing that "judges in this country have long exercised discretion" to impose sentences within a statutory sentencing range by "taking into consideration various factors relating both to offense and offender"). The same is true of the criminal contempt statute, 18 U.S.C. § 401, which has been applied to a wide range of conduct, *see United States v. McGainey*, 37 F.3d 682, 683 (D.C. Cir. 1994) (threatening gesture that led to "disruption" of a criminal trial constituted "'obstruction of the administration of justice'"); *id.* at 684-85 (citing other disruption case), and prescribes no maximum or minimum penalty, *see* 18 U.S.C. § 401 (permitting court the "power to punish by fine or imprisonment, or both, at its discretion").

b. *The statute's nexus requirement also cabins its application.*

To violate Section 1512(c)(2), the government must also satisfy the "nexus" requirement, namely, that the defendant "contemplated a particular, foreseeable proceeding, and that the contemplated proceeding constituted an official proceeding." *United States v. Young*, 916 F.3d 368, 386 (4th Cir.), *cert. denied*, 140 S. Ct. 113 (2019) (internal quotation marks omitted) (collecting cases). "[T]he nexus limitation is best understood as an articulation of the proof of wrongful intent that will satisfy the *mens rea* requirement of 'corruptly' obstructing or endeavoring to obstruct—that is, the first element of proving a § 1512(c)(2) charge." *Id.* at 385 n.12 (quoting *United States v. Erickson*, 561 F.3d 1150, 1159 (10th Cir. 2009) (internal quotation marks omitted)).

The nexus requirement derives from the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593 (1995). There, the defendant was convicted under the omnibus clause in Section 1503 for lying to an FBI agent "who might or might not testify before a grand jury." *Id.* at 600. That uncertainty was too attenuated to give rise to criminal liability because an obstructive act must "have a relationship in time, causation, or logic" with the official proceeding. *Id.* 599-600. That was so, the Court held, because "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." *Id.* at 599.

The Supreme Court's decision in *Arthur Andersen* applied the nexus requirement to Section 1512(b)(2)(A) offenses, which prohibit "knowingly" and "corruptly persuad[ing]" another to destroy documents in contemplation of an official proceeding. *See* 544 U.S. at 703. Observing that "[i]t is . . . one thing . . . to say that a proceeding 'need not be pending or about to be instituted at the time of the offense,'" *id.* at 707; *see* 18 U.S.C. § 1512(f), the Supreme Court found it "quite another to say a proceeding need not even be foreseen," 544 U.S. at 708. To secure a conviction

under Section 1512(b), therefore, the government must prove that the defendant has "in contemplation" a "particular official proceeding in which [the tampered-with] documents might be material." *Id.*

The same logic applies to Section 1512(c)(2). *See Ring*, 628 F. Supp. 2d at 223 (applying nexus requirement to Section 1512(c)(2)). Courts considering prosecutions brought under Section 1512(c)(2), moreover, have vacated convictions where the evidence failed to establish a sufficient nexus between the obstructive act and the alleged official proceeding. *See Young*, 916 F.3d at 387-89 (defendant's general awareness that the government might be investigating him was insufficiently connected to "a *specific* and *reasonably foreseeable* official proceeding"); *Friske*, 640 F.3d at 1292-93 (government failed to prove that the defendant who, at a friend's request, retrieved items that were subject to criminal forfeiture, "knew that the natural and probable result of his actions would be the obstruction of [the friend's] forfeiture proceeding"). To be sure, establishing a "relationship in time, causation, or logic," *Aguilar*, 515 U.S. at 599, between the obstructive conduct and the official proceeding in the defendants' case, where they are alleged to have forced their way into the Capitol seeking to impede Congress's certification of the Electoral College vote when they believed that process was underway, does not raise the borderline questions at issue in other cases. But the nexus requirement nonetheless imposes a meaningful "restraint" on the "reach of a federal criminal [obstruction] statute." *Marinello*, 138 S. Ct. at 1106 (quoting *Aguilar*, 515 U.S. at 600).

