UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )( | |
| )( | Criminal No. 21-88 (DLF) |
| v.         )( | Judge Friedrich |
| )( | Hearing: December 3, 2021 |
| RONALD SANDLIN    )( | |

**REPLY TO
UNITED STATES' MEMORANDUM IN OPPOSITION TO
DEFENDANT SANDLIN'S MOTION
TO DISMISS COUNT FIVE OF INDICTMENT
AND POINTS AND AUTHORITY IN SUPPORT THEREOF**

COMES NOW the defendant, Ronald Sandlin, by and through undersigned counsel, and respectfully replies to the United States' Memorandum in Opposition to Defendant Sandlin's Motion to Dismiss Count Five of Indictment. In support of this reply, Mr. Sandlin would show:

1.     On September 13, 2021, Ronald Sandlin filed a Motion to Dismiss Count Five of Indictment for Failure to State an Offense and Points and Authority in Support Thereof (ECF #45) (Motion to Dismiss). In the Motion to Dismiss, Mr. Sandlin argues that, in charging him with Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2), count five of the indictment at issue failed to state an offense for two different reasons. First, it alleged conduct in violation of § 1512(c)(2) that is actually beyond the provision's reach. Motion to Dismiss at 2-17. Second, it alleged that the "official proceeding" at issue in the offense was the congressional hearing to count the Electoral College votes that occurred at the United States Capitol on January 6, 2021. However,

1

this hearing does not qualify as an "official proceeding" for the purposes of § 1512(c)(2). Id. at 17-27.

2. After Mr. Sandlin filed his Motion to Dismiss, the government obtained a superseding indictment against him. The new indictment charges Mr. Sandlin with Conspiracy to Obstruct an Official Proceeding under 18 U.S.C. § 1512(k) (count one) and with Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2) and § 2 (count two). However, the arguments that Mr. Sandlin makes in his Motion to Dismiss about the failure of count five of the previous indictment to state an offense apply with equal force to counts one and two of the current indictment.

3. On October 8, 2021, the government filed a United States' Memorandum in Opposition to Defendant Sandlin's Motion to Dismiss Count Five of Indictment (ECF #53) (Opposition). In this Opposition, the government makes a number of points in response to the arguments that Mr. Sandlin raises in is Motion to Dismiss. Mr. Sandlin now addresses some of these points.

## The Reach of § 1512(c)(2)

4. In his Motion to Dismiss, in support of his argument that the conduct for which he is charge under § 1512(c)(2) is actually beyond the reach of that provision, Mr. Sandlin points out that the structure of § 1512(c) shows that Congress intended for § 1512(c)(2) to only reach conduct similar in nature to the conduct described in specific terms in its companion provision, § 1512(c)(1), which deals with the destruction and alteration of documents and evidence. Id. at 2-17. For this reason, Mr. Sandlin argues that Congress did not intend for § 1512(c)(2) to reach the conduct he is charged with—that is, "conduct directed at an official proceeding while it is occurring," id. at 2.

5.      In its Opposition, to support its assertion that § 1512(c)(2) does in fact reach the conduct that Mr. Sandlin is charged with, the government asserts that § 1512(c)(2) "serves as a comprehensive prohibition on corrupt conduct that intentionally obstructs or impedes an official proceeding." Opposition at 20. The government then goes on to assert that "[t]he verbs Congress selected in Section 1512(c)(2) [obstruct, influence, and impede] reach broadly." Id. Indeed, in regards to the verbs "obstruct" and "impede," the government indicates that they can "refer to anything that the 'blocks,' 'makes difficult,' or 'hinders.'" Id. (quoting Marinello v. United States, 138 S.Ct. 1101, 1106 (2018) (citing dictionaries)). Also, in regards to the verb "influence," the government indicates that it "includes 'affect[ing] the condition of' or 'hav[ing] an effect on.'" Id. (quoting Oxford English Dictionary, available at http://www.oed.com). Accordingly, the government concludes that the "string of verbs in Section 1512(c)(2) are properly viewed as 'expansive' in their coverage." Id. at 20 (citing United States v. Burge, 711 F.3d 803, 809 (7th Cir. 2013)[1]). This is consistent with the government's repeated characterization of §1512(c)(2) as a general "catch-all" provision. Id. at 22, 23, 24. This is also consistent with the government's view that, in connection with the events of January 6, Mr. Sandlin and others violated § 1512(c)(2) precisely because they "hindered and delayed… the certification of the Electoral College votes." Id. at 22.