The *mens rea* and nexus requirements in Section 1512(c)(2) thus serve the critical function of ensuring that only those who understand the character and import of their actions are punished. A defendant does not violate the statute unless, at a minimum, he intentionally and wrongfully

obstructs (or attempts to obstruct) a particular foreseeable proceeding that qualifies as an "official proceeding" under Section 1515(a)(1).

3.     <u>The Supreme Court's decision in <em>Yates v. United States</em> does not counsel a different interpretation.</u>

The Supreme Court's decision in *Yates v. United States*, which considered how to construe the statutory term "tangible object" in Section 1519, 574 U.S. at 532 (plurality opinion), does not undermine the interpretation of Section 1512(c)(2) articulated above. In *Yates*, a plurality of the Court undertook a "contextual reading" to narrow the scope of "tangible object" in Section 1519 to "only objects one can use to record or preserve information, not all objects in the physical world." *Id.* at 536 (plurality opinion). The contextual features that animated that narrow interpretation in Section 1519 are, however, absent in Section 1512(c)(2).

*a.*     *Background*

The Court in *Yates* considered a prosecution brought under Section 1519, which makes it a crime to "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence" a federal investigation. 18 U.S.C. § 1519. Yates was a commercial fisherman who ordered his crew to throw his catch back into the sea to prevent federal authorities from determining whether he had harvested undersized fish. *Yates*, 574 U.S. at 531 (plurality opinion). The question presented was whether "tangible object" as used in Section 1519 included a fish. A fractured Supreme Court produced three opinions.

A four-Justice plurality concluded that Section 1519's "context" supported a "narrower reading." *Yates*, 574 U.S. at 539. A holding that "tangible object" included "any and all objects," the plurality concluded, would "cut § 1519 loose from its financial-fraud mooring" in the Sarbanes-Oxley Act. *Id.* at 532. The plurality grounded its analysis in several "[f]amiliar interpretive

guides." *Id.* at 539. First, neither Section 1519's caption, "Destruction, alteration, or falsification of records in Federal investigations and bankruptcy," nor the title within the Sarbanes-Oxley Act within which Section 1519 was placed, "Criminal penalties for altering documents," suggested that Congress aimed to "sweep" in "physical objects of every kind." *Id.* at 539-40.

Second, the plurality relied on Section 1519's placement within Title 18's Chapter 73. *Yates*, 574 U.S. at 540. Specifically, its placement at the end of the chapter following several provisions "prohibiting obstructive acts in specific contexts," suggested that Congress did not intend Section 1519 as an "across-the-board" spoliation ban. *Id.* In contrast, the plurality noted, Congress directed codification of the Sarbanes-Oxley Act's "other additions . . . within or alongside retained provisions that address obstructive acts relating broadly to official proceedings and criminal trials." *Id.* To illustrate one such "broad[]" provision, the plurality specifically referred to the provision at issue in this case, Section 1512(c), which, as noted above, was titled "Tampering with a record or otherwise impeding an official proceeding," and which Congress placed—as Section 1512(c)—within the "broad proscription[]" found in the "pre-existing" Section 1512. *Id.* at 541.

Third, the plurality compared Section 1519 with the "contemporaneous passage" in the Sarbanes-Oxley Act of Section 1512(c)(1). *See* 574 U.S. at 541. Because Section 1512(c)(1)'s reference to "'other object'" encompassed "any and every physical object," the plurality "resist[ed] a reading of § 1519" that would make Section 1512(c)(1) superfluous. *Id.* at 542-43. The plurality reasoned that because Congress's formulation in Section 1519 did not track the language in Section 1512(c)(1), this indicated that Congress intended Section 1519 to be construed differently from Section 1512. *Id.* at 545 n.7. More specifically, the plurality concluded that, by adopting those

different formulations, Congress intended the phrase "tangible object" in Section 1519 to "have a narrower scope" than the phrase "'other object'" in Section 1512(c)(1). *Id.* at 544-45.