6.      The government's view of § 1512(c)(2) as a broad, general catch-all provision is inconsistent with the fact that, when Congress enacted the current version of § 1512(c), it included § 1512(c)(2) as a companion provision to § 1512(c)(1). It makes little sense that, when enacting the current version of § 1512(c), Congress would have gone out of its way to carefully tailor a provision (§ 1512(c)(1)) to deal specifically with

---

[1] Burge found that § 1512(c)(2) could be read broadly enough to apply to the defendant's lying in interrogatories that he answered in connection with a civil suit. 711 F.3d at 806, 810.

conduct related to the destruction and alteration of documents and evidence that could be used at an official proceeding only to then go on, with § 1512(c)(2), to completely explode § 1512(c) to include the universe of all conduct that might have "an effect" on an official proceeding. If accepted as valid, the government's broad reading of § 1512(c)(2) would obviously render § 1512(c)(1) superfluous.[2]

7.  In its Opposition, in a seeming bid to explain why Congress would have even bothered crafting, in § 1512(c)(1), a provision to deal specifically with conduct related to the destruction and alteration of documents and evidence that could be used at an official proceeding if it was intending, with § 1512(c)(2), to have § 1512(c) include the universe of all conduct that might have "an effect" on an official proceeding, the government argues, "Section 1512(c)(2) criminalizes the same result prohibited by Section 1512(c)(1)—obstruction of an official proceeding—but accomplished by a different means—i.e., some conduct other than destruction of a document, record, or other object." Opposition at 21 (emphasis in original). Thus, in the government's view, "Section 1512(c)(2) [serves] as catch-all for corrupt obstructive conduct not covered by Section 1512(c)(1). Id. at 23 (emphasis added).

8.  The government's argument that Congress intended for § 1512(c)(2) to apply to all "corrupt obstructive conduct not covered by Section § 1512(c)(1)" makes little sense. If Congress did in fact intend for § 1512(c)(2) to cover all corrupt obstructive conduct not covered by § 1512(c)(1), then it was still intending for § 1512(c) to cover the universe of all corrupt obstructive conduct. But if this is really what Congress intended, why then did it even bother to provide, in §1512(c)(1) and § 1512(c)(2), alternate ways for violating § 1512(c) in the first place? Why did it not just have § 1512(c) be a unitary

---

[2] It should be noted that, if accepted as valid, the government's broad reading of § 1512(c)(2) would render 18 U.S.C. § 1512(a), 18 U.S.C. § 1512(b), 18 U.S.C. § 1512(d) superfluous as well, since those provisions all deal with conduct that would also be covered by the government's broad reading of § 1512(c)(2).

proscription against all corrupt obstructive conduct related to an official proceeding and leave it at that?  Thus, the fact that Congress did provide, in § 1512(c)(1) and § 1512(c)(2), alternative ways for violating § 1512(c) shows that Congress did not intend for § 1512(c)(2) to simply serve as a "catch-all for corrupt obstructive conduct not covered by Section § 1512(c)(1)."  Rather, it meant for § 1512(c)(1) and § 1512(c)(2) to relate to each other in a different way.