Fourth, the plurality found support for its narrowing construction in the *noscitur a sociis* and *ejusdem generis* interpretive canons. 574 U.S. at 543-46. Because "tangible object" in Section 1519 was the "last in a list of terms that begins 'any record [or] document,'" the *noscitur a sociis* canon counseled interpreting that term "to refer . . . specifically to the subject of tangible objects involving records and documents." *Id.* at 544. That reading, moreover, "accord[ed] with" Section 1519's verbs, which include "'falsif[ying]'" and "'mak[ing] a false entry in'"—terms that commonly "take as grammatical objects records, documents, or things used to record or preserve information." *Id.* (emphasis omitted). Similarly, application of the *ejusdem generis* canon—that "general words" following "specific words" when listed in a statute are "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words," *id.* at 545 (internal quotation marks omitted)—indicated that Congress "would have had no reason to refer specifically to 'record' or 'document'" if it intended Section 1519 to "capture physical objects as dissimilar as documents and fish." *Id.* at 546.[13]

Finally, the plurality stated that, to the extent its "recourse to traditional tools of statutory construction" left "any doubt" about how to interpret "'tangible object'" in Section 1519, the rule of lenity favored a narrow interpretation of that phrase. 574 U.S. at 547-48. Because a broad

---

[13] By way of example, the Supreme Court cited its decision in *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015), where the Court interpreted the residual clause in the Armed Career Criminal Act (ACCA), which covered "any crime . . . that . . . is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). The ACCA's enumeration of specific crimes suggested that the "otherwise involves" provisions applied only to "*similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.'" *Begay*, 553 U.S. at 142.

reading of Section 1519 would criminalize "tampering with *any* physical object that *might* have evidentiary value in *any* federal investigation into *any* offense, no matter whether the investigation is pending or merely contemplated, or whether the offense subject to investigation is criminal or civil," the plurality reasoned that before it opted for the "harsher alternative," Congress must speak "in language that is clear and definite." *Id.* at 548 (internal quotation marks omitted).

Justice Alito concurred in the judgment on narrower grounds.[14]  Observing that the statutory "question is close," Justice Alito reasoned that the combined effect of "the statute's list of nouns, its list of verbs, and its title" favored the plurality's conclusion. *Yates*, 574 U.S. at 549 (Alito, J., concurring).  Section 1519's nouns suggested that "'tangible object'" in that provision "should refer to something similar to records or documents." *Id.* at 550.  Similarly, Section 1519's list of verbs are "closely associated with filekeeping," and at least one verb phrase—"'makes a false entry in'"—"makes no sense outside of filekeeping." *Id.* at 551.  Finally, Section 1519's title—"Destruction, alteration, or falsification of records in Federal investigations and bankruptcy," § 1519—suggested that "no matter how other statutes might be read," Section 1519 "does not cover every noun in the universe with tangible form." *Id.* at 552.[15]

> b.     Yates *does not prohibit the application of Section 1512(c)(2) to the defendants' conduct.*

The decision in *Yates* does not unsettle the straightforward interpretation of Section 1512(c)(2) articulated above because the "familiar interpretive guides" on which the plurality (and to some extent Justice Alito) relied to narrow the scope of Section 1519 do not apply to Section 1512(c)(2).

---

[14] Under the rule announced in *Marks v. United States*, 430 U.S. 188 (1977), Justice Alito's concurrence represents the binding holding as the narrowest opinion among those concurring in the judgment. *See id.* at 193.

[15] Justice Kagan, joined by three other Justices, dissented.