        9.       Given that it makes little sense that Congress would have intended for § 1512(c)(2) to apply to all obstructive conduct not covered by § 1512(c)(1), the logical explanation for the fact that § 1512(c)(2) describes the conduct it concerns in terms that are broader and more general than the terms that § 1512(c)(1) uses to describe the conduct it concerns is that, at the time it enacted the current version of § 1512(c), Congress realized that there might be other, as-of-yet-unrecognized ways of obstructing an official proceeding that are similar to and therefore just as harmful as the ways of obstructing an official proceeding specifically identified in § 1512(c)(1).  Accordingly, Congress enacted § 1512(c)(2) to make sure that persons who did obstruct an official proceeding in these other ways would not escape criminal liability just because Congress could not specifically describe those ways at the time it enacted the current § 1512(c).  This understanding of how § 1512(c)(1) and § 1512(c)(2) relate to each other of course supports Mr. Sandlin's view that § 1512(c)(2) can only be read to reach conduct that would obstruct an official in ways that are similar in scope to those ways that would obstruct such a proceeding that are specifically identified in § 1512(c)(1).  More importantly, it respects the fact that Congress created, with § 1512(c)(1) and § 1512(c)(2) alternative ways of violating § 1512(c) and thus makes considerably more sense than the government's view that Congress intended for § 1512(c)(2) to reach all corrupt obstructive conduct not covered by § 1512(c)(1)—a view that still has § 1512(c) reaching

the universe of all corrupt obstructive conduct related to an official proceeding and is thus completely at odds with the fact that § 1512(c) uses alternate provisions to describe the conduct it covers.

10. In its Opposition, the government complains that Mr. Sandlin's view that § 1512(c)(2) only reaches conduct that would affect an official proceeding in ways similar to the ways described in § 1512(c)(1) "gives rise to unnecessarily complex questions about what sort of conduct [under § 1512(c)(2)] qualifies as 'similar to but different from' the proscribed conduct 'described in [Section 1512](c)(1).'"  Opposition at 23 (quoting United States v. Singleton, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex July 14, 2006) (unpublished)[3]).  It is true that that adopting the government's everything-and-the-kitchen-sink reading of § 1512(c)(2) would do away with any need for judges and lawyers dealing with the provision to engage in bothersome legal analysis when deciding what conduct the provision actually covers.  However, given that doing such legal analysis is a core part of the work they are expected to do, relieving them of the responsibility to engage in that work can hardly be viewed as a valid reason for choosing the government's reading of § 1512(c)(2).

11. In its Opposition, the government suggests that Mr. Sandlin's view of § 1512(c)(2) as only applying to conduct that is similar in nature to the conduct described in § 1512(c)(2) means that § 1512(c)(2) would therefore only apply to conduct related to the destruction or alteration of documents and physical evidence.  Opposition at 23-25. The government argues that, since § 1512(c)(1) and another statutory provision (18

---

[3] Given the position that is taking, the fact that the government draws attention to Singleton in support of that position is somewhat strange.  In Singleton, the court expressly held that § 1512(c)(2) does in fact apply "to conduct similar to but different from that specifically described in [§ 1512](c)(2)."  No. 06-cr-80, slip op. at 7.  Moreover, in reaching this holding, the court expressly rejected as "too broad" the very reading of § 1512(c)(2) that the government is endorsing here in Mr. Sandlin's case.  Id.  As if this were not enough, the court also expressly held, "[T]hat to violate §1512(c)(2), the charged conduct must [still] have some reasonable nexus to a record, document or tangible object."  Id., slip op. at 8.  This is obviously a reading of § 1512(c)(2) that is narrower than the one that even Mr. Sandlin endorses.  See infra at 7.