Consider first, as the plurality did, Section 1512's statutory title. *See Yates*, 574 U.S. at 539-40 (plurality opinion); *see also id.* at 552 (Alito, J., concurring) (considering Section 1519's title). Even leaving aside the "the wise rule" that neither "the title of a statute" nor "the heading of a section" can "limit the plain meaning of the text," *Brotherhood of R.R. Trainmen*, 331 U.S. at 528-29, Section 1512's title, "Tampering with a witness, victim, or an informant," provides no reason to narrow the interpretation of Section 1512(c)(2). *See, supra*, at Section II.A.2.b.iii. As described above, Congress named that title 20 years before it enacted 1512(c) in the Sarbanes-Oxley Act, and then simply opted not to rename Section 1512 to reflect either of the two new obstruction prohibitions added in Section 1512(c). Section 1512's overarching title therefore does not have the same interpretive force as Section 1519's title, which was enacted by the same Congress that enacted the rest of Section 1519. *See Yates*, 574 U.S. 541 n.4 (plurality opinion). Additionally, whereas Section 1519's title within the Sarbanes-Oxley Act, "Criminal penalties for altering documents," suggested a narrow focus on document destruction, *see id.* at 539-40, Section 1512(c)'s title within the Sarbanes-Oxley Act reflected both the document-destruction prohibition in Section 1512(c)(1) *and* the broader catch-all obstruction provision in Section 1512(c)(2): "Tampering with a record *or otherwise impeding an official proceeding.*" Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered).

Similarly inapposite here is Section 1512(c)(2)'s placement within Chapter 73. *See Yates*, 574 U.S. at 540-41 (plurality opinion). Whereas Congress enacted Section 1519 as a standalone prohibition and placed it at the end of the chapter "together with specialized provisions expressly aimed at corporate fraud and financial audits," it instead inserted Section 1512(c) within the "pre-existing" Section 1512. *Id.* at 541 (plurality opinion). So situated, Section 1512(c)(2)'s function

as a catch-all obstruction prohibition is consistent with Section 1512's role as a "broad proscription" on obstructive acts. *See id.* (plurality opinion).

That reading, moreover, is consistent with how the *Yates* plurality opinion describes Section 1512(c). *See* 574 U.S. at 541-43, 545. Contrasting the term "other object" in the document-destruction provision in Section 1512(c)(1) with "tangible object" in Section 1519, the plurality concluded that Section 1512(c)(1)'s later enactment suggested Congress intended it to reach more broadly than Section 1519. *Id.* at 542-43; *id.* at 545 n.7 ("Congress designed § 1519 to be interpreted apart from § 1512, not in lockstep with it."). And if Congress intended Section 1512(c)(1) to cover more ground than Section 1519, Section 1512(c)'s text and structure make plain that it further intended Section 1512(c)(2) to cover more ground than Section 1512(c)(1).

The plurality, 574 U.S. at 544-45, and Justice Alito, *id.* at 550, also drew support for their narrowing construction of Section 1519 from interpretive canons, but those canons do not help the defendants here. "Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category." *United States v. Espy*, 145 F.3d 1369, 1370-71 (D.C. Cir. 1998). Section 1519's structure—a list of specific terms ("record" and "document) followed by a more general term ("tangible object")—in a singular provision is susceptible to that analysis. *Yates*, 574 U.S. at 545-56 (plurality opinion); *id.* at 549-50 (Alito, J., concurring). But Section 1512(c)'s structure differs significantly: it includes one numbered provision that prohibits evidence-tampering, followed by a semi-colon, the disjunctive "or," and then a separate numbered provision containing the separate catch-all obstruction prohibition. "The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008).

Furthermore, in the same way that the *ejusdem generis* canon does not apply to the omnibus clause in Section 1503 that is "one of . . . several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable," it has no application to Section 1512(c)(2), which embodies the same structure. *Aguilar*, 515 U.S. at 615 (Scalia, J., concurring in part and dissenting in part); *cf. Loughrin v. United States*, 573 U.S. 351, 359 (2014) (distinguishing the mail fraud statute (18 U.S.C. § 1341), which "contains two phrases strung together in a single, unbroken sentence," from the bank fraud statute (18 U.S.C. § 1344), which comprised "two clauses" with "separate numbers, line breaks before, between, and after them, and equivalent indentation—thus placing the clauses on an equal footing and indicating that they have separate meanings").