U.S.C. § 1519) already specifically apply to that kind of conduct, such a narrow reading of § 1512(c)(2) would render the provision superfluous.  Id.  This is a straw-man argument.  Understanding § 1512(c)(2) to only apply to conduct that is similar in nature to the conduct described in § 1512(c)(1) would still allow § 1512(c)(2) to reach unspecified conduct that does not apply to the destruction and alteration of documents and physical evidence.  Indeed, the government's previously-made objection that Mr. Sandlin's reading of § 1512(c)(2) requires determining what conduct is "similar to but different from [emphasis added]" the conduct described in § 1512(c)(1), see supra at 6, is specifically premised on the fact that Mr. Sandlin's reading on § 1512(c)(2) does allow for the provision to reach conduct that is "different from" the conduct described in § 1512(c)(1)—that is, different from conduct related to the destruction and alteration of documents and physical evidence.  Moreover, in his Motion to Dismiss, Mr. Sandlin only argues that reading § 1512(c)(2) to apply to conduct that is similar in nature to § 1512(c)(1) simply means that § 1512(c)(2) cannot be understood to apply to "conduct directed at an official proceeding while it is occurring," id. at 2, and he allows that § 1512(c)(2) could still be understood to apply to conduct that "can affect an official proceeding by impacting the state and content of what it might consider in making it deliberations," id. at 9, which is obviously conduct that can be different than conduct that just applies to the destruction and alteration of documents and physical evidence.  For instance, among other things, such conduct could include conduct related to the submission of fraudulent documents and physical evidence, conduct related to the presentation of false or incomplete testimony at an official proceeding, and conduct related to providing false statements in interrogatories and depositions.

       12.     In its Opposition, the government argues that the broad reading it gives § 1512(c)(2) is supported by the legislative history of the provision.  Opposition at 26-29.

7

The government points out that, before the enactment of the current § 1512(c), 18 U.S.C. § 1512 only "made it a crime to induce 'another person to destroy documents, but not a crime for a person to destroy the same documents personally'—a limitation that 'forced' prosecutors to 'proceed under the legal fiction that the defendants [in the then-pending United States v. Arthur Andersen] are being prosecuted for telling other people to shred documents, not simply, for destroying evidence themselves.'" Id. at 27 (quoting S Rep No 107-146 at 6-7). The government then notes that the current version of § 1512(c) was thus enacted because it "'broadened' Section 1512 by permitting prosecution of 'an individual who acts alone in destroying evidence.'" Opposition at 27 (quoting 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch)). The government then goes on to argue that this shows that, in enacting the current § 1512(c), Congress meant for it to reach all "firsthand obstructive conduct" that might affect an official proceeding just as a general matter—not just conduct related to documents and evidence—and thus for § 1512(c)(2) to have the expansive reach the government understands it to have. Id. at 29.

   13. The government's conclusion that the legislative history of § 1512(c) shows that Congress intended for it to reach all "firsthand obstructive conduct" as a general matter is grossly overstated. Indeed, by the governments' own admission, the legislative history of the current § 1512(c) shows that the reason it even addresses "firsthand obstructive conduct" in the first place is simply to protect documents and evidence from destruction and alteration by making sure that that the people who personally do the destroying or altering are held accountable. Its intent is to protect documents and evidence—not to criminalize "firsthand obstructive conduct" that does not have a nexus to documents and evidence. Thus, far from supporting the broad reading that the government gives § 1512(c)(2), the legislative history of the current §

1512(c) actually supports a reading of § 1512(c)(2) that limits its reach to conduct that has a nexus to documents and evidence.  Such a reading of the provision is even narrower than the one that Mr. Sandlin gives it.  See supra at 7.

      14.     In his Motion to Dismiss, Mr. Sandlin argues that the government's broad reading of § 1512(c)(2) should be rejected because it is leading to selective and arbitrary enforcement and, if valid, would therefore be unconstitutionally vague.  Motion to Dismiss at 12-15.  In its Opposition, the government argues that "Section 1512(c)(2)'s mens rea and nexus requirements guard against arbitrary enforcement."  Opposition at 30.  The government notes that § 1512(c)(2) only criminalizes conduct that is done "corruptly," which it says means "with consciousness of wrongdoing."  Id. (citing Arthur Anderson LLP v. United States , 544 U.S. 696, 706 (2005)).   The government claims that this provides a "meaningful limitation[]on the exercise of prosecutorial discretion in matters arising under Section 1512(c)(2)."  Additionally the government notes that § 1512(c)(2) has a nexus requirement whereby it must prove, in order to secure a conviction under the provision, that a defendant's conduct "contemplated a particular, foreseeable proceeding."  Id. at 32 (quoting United States v. Young, 916 F.3d 368, 386 (4th Cir. 2019).  The government says that this, too, limits prosecutorial discretion.  Id. at 32-33.