The Supreme Court's decision in *Begay v. United States*, 553 U.S. 137, on which the *Yates* plurality in part relied, does not suggest a different conclusion with respect to Section 1512(c)(2). *See, supra*, note 14. The statutory provision at issue in *Begay* included a list of specified crimes ("any crime . . . that is . . . burglary, arson, or extortion, or involves use of explosives") followed, in the same sentence, by a more general category ("or otherwise involves conduct that presents a serious potential risk of physical injury to another"). 18 U.S.C. § 924(e)(2)(B)(ii). The Supreme Court held that the "otherwise involves" provision covered only crimes "similar" to those in the enumerated list. *See* 553 U.S. at 142-43. In Section 1512(c)(2), by contrast, "the 'otherwise' phrase . . . stands alone, unaccompanied by any limiting examples" in a provision that "is plainly separate and independent of" Section 1512(c)(1). *Ring*, 628 F. Supp. 2d at 224 n.17. "Thus, just as *Begay* did not define the 'otherwise' clause" in Section 924(e)(2)(B)(ii) "in terms of the independent and preceding" Section 924(e)(2)(B)(i), Section 1512(c)(2)'s "use of 'otherwise'" should not be construed "as limited by § 1512(c)(1)'s separate and independent prohibition on

evidence-tampering." *Id.*; *see De Bruhl-Daniels*, 491 F. Supp. 3d at 251 ("[Section 1512(c)(2)]

does not appear as a broad catch-all term at the end of a list that must be wrangled into conformity

with congressional intent using a canon of construction" but instead "exists as a potent,

independent, and unequivocal catch-all provision that reaches all manner of obstructive conduct

related to an official proceeding.").

The *noscitur a sociis* canon, also cited by the defendant, is similarly inapplicable here. *See*

Def's Mot Dismiss 9. That canon is used only to construe terms that are "of obscure or doubtful

meaning," not to change the meaning of unambiguous terms that are simply broad. *Russell Motor*

*Car Co. v. United States,* 261 U.S. 514, 520 (1923). Moreover, the canon may be invoked only

"when a string of statutory terms raises the implication that the words grouped in a list should be

given related meaning." *S. D. Warren Co. v. Maine Bd. of Env't Prot.,* 547 U.S. 370, 378 (2006)

(internal quotation marks omitted); *see Beecham v. United States,* 511 U.S. 368, 371 (1994) ("That

several items in a list share an attribute counsels in favor of interpreting the other items as

possessing that attribute as well."). As noted above, the first and second clauses of Section 1512(c)

are not items in a list of related terms; rather, they are distinct offenses phrased in the disjunctive.

18 U.S.C. § 1512(c). That structure therefore does not lend itself to application of *noscitur a sociis*.

*See De Bruhl-Daniels*, 491 F. Supp. 3d at 251 (declining to apply the *noscitur a sociis* canon to

Section 1512(c)).

Contrary to the defendant's assertion, the plurality's reliance on the rule of lenity in *Yates*

has no application here.[16] *See* Def's Mot. Dismiss 16 (citing *Yates*, 135 S. Ct. at 1088). The rule

---

[16] Justice Alito did not rely on several features that guide the plurality opinion, including the rule of lenity. *See* 574 U.S. at 549 (noting that the case "should be resolved on narrow grounds," namely, "the statute's list of nouns, its list of verbs, and its title," but not discussing the Sarbanes-Oxley Act, Section 1519's placement within Chapter 73, the Supreme Court's decision in *Begay*, or the rule of lenity). It follows that his controlling opinion, *see supra* note 15,

of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *see Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring). There is no grievous ambiguity here. Section 1512(c)(2)'s text, structure, history, and purpose make clear that it functions as a broad catch-all prohibition on obstructive conduct that covers "otherwise obstructive behavior that might not constitute a more specific" obstruction offense. *Petruk*, 781 F.3d at 447 (internal quotation marks omitted).