      15.     While § 1512(c)(2)'s mens rea and nexus requirements may limit the reach of the provision, they do not do so nearly enough to rescue the government's broad reading of it from the arbitrary-enforcement problems that Mr. Sandlin notes in his Motion to Dismiss.  As stated in the Motion to Dismiss, approximately 600 people have been arrested in connection with the events at the Capitol on January 6, 2021.  Motion to Dismiss at 14.  Almost all of these people entered the building, under circumstances indicative of trespassing, around the time the hearing to count the Electoral College was

occurring and did so as part of a protest against that hearing. It is hard to see how it can be claimed that these people did not engage in conduct that can be characterized as "having an effect on" an official proceeding with the requisite mens rea (consciousness of wrongdoing) and an awareness of the proceeding. However, less than 300 of these people have been charged with obstruction under § 1512(c)(2). Moreover, as also noted in the Motion to Dismiss, people often intentionally disrupt official proceedings with illegal protests (for instance, at Senate confirmation hearings). Id. However, the government does not appear to charge these people with obstruction under § 1512(c)(2) simply for doing so. Thus, despite the guards against arbitrary enforcement that the government claims § 1512(c)(2)'s mens rea and nexus requirements serve as, the government still appears to be using its overly broad reading of the provision to selectively prosecute people—including Mr. Sandlin. It cannot be credibly claimed, however, that Congress intended for § 1512(c)(2) to be construed so broadly that the government can effectively use it to choose who to prosecute for reasons that are not statutorily based—thus effectively legislating, for reasons important to it, its own more specific crime and then enforcing it ex post facto.

16. In it Opposition, the government states that, in his Motion to Dismiss, "[t]he defendant argues that that Section 1512(c) is unconstitutionally vague," Opposition at 13. The government then spends time arguing that the statute is in fact not unconstitutionally vague both as a general matter and "as applied." Id. at 13-19. The government misunderstands what Mr. Sandlin is saying about § 1512(c). In his Motion to Dismiss, Mr. Sandlin is not arguing that § 1512(c) is unconstitutionally vague either as a whole or in its two separate provisions—§ 1512(c)(1) and § 1512(c)(2). Rather, Mr. Sandlin is pointing out that the interpretation that the government is giving to §

1512(c)(2) in order to prosecute him under it renders it unconstitutionally vague and is therefore incorrect.  Motion to Dismiss at 12-15.

17. In it Opposition, the government suggest that Mr. Sandlin is arguing that the conduct he is charged with in this case is "somehow legal." Opposition at 18.  Mr. Sandlin is not making any such an argument.  The conduct he is charged with would be illegal under many statutes and provisions.  It is not, however, illegal under § 1512(c)(2).

18. From an obstruction point of view, conduct involving the open, public disruption of an official proceeding (which is the type of obstructive conduct that Mr. Sandlin is charged with) is not as serious as conduct that can affect an official proceeding by impacting the state and content of what it might consider in making its deliberations—such as conduct related to destruction and alteration of documents and evidence and witness tampering.  Conduct that impacts the state and content of what an official proceeding might consider in making its deliberations has great potential for going unnoticed or for resulting in obstruction that cannot be later remedied—thus causing a permanent miscarriage of justice.  Conduct involving the open, public disruption of an official proceeding is not likely to result in a permanent miscarriage of justice.  This is not to say that conduct involving the open, public disruption of an official proceeding cannot be serious in nature.  It can be extremely serious—for instance, it can involve acts of violence.  However, to the extent the conduct attains such seriousness, it does so because it involves crimes other than obstruction.  From an obstruction point of view, the conduct is still not nearly serious as conduct that impacts the state and content of what an official proceeding might consider in making its deliberations.  Since this is the case, it makes little sense that Congress would seek to criminalize conduct involving the open, public disruption of an official proceeding as it would conduct that impacts the state and content of what a official proceeding might consider in making its deliberations.  This

consideration supports the view that Congress did not intend for § 1512(c)(2) to reach to conduct involving the open, public disruption of an official proceeding.