The plurality in *Yates* also found the rule of lenity "relevant" in part due to the absence of limiting principles under a broad construction of Section 1519. *See Yates*, 574 U.S. at 548. But neither of the features that constrain Section 1512(c)(2)'s reach—*i.e.*, the government's requirement to establish that the defendant acted "corruptly" and a nexus to a contemplated official proceeding, *see, supra*, Section II.C.2—is present in Section 1519. Section 1519 requires that the defendant act "knowingly" and "with the intent to impede, obstruct, or influence," 18 U.S.C. § 1519, but does not impose the more stringent "corruptly" *mens rea*. And courts of appeals have uniformly concluded that Section 1519 does not include a "nexus" requirement. *See United States v. Scott*, 979 F.3d 986, 992 (2d Cir. 2020) (Supreme Court's decisions in *Marinello*, *Arthur Andersen*, and *Aguilar* do not "overrule[]" existing circuit precedent that Section 1519 "does not have a nexus requirement"); *United States v. Moyer*, 674 F.3d 192, 209 (3d Cir. 2012) (declining to extend nexus requirement from Section 1503 and 1512(b)(2) to Section 1519); *United States v. Kernell*, 667 F.3d 746, 753-55 (6th Cir. 2012); *United States v. Yielding*, 657 F.3d 688, 712-14

---

provides even fewer grounds than the plurality opinion to interpret Section 1512(c)(2) differently than its text and structure would suggest.

(8th Cir. 2011); *see also* S. Rep. No. 107-146, at 14-15 ("[Section 1519] is specifically meant not to include any technical requirement, which some courts have read into other obstruction of justice statutes, to tie the obstructive conduct to a pending or imminent proceeding or matter.").

To be sure, no court appears to have applied Section 1512(c)(2) to conduct precisely akin to the defendants' alleged actions—namely, pushing past barricades and law enforcement to force their way into a congressional proceeding in a (successful) effort to halt or delay that proceeding. Even if Section 1512(c)(2)'s application to this case was "not expressly anticipated by Congress," that alone "does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020) (internal quotation marks and brackets omitted). That is so even if the statute's application in a particular case "reaches 'beyond the principal evil' legislators may have intended or expected to address." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)). If certain policy considerations for a narrowed view of the statute "suggest that the current scheme should be altered," *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 778 (2020), "[r]esolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress," *United States v. Rodgers*, 466 U.S. 475, 484 (1984).

>    **D.      Even if Section 1512(c)(2) required that the obstructive act
>             relate to documentary or other tangible evidence, the
>             defendants' alleged conduct would be covered.**

At a bare minimum, Section 1512(c)(2) covers conduct that prevents the examination of documents, records, and other nontestimonial evidence in connection with an official proceeding. If, for example, the defendants had blocked the vehicle carrying the election returns to the Capitol for congressional examination at the certification proceeding, that conduct would clearly fit within Section 1512(c)(2). Section 1512(c)(2) would likewise cover blocking a bus carrying the Members of Congress to the Capitol to examine the election returns at the certification

proceeding. And it just as readily covers displacing the Members of Congress from the House and Senate Chambers, where they would examine and discuss those returns and other records.

No court following *Yates* has adopted an interpretation of Section 1512(c)(2) that limits it to document-focused obstructive conduct. *See, e.g.*, *Petruk*, 781 F.3d at 447-48; *De Bruhl-Daniels*, 491 F. Supp. 3d at 251; *Cervantes*, 2021 WL 2666684, at *6. But even were this Court to adopt the limitation that Section 1512(c)(2) "requires some nexus to tangible evidence," *Singleton*, 2006 WL 1984467, at *3, or a "tangible object," *Hutcherson*, 2006 WL 270019, at *2, the defendants' alleged conduct in Counts One and Two would still fall within the scope of Section 1512(c)(2) because the defendants "otherwise obstruct[ed], influence[d], or impede[d]" Congress's ability to review documents that it was constitutionally and statutorily required to receive and act upon, thereby obstructing the certification of the Electoral College vote.