19. In it Opposition, the government argues that § 1512(c)(2) stands alone from § 1512(c)(1) and that it should not therefore be interpreted in light of it, thus making it unnecessary to determine the reach of § 1512(c)(2) by using the interpretive canons of noscitur a sociis and ejusdem generis to compare it to § 1512(c)(1). Opposition at 34-43. In making this argument, the government focuses on the fact that, within the body § 1512(c), § 1512(c)(1) and § 1512(c)(2) and are separated by "a semi-colon [and] the disjunctive 'or' and… [are] separated numbered provision[s]." Id. at 39; see also id. at 41.

20. The government's argument that § 1512(c)(2) stands alone from § 1512(c)(1) and should not be interpreted in light of it is hyper-technical and myopic and ignores the fundamental structure of § 1512(c). Under § 1512(c), § 1512(c)(1) and § 1512(c)(2) are separate clauses that are symmetrically laid out within the same overarching sentence. Both § 1512(c)(1) and §1512(c)(2) are adjectival verb clauses that provide alternate modifications of a common subject—"[W]hoever"—that is placed above them. They are both modified by the same adverb—"corruptly"—that, along with their common subject, is also placed above them, and they are both subject to the same verb phrase that comes after them—"shall be fined under this title or imprisoned not more than 20 years, or both." Everything about this structure—including the fact that the punishment is the exact same for both violations of § 1512(c)(1) and § 1512(c)(2)—shows that Congress laid out the two provisions as equivalent ways of violating § 1512(c), thus making it entirely appropriate to interpret 1512(c)(2) in light of 1512(c)(1) and thus making the canons of ejusdem generis and noscitur a sociis extremely apt tools for divining § 1512(c)(2)'s meaning.

21. In its Opposition, the government argues that, even if § 1512(c)(2) is read to only reach conduct that has some "nexus to tangible evidence," the conduct for which Mr. Sandlin is charged under § 1512(c)(2) would still be covered. Opposition at 44 (quoting Singleton, 2006 WL 1984467, at *3 (unpublished)). This is because that conduct might have interfered with "Congress's ability to review documents that it was statutorily required to receive and act upon." Opposition at 44. It seems safe to assume that the documents the government is referring to here are the certificates submitted by the states that formally announce who they have awarded their Electoral College votes to.

22. The government's argument that the conduct for which Mr. Sandlin is charged with under § 1512(c)(2) is in fact covered by that provision because that conduct has some nexus to evidence—i.e., the certificates that the states submitted to formally announce who they have awarded their Electoral College votes to—is strained. The certificates at issue are not evidence that Congress can consider when certifying the Electoral College votes. They are not submitted to prove any contested point. They are simply formal announcements of what is already known. See 3 U.S.C. § 15. It is true that Congress can decide not to accept a certificate of Electoral College votes submitted by a state, but this is the case only under two circumstances. First, Congress can reject a state's certificate of electoral votes when it determines that the votes at issue "have not been regularly given by he electors whose appointment has been lawfully certified" pursuant to the state's laws. 3 U.S.C. § 15; see 3 U.S.C. § 6. Second, in those instances where a state submits more than one certificate of electoral votes, Congress can pick one certificate and thus reject any others by determining which certificate actually reports votes that have "been regularly given by the electors who are shown… to have been [legally] appointed" by the state at issue. 3 U.S.C. § 15; see 3 U.S.C. § 5. However, in either instance, Congress is simply deciding if the electors whose votes the certificates

13

under review announce are in fact proper electors. It is not making any determination regarding the accuracy of the information contained in the certificates under review—that is, any determination about whether the certificates accurately tally the electors' votes. Thus, the states' certificates of Electoral College votes as are not what Congress reviews when deciding whether or not to accept them. Accordingly, they cannot be credibly characterized as "evidence" in any meaningful sense.