The certification of the Electoral College vote is rooted in federal constitutional and statutory law, *see* Superseding Indictment, at ¶ 4, that requires the creation and consideration of various documents. Under the Twelfth Amendment, the state Electors must "vote by ballot," marking one set of ballots for the individual voted for as President and "distinct ballots" for the vice-presidential selection. U.S. Const. amend. XII. The Electors must then create "lists" of the presidential and vice-presidential candidates who received votes, "which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States." *Id.* These certified lists, or "certificates," are then opened by the President of the Senate "in the presence of the Senate and House of Representatives." *Id.* After opening them, the President of the Senate hands the certificates to two appointed "tellers," who in turn create a new "list" that comprises "the votes as they shall appear from the said certificates." 3 U.S.C. § 15. During the reading of the certificates, the President of the Senate must open the floor to objections; any objection "shall be made in

writing . . . and shall be signed by at least one Senator and one Member of the House of Representatives." *Id.* Congress's certification of the Electoral College vote, therefore, operates through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections.

Had the defendants sought to alter or destroy any of those documents, they also would have violated Section 1512(c)(1). Instead, the defendants allegedly sought to stop the Members of Congress from reviewing those constitutionally and statutorily mandated documents at a proceeding to certify the results of the 2020 presidential election. And defendant DeGrave encouraged other rioters in the Senate Chamber to "take laptops" and "paperwork," which further evinces an intent to interfere with the documents related to the certification proceedings present in the Senate Chamber. Because the defendants' alleged conduct thus precluded a full and fair examination of physical or documentary evidence at an official proceeding, the indictment's allegations would satisfy any extratextual "requirement" in Section 1512(c)(2) "for some nexus to a document or other tangible evidence." *Singleton*, 2006 WL 1984467, at *5.[17]

### E.  The rule of lenity does not apply.

Finally, the defendant's rule of lenity argument fails, as it is only a canon of "last resort." *Guedes v. Bureau of Alcohol, Tobacco & Firearms*, 920 F.3d 1, 27-29 (D.C. Cir. 2019). The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (internal citation and quotation

---

[17] Relatedly, if Section 1512(c)(2) were construed to contain an extratextual requirement for some nexus to an effect on a witness or other individual appearing at an official proceeding, the indictment's allegations that the defendants' actions forced the evacuation of the Members of Congress from their respective chambers, *see* Superseding Indictment, at ¶ 9, would suffice.

omitted). There is no grievous ambiguity here. As discussed above, the statute's text, structure, and legislative history, as well as the case law, all support the government's position. *See, supra*, Sections II.A-C.

Here, the defendants took intentional and unlawful action to disrupt a Joint Session of Congress. Section 1512(c)(2) criminalizes "corruptly" obstructing an "official proceeding," which, as discussed above, encompasses Congress's certification of the Electoral College vote. Unlike some statutes, which may require complicated compliance regimes, the defendants could have easily complied with the law on January 6. They could have voiced their support for their preferred candidate or cause in constitutionally protected free speech outside of the restricted Capitol grounds. Or they could have applied political pressure on enough legislators to object and not vote to certify in favor of the eventual winner. Far from failing to provide fair notice, no guess work was needed to comply with the law.

## CONCLUSION

The government respectfully submits that the Court should deny the defendant's motion and not dismiss any of the counts in the Superseding Indictment.

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793


By: _____/s/ *Jessica Arco*_____
Jessica Arco
Trial Attorney – Detailee
D.C. Bar No. 1035204
U.S. Attorney's Office for the District of Columbia
555 4th Street NW
Washington, DC 20530
Jessica.arco@usdoj.gov