### Official Proceeding

23. In his Motion to Dismiss, Mr. Sandlin argues that the a congressional hearing to count the Electoral College votes is not an "official proceeding" as that term is defined in 18 U.S.C. 1515(a)(1) for the purposes of 18 U.S.C. § 1512(c)(2). Motion to Dismiss at 17-27. Mr. Sandlin points out that that the term "official proceeding" is intended to refer to court-like proceedings related to the administration of justice where witnesses and evidence can be secured to aid the adjudicative decision-making that needs to be done. Id. at 22-23. He points out that a hearing to count the Electoral College votes does not even have the ability to secure testimony and evidence and that what limited decision-making ability it does possess can only be informed by debate and the application of certain hierarchical rules. Id. at 25. Also, he points out that it is not a hearing related to the administration of justice. Id. at 26.

24. In its Opposition, in arguing that a congressional hearing to count the Electoral College votes is an official proceeding for the purpose of § 1512(c)(2), the government stresses the "solemn and formal" nature of Joint Sessions of Congress as a general matter and points out some of the elaborate rules of protocol that specifically

attend a hearing to count the Electoral College votes—even pointing out how the participants in the hearing are required to sit in certain places based on their status. Opposition at 7. But while the fact that a hearing to count the Electoral College votes is heavy on pomp may make it seem like an "official proceeding" in some general sense, it does not make it an "official proceeding" in the more clinical and legal sense that § 1512(c)(2) uses the term. Nor can it be credibly claimed that the purpose of § 1512(c)(2) is to protect the solemnity of proceedings or insure that etiquette is maintained.

25. In its Opposition, in effort to make the congressional hearing to count the Electoral College votes sound more like an "official proceeding" in the clinical and legal sense, the government tries to analogize it to court-like proceedings and to characterize it as at least "quasi-legal" in nature. Opposition at 12-13. Indeed, the government even goes so far to describe the hearing as one that is convened "to render judgment on whether to certify the votes cast by the Electors in the presidential election." Opposition at 13. But this is a grandiose description of what the joint session of Congress actually does when counting the Electoral College votes. Congress does not certify the states' awards of their Electoral College votes. It has no duty to do so. Unlike, say, jurors at a trial tasked with the responsibility of rendering judgment on a criminal defendant, Congress has no responsibility to render judgment on the certificates of Electoral College votes that the states submit. While it can—if it chooses to—refuse to allow a particular state's certificate of Electoral College votes to be considered in certain very limited situations, see supra at 13, its role otherwise is to stand back and let the votes be counted. 3 U.S.C. § 15. Indeed, prior to the 2021 hearing at issue in this case, this is what has

15

happened in all but two hearings (1969 and 2005) since 3 U.S.C. § 15 was enacted in 1887.  See https://en.wikipedia.org > wiki > Electoral_Count_Act.  Thus, unlike judges and jurors in courtroom settings, Congress has no adjudicative responsibility that it must necessarily exercise when the hearing to count the Electoral College votes is being held.  Especially when this fact is viewed in conjunction with the fact that Congress does not even have the ability to secure testimony and evidence to aid any decision-making it might undertake at a hearing to count the Electoral College votes, such a hearing cannot really be considered even quasi-legal in nature.

## CONCLUSION

WHEREFORE, the defendant, Ronald Sandlin, replies to the United States' Memorandum in Opposition to Defendant Sandlin's Motion to Dismiss Count Five of Indictment.

Respectfully submitted,

_____/s/_____
Jerry Ray Smith, Jr.
D.C. Bar No. 448699
Counsel for Ronald Sandlin
717 D Street, N.W.
Suite 310
Washington, DC 20004
Phone: (202) 347-6101
E-mail: jerryraysmith@verizon.net