**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | **:** | |
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| v. | **:** | **Case No. 21-cr-88-DLF** |
| | **:** | |
| **RONALD SANDLIN,** | **:** | |
| | **:** | |
| Defendant. | **:** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Ronald Sandlin to sixty-three months of incarceration, three years of supervised release, $2,000 in restitution, a $20,000 fine, and the mandatory $100 special assessment for each count of conviction.

## I.    INTRODUCTION

The defendant, Ronald Sandlin, together with his coconspirators, Nathaniel DeGrave and Josiah Colt, substantially planned for and then participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, in part, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Sandlin and his co-conspirators brought a car full of weapons, including knives, bear spray, and Sandlin's M&P pocket pistol, to Washington, D.C. in advance of the rally on January 6 with the expectation that there would be violence—specifically, a "boogaloo" or civil war related to the outcome of the certification of the 2020 presidential election.   Prior to storming the Capitol, Sandlin incited others to "take" and "occupy the Capitol," repeating his rallying cry, "freedom is paid for with blood," no less than four times on January 6.

After expressing this violent rhetoric, he acted on it.   Sandlin directly assaulted at least two U.S. Capitol Police ("USCP") officers, including by attempting to remove one officer's helmet, and abetted the assaults of four others.   He led the mob's charge against officers at two separate choke points—the Rotunda doors and the Senate Gallery—leading to the violent breach of those spaces and risking further injury to officers and members of Congress and their staff.   In an effort to intimidate USCP officers and convince them to leave their posts, Sandlin ominously warned, prior to assaulting them: "your life is not worth it...you're going to die, get out of the way."

After the riot, when the import of his actions should have been clear, Sandlin sent messages to friends evincing a clear lack of remorse.   For example, he told a friend on Facebook, "I'm a true patriot I'll do my time proudly."   Even months later, after he had been arrested, Sandlin believed that he had "a divine destiny to fulfill and I/we made history that day and the full implications of our actions [have] yet to be realized."   And as recently as this year, he attempted to profit from his unlawful conduct on January 6 by taking steps to sell his footage of the Capitol riot to media outlets.

The government recommends that the Court sentence Sandlin to a Guidelines range sentence of 63 months' incarceration.  A 63-month sentence reflects the gravity of Sandlin's conduct on January 6 and serves to deter those who would seek to emulate it.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Sandlin among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.  Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.   Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.  *See United States v. Matthew Mazzocco*, 1:21-cr-54-TSC, Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy."  *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself."  *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Reffitt*, 21-cr-32, Sentencing Hr'g Tr.

173:8-10 ("[T]hose who stormed the Capitol are not…patriots, they are a direct threat to our democracy and will be punished as such."); *United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish.   This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-54-TSC, Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred police officers.   *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on   January   6   (June   7,   2021),   at   29,   *available   at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries).   Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety.   *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May   19,   2021),   *available   at*   https://www.aoc.gov/sites/default/files/2021-

05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive and, in some instances, incalculable losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8 million dollars.

### B.   Sandlin's Extensive Role in the January 6, 2021 Attack on the Capitol

#### i.   Planning and Coordination Pre-January 6

In the weeks leading up to January 6, 2021, Sandlin used his social media presence to spread the type of false information and violent rhetoric that led thousands to descend on the U.S. Capitol and ultimately participate in a riot. A review of the search warrant return executed on Sandlin's Facebook account revealed that Sandlin believed the 2020 presidential election was stolen, that he adhered to the QAnon conspiracy theory, and that he traveled to Washington, D.C.

prepared to commit acts of violence to interfere with the peaceful transition of power and stop the Congressional certification of the 2020 presidential election.

Sandlin appears to have fancied himself as a modern-day Patrick Henry as early as December 10, 2020.[2]   On that day, he posted to his Facebook account what eventually became his battle cry on January 6: "tyranny always masquerades itself as safety and security. *Freedom is paid for with blood*, there is a reason why America was founded on the principles of give me liberty or give me death."   He also posted the hashtag "#WWG1WGA"—where we go one we go all— a QAnon refrain.[3]

On December 23, 2020, Sandlin's plans for January 6th became more concrete, as he posted the following:

> Who is going to Washington D.C. on the 6th of January? I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon.[4]   If you are a patriot I believe it's your duty to be there. I see it as my civic responsibility. If you're going comment below or PM me so we can meet up.

Nathaniel DeGrave,[5] Sandlin's co-defendant, responded to Sandlin that he was "considering"

---

[2] Patrick Henry, a founding father, is best known for declaring, "Give me liberty, or give me death!"   *See* https://avalon.law.yale.edu/18th_century/patrick.asp.

[3] According to witness testimony, Sandlin also carried around a coin with the letter "Q" on it, apparently to demonstrate his proud affiliation with the QAnon movement.   *See* CBS News, *What Is the QAnon Conspiracy Theory?* (Nov. 24, 2020), https://www.cbsnews.com/news/what-is-the-qanon-conspiracy-theory/.

[4] This phrase is a reference to Julius Caesar's crossing the Rubicon river and signifies committing oneself "irrevocably to a risky or revolutionary course of action, similar to the modern phrase 'passing the point of no return.'"   *See* https://www.collinsdictionary.com/dictionary/english/to-cross-the-rubicon.

[5] DeGrave has since pleaded guilty, pursuant to a cooperation agreement, to Conspiracy to Obstruct an Official Proceeding (18 U.S.C. § 1512(k)) and Assaulting Certain Officers (18 U.S.C. § 111(a)).

joining him, and that he could "come to Nashville and drive there with you."   *See* Sandlin

Statement of Offense ("SOO") ¶ 9.   In a post on December 31, 2020, Sandlin announced on

Facebook his plans with DeGrave and Josiah Colt[6] to travel to D.C. on January 6:

> Dear Patriots, I'm organizing a caravan of patriots who are going to
> Washington D.C. to stand behind our president Donald J. Trump.   I
> posted about this last week and a got almost a dozen messages from
> people asking how they can help or expressing their wish to
> participate somehow.   Josiah Colt, Nate DeGrave, and myself have
> already booked and paid for our trip to Washington D.C. but we
> could use your help and support!   Every dollar you contribute to us
> is a smack in the face to Antifa. Every penny is a boot in the ass
> against tyranny. Every Buffalo nickel is a body slam against China.
> If you can't be there in person this is the next best thing.   We will
> be documenting our journey and every contributer will get a
> personal thank you video shot on location in Washington D.C. and
> will be featured as a contributor on the video mini documentary.
> Share, comment, like, and hate on us in the comments.

The post also contained a link to a GoFundMe webpage[7] with Sandlin's face superimposed on

that of an individual in a car holding what appears to be a semi-automatic rifle, along with the

caption, "The only thing necessary for the triumph of evil is for good men to do noth[ing]… Ronnie

Sandlin needs your support for Patriots Defending Our Country On Jan 6th."   SOO ¶ 11.

The items from Sandlin's Facebook search warrant return reflected coordination and

planning for violence in D.C. on January 6.   In one December 30, 2020 conversation, Sandlin

wrote DeGrave, "Yo sorry bro I'm going back and fourth [sic] about going some people I respect

are saying it may get dangerous" and then, "Are you down for danger bro?"   DeGrave responded,

"Im bringing bullet proof clothing" and "yes."   SOO ¶ 10.

---

[6] Colt has since pleaded guilty, pursuant to a cooperation agreement, to Obstruction of an Official
Proceeding before Judge Hogan in case number 21-cr-74.
[7] GoFundMe is a social fundraising online platform allowing individuals to raise money for a
particular cause or reason.

Beginning on December 31, 2020, Sandlin, DeGrave, and Colt began a private group chat on Facebook to plan for the 6th.  They discussed "shipping guns" to Sandlin's residence in Tennessee, where they would all meet before driving to D.C.  Colt said he would try to fly with his "G43," referring to his Glock .43 caliber pistol.  They filled up their Amazon shopping carts with weapons and paramilitary gear to take to the Capitol.  Sandlin later stated he was bringing his "little pocket gun" and a knife.  Later that evening, DeGrave asked for Sandlin's address, which Sandlin provided, and then wrote that he had "about 300 worth of stuff coming to you." Sandlin and Colt later posted pictures of their recent purchases, including a Glock holster, gas masks, shin guards, and a helmet.  SOO ¶ 12.

On January 4, 2021, DeGrave wrote Sandlin and Colt, "[w]e meet here at 10:00 a.m." and sent a screenshot of "wildprotest.com" depicting a map of the U.S. Capitol with a "Meet Here" notation in front of the building.  He also forwarded them a post from the Parler application stating: "#DoNotCertify #january6th" and "#stopthestealcaravan #darktolight #thegreatawakening #DRAINTHESWAMP," followed by his own commentary, "let em try us."  SOO ¶ 13.  That same day, Sandlin posted Figure 1, a photo of Colt lying in a bed holding a firearm, with the caption, "My fellow patriot Josiah Colt sleeping ready for the boogaloo Jan 6."  *See* Figure 1 (recovered from Colt's Facebook account); *see also* SOO ¶ 14.  Sandlin knew at the time he wrote this post that the term "boogaloo" referred to civil war.  *See* SOO ¶ 14.



*Figure 1*

Sandlin, Colt, and DeGrave (hereinafter, the "trio") ultimately brought the following weapons and other items with them in a rental car from Tennessee to the D.C. metropolitan area on January 5, 2021: Colt's Glock 43 pistol, Sandlin's M&P bodyguard pocket pistol, two magazines of ammunition, two cans of bear mace, gas masks, a handheld taser/stun gun, a slingshot, military-style vests/body armor, two helmets, an expandable baton, walkie talkies, and several knives, including a fixed blade owned by Sandlin.   *See* SOO ¶ 15.

When they arrived in the D.C. area on January 5, the trio picked up a fourth individual—a female—from Reagan National Airport, and the four went to a rally protesting the results of the 2020 presidential election in Washington, D.C. that evening.   While driving back from the rally, a can of bear spray discharged in DeGrave's pocket.   Colt posted a video of this moment to his social media bearing the caption, "Nate's bear mace was going off in his pocket and it started filling the van [with] bear spray."   SOO ¶ 17.

    *ii.*    *Events of January 6*

Sandlin and his co-conspirators traveled to D.C. early in the morning on January 6 to attend the "Stop the Steal" rally.   Sandlin armed himself with a knife and wore shin guards and a motorcycle jacket, while Colt and DeGrave each carried face/gas masks and walkie talkies.

9

DeGrave also carried a can of bear spray in his pocket.  *See* Figure 2 (depicting bear spray in DeGrave's pocket, as seen in video recorded by Colt); SOO ¶ 21.



*Figure 2*

Before the riot began, the trio traveled from the rally to a TGI Friday's restaurant in Alexandria, Virginia, where they watched former President Trump's speech on television.   After the speech ended, Sandlin live streamed a "selfie"-style video and called on "fellow patriots" to watch.   In the video, Sandlin said, no less than four times, "freedom is paid for with blood."   *See* Ex. 1.[8]   Sandlin also stated:

> Alright so we have been at the protests…we were there pretty early, scoped it out…there were some scrimmages, I will upload the video later…I think a precursor of what is going to [happen] in a few hours.   People are really mad…it is just a precursor to what's going to happen…Either way there is going to be violence.

---

[8]  All audio/video exhibits cited in this memorandum will be provided to the Court either via a file sharing platform or during the sentencing hearing (due to redaction issues).

A little later in the video, Sandlin stated:

> What is happening to this country is absolutely horrific, absolutely horrific…we are ready to occupy the state capitol if needed to…_I urge other patriots watching this too, to be willing to take the capitol…if you are watching this and you are a patriot and are here, I think it is time to take the capitol and I don't say that lightly_…. I am willing to do it, I willing to go and fight for this country.   Even if that means I have to sacrifice in some capacity.   It is not what I want to do…

(Emphasis added).

In the video, Sandlin hands the device used to record the video to Colt and DeGrave.   Colt states that "[t]he whole thing is a scam, dude.   The whole election, they can't just steal an election. Like they are trying to do in Georgia last night.   It is a lie."   DeGrave responds: "We are sick and tired of the fucking lies.   It is time to put an end to this once and for all."   At this point, Sandlin takes the device back from them and states: "You either have conviction and you stand up for what you believe in or you sit down and shut the fuck up."   Towards the end of the video, Sandlin states:

> _If we need to occupy the capitol, we will occupy the capitol._   You guys are driving all the way to D.C. and you are missing the rally. We have been at the rally, we went last night, we have been at the rally since six in the morning.   We needed to grab a bite to eat, and like decompress because we went through a few intense moments and also regroup and plan for the next…._one o'clock is when it is all going to go down.   So we are going to be there back by one o'clock when it is action time it is game time._

(Emphasis added).

At this point in the video, Colt asks Sandlin, "storming the Capitol?" to which Sandlin replies, "I'm willing to occupy the Capitol."   Sandlin's statements appear to refer to the joint session of Congress at the U.S. Capitol building that began at approximately 1:00 p.m.   The trio

agreed to go to the Capitol shortly after this video was made.   DeGrave Statement of Offense ¶ 23.

Videos posted to Colt's social media as well as videos recovered from the trio's devices show them walking on the National Mall towards the Capitol.   In one such video, DeGrave appeared to tell someone on a walkie talkie, "meet us there, over."   Ex. 2 (recovered from Sandlin's encrypted laptop file).   DeGrave then stated, "they're trying to get through the barricade, they're going in," to which Sandlin responded, "It's go time.   Pence did his job, it's time for us patriots to do our job.   We need to occupy the Capitol building."   *Id.*; SOO ¶ 22.

Upon arriving on Capitol grounds, the trio learned that rioters had, in fact, breached the barricades and were storming the Capitol.   They proceeded to scale a dismantled bike barricade to get over a stone barrier and move closer to the Capitol building.   *See* Ex. 3 (recovered from DeGrave's cell phone).   Around this time, DeGrave recorded a video on his cell phone, stating: "They just breached the Capitol building. That's it, bro. It's game time.   We all armored up, we got a gas mask.   This is what separates us true patriots from everyone else who is all talk—you know, fuck this, fuck that, sitting at home, we out here taking action.   It's Dr. Death in the building and it's about to go down."   SOO ¶ 24.

The trio then wormed its way through the crowd, pushing past others to get closer to the Capitol building.   As they did so, Sandlin repeatedly yelled things such as "we're not here to spectate anymore," "the time for talk is over," and "if you're not breaching the building, move out of the way."   *See* Ex. 4 (recovered from Colt's GoPro camera).   Sandlin witnessed rioters climbing the scaffolding set up for the presidential inauguration as he ascended the stairs below it. *See id.*   Upon his arrival to the Upper West Terrace of the Capitol, Sandlin stopped to take a

picture of a pile of dismantled bike rack barricades.   *See* Figure 3 (recovered from encrypted folder on Sandlin's laptop).



*Figure 3*

Undeterred by the mayhem and obvious signs of a violent breach of the U.S. Capitol building, the trio stormed the Capitol through the Upper West Terrace doors at 2:35 p.m., just as Sandlin had suggested at the TGI Friday's hours earlier.   *See* Ex. 4.

The trio made their way through the Rotunda to the East Rotunda doors, on the other side of which a mob was attempting to gain entry to the Capitol.   As he entered this space, Sandlin observed three USCP officers standing guard in front of these doors, with twenty to thirty other individuals encircling them.   With the security alarm blaring, Sandlin approached the officers, yelling to "get out of the way."   *See* Ex. 5 (recovered from Sandlin's laptop); Ex. 6 (CCTV footage).   Sandlin then shouted at the officers, "your life is not worth it today" and "you're going to die, get out of the way."

Immediately thereafter, the mob, including Sandlin and DeGrave, began shoving the officers to force the door behind them open, allowing the mob outside to begin streaming in.

During this melee, Sandlin tried to rip the helmet off of USCP Officer B.A.,[9] while DeGrave shouted, "get the fuck through" and "kick it the fuck open."   *See* SOO ¶ 29; *see also* Ex. 7 (CCTV footage), Ex. 8 (rioter footage of Sandlin assault of Officer B.A.); Figure 4.   Officer A.W. was "pinned and crushed" during this assault, while Officer K.T. was pepper sprayed by rioters, rendering him momentarily blind and forcing him to feel along the wall to make it to safety.   *See* Ex. 9 (Colt's GoPro footage of Sandlin's assaults); Exs. 10-11 (reports of interviews with Officers A.W. and K.T.).



*Figure 4*

[9] Although Officer B.A., the assault victim in Count Four, reported that he did not suffer any physical injuries attributable to Sandlin, Sandlin's participation in the riot aided those rioters who did succeed in injuring officers and destroying property.   For example, Officer B.A. was assaulted by another rioter shortly before Sandlin's assault and in much the same manner.   Prior to the second breach of the Rotunda doors in which Sandlin attempted to rip off Officer B.A.'s helmet, another rioter grabbed and pulled Officer B.A.'s helmet, causing the chin strap to choke him.   *See* Ex. 7 and Ex. 12 (report of interview with Officer B.A.).   Ultimately, the rioter threw Officer B.A. to the floor as he momentarily lost consciousness.   In other words, by assaulting Officer B.A. shortly after this incident, Sandlin literally added assault to injury.   And finally, as described herein, Sandlin's violent conduct and rhetoric served to incite and embolden other violent rioters around him.

After enabling the breach of a key entry point to the Capitol, the trio ascended a set of stairs in search of the "Senate…where they're meeting." *See* Ex. 9.  The trio eventually made their way to a hallway just outside the Senate Gallery, a balcony overlooking the Senate Chamber. Only twenty minutes earlier, the U.S. Senators gathered there to count and certify the Electoral College vote had been evacuated.  As the trio entered the hallway, three USCP Officers were locking the doors to the Gallery to prevent the rioters from gaining access.

Sandlin again led the charge.  He appears to have been the first rioter to shout at these officers, "don't you lock another door," and then at fellow rioters to "grab the door."  Ex. 5.  In other words, Sandlin instigated the assault on the three USCP officers over access to the Senate Gallery, where he believed the Senators were convened.   Along with DeGrave and other rioters, Sandlin engaged in a shoving match with the officers in an attempt to keep the doors to the Senate Gallery open, striking Officer N.T.'s head in the process.  *See* Figure 5 (CCTV footage depicting Sandlin with arm raised towards Officer N.T.) and Ex. 9.



*Figure 5*

15

Having violently breached yet another sensitive space, the trio entered the Senate Gallery. Colt jumped down to the Senate Floor and sat in the seat occupied moments earlier by the Vice President, while Sandlin began to weep, celebrating the achievement of his earlier-stated goal to take the Capitol.   "We took it, we did it," he exclaimed.   *See* Ex. 13.   DeGrave shouted from the balcony at Colt and others on the Senate Floor to "take laptops, paperwork, take everything, all that shit."   *See id.*

As he wandered through the Capitol, Sandlin continued his pursuit of members of Congress, asking an unknown individual, "is that where the Senators are at?"   *See* Ex. 14.   He then told a police officer, "we've pushed our way through already, sir."   Sometime thereafter, Sandlin smoked a marijuana joint in the Rotunda of the Capitol while stating, "we made history" and "this is our house."   SOO ¶ 35.

Before exiting the Capitol through the Rotunda doors at approximately 3:16 p.m., Sandlin stole a book from a desk in a Senate-side office.   *See* SOO ¶ 36; Figure 6 and Ex. 15 (CCTV footage depicting Sandlin with book in right hand).   Sandlin also picked up an oil painting from the Capitol and slung it over his shoulder, ready to cart it off, before other rioters stopped him and took it off his shoulder.   *See* SOO ¶ 36; Figure 7 and Ex. 16 (CCTV footage of Sandlin with painting on shoulder).   Sandlin took the stolen book with him back to Las Vegas, NV, where he showed it off to Colt as a "souvenir."   SOO ¶ 36.



*Figure 6*



*Figure 7*

    *iii.    Sandlin's Knowledge of FBI Investigation*

        Sandlin, DeGrave, and Colt left D.C. and drove cross country almost immediately after their unlawful entry into the Capitol.   They were well aware of the criminal nature of their actions that day.   Indeed, as early as approximately 6 p.m. on January 6,[10] a friend of Colt messaged Sandlin directly that authorities were "probably going to charge Josiah with at least one or multiple

---

[10]   Facebook returns show time stamps in UTC, or Universal Time Coordinated, which is four hours ahead of Eastern (Daylight) Time during winter months.   *See* https://www.onlineconverter.com/utc-to-est.

offenses and trying to help him out by getting a federal attorney to protect him now," to which

Sandlin defiantly responded, "We made our decisions."   *See* Ex. 17 at 11 (relevant excerpts from

Sandlin's Facebook account) and Figure 8 below.



*Figure 8*

Then, around 8:30 p.m. on January 6, a friend wrote Sandlin privately on Facebook, "are

you being censored?" to which Sandlin replied, the "FBI [is] after us"—suggesting that he deleted

certain public-facing posts from his Facebook to avoid law enforcement detection.   *See* Ex. 17 at

5.   Later, in a Facebook group chat at approximately 10 p.m., Sandlin told the female who stayed

18

in the hotel with them that the trio had left D.C. to get "to a safe spot," and that they were "at risk for serious jail time."   Ex. 18 (Facebook group chat recovered from Colt's return); PSR ¶ 31.   On January 8, Sandlin told another individual on Facebook that he believed charges against him were "imminent."   *See* Ex 17 at 2.

> iv.   *Destruction of Evidence*

Sandlin deleted the videos he recorded and posted to Facebook on January 6 well after he left the Capitol and was aware that a criminal investigation would ensue.   Around 5 p.m. on January 6, Colt's friend wrote the trio in the group chat that he would "work on finding help," to which DeGrave replied, "[t]hank you bro we need it."   Ex. 18.   An hour later, around 6 p.m., DeGrave implored Sandlin to "untag and delete all posts," indicating that the live-streamed videos Sandlin recorded from the Capitol were still public.   *Id.*   Sandlin responded, "I'm leaving it up I'm not scared I'll untag but why come if you're [scared]."   *Id.*   The friend offering help replied, "[b]ecause I ID'd J[osiah] in 2 seconds from your sm posts…and facial recognition will."   *Id.*

Sometime thereafter, Sandlin deleted the following videos from his Facebook account, as they were submitted as tips to the FBI or otherwise posted online but did not appear in the search warrant return for his account: (1) the video Sandlin recorded at the TGI Friday's; (2) the video in which Sandlin exclaimed, from the Senate Gallery, "we took it, we did it"; (3) the video in which Sandlin told an officer that he and the rioters had "pushed our way through already, sir"; and (4) a video in which Sandlin smoked a marijuana joint in the Rotunda.[11]

---

[11] Sandlin's Facebook "friends" appear to have shared these videos with media outlets, as they became public shortly after the riot and long before these proceedings began.   *See* Laura Italiano, *Video shows rioter smoking pot in Capitol Rotunda during siege* (N.Y. Post, Jan. 9, 2021), https://nypost.com/2021/01/09/video-shows-rioter-smoking-pot-in-capitol-rotunda-during-siege/ (depicting three of four videos described above).   Indeed, in a private thread with Sandlin on

Separately, Sandlin deleted nearly the entire group chat described above in which he, DeGrave, Colt, and the female friend participated.   As seen in the search warrant return for Colt's Facebook account, Sandlin created the group chat on December 31, 2020.   In it, as described above, the trio discussed buying weapons and gear and shipping guns to bring to the rally in D.C. on January 6.   *See* Ex. 18.   All messages from the group chat from December 31 until the evening of January 6 are conspicuously absent from Sandlin's Facebook search warrant return.   *See* Ex. 19 (Facebook group chat recovered from Sandlin's return).   Indeed, the group chat as seen in Sandlin's return picks up at 9:52 p.m. on January 6 and features only a conversation with the female friend about the trio clearing out of the hotel and leaving D.C.   *Compare* Ex. 18 *with* Ex. 19.   Significantly, Sandlin deleted the group chat hours after messaging the group that he was not scared of being identified, as described above.

> v.   *Attempts to Profit Off Criminal Conduct*

Despite knowing they were likely targets of a criminal investigation, Sandlin, DeGrave, and Colt discussed selling their footage of the riot via encrypted messaging applications.   On January 14, 2021, Sandlin discussed his "footage" with an associate, noting that he had "a meeting with Dinesh Desuza [sic] this week"[12] and asking to "chat on signal."   Two days later, Sandlin wrote a third party on Facebook that he was "already working out a Netflix deal on the footage I have."   In a message to his ex-fiancée from jail, Sandlin stated that he was "writing a book about

---

Facebook on January 6, 2021 at 8:24 p.m., an individual stated, "I can't wait to send your videos in."

[12] Dinesh D'Souza is a commentator who has produced several documentaries, such as "2016: Obama's America" and "Hillary's America."   *See, e.g.*, Daniel Victor, *A Look at Dinesh D'Souza, Pardoned by Trump* (May 31, 2018), https://www.nytimes.com/2018/05/31/us/politics/dinesh-dsouza-facts-history.html.

his journey and I hope to turn it into a movie."   *See* Ex. 20 (relevant jail text message excerpts).

Even after spending nearly a year in pretrial detention, Sandlin still attempted to profit from his criminal conduct on January 6.   In recorded jail calls from December 2021, Sandlin instructed a friend to watermark his footage from inside the Capitol so that he could send a sample to potential buyers.   *See* Exs. 21-22 (Dec. 8, 14, 2021 jail calls).   He also participated in an interview with documentary filmmaker Alexandra Pelosi, over the course of several recorded jail calls, in which he discussed providing his footage to her as well as his conspiracy theories regarding the events of January 6—e.g., that the police murdered protester Rosanne Boyland outside of the Capitol, and that this is what caused the crowd to erupt in violence.[13]   *See, e.g.*, Ex. 23 (Dec. 8, 2021, jail call to Alexandra Pelosi).

Separately, Sandlin created an online fundraiser purportedly for "legal fees," despite benefiting from the services of a court-appoint attorney at no cost to him.   *See* Ex. 24.   In his GiveSendGo campaign, aptly titled "Mexican J6-er Political Prisoner in DC's Gitmo," Sandlin paints a portrait of himself as a victim, stating that he was offered a "6 year plea deal for minor charges that his lawyer said he should only receive probation for if we weren't dealing with a politically biased judicial system."   *Id.*   As of October 27, 2022, Sandlin has raised over $21,000 through this platform, a figure confirmed by Sandlin in his PSR interview.   *See id*; *see also* PSR ¶ 93.   Given that he has no legal fees to speak of, he has used and will use these funds for personal expenses (e.g., his "canteen" and tablet expenses).   *See* Def.'s Objections to Draft PSR.

---

[13] It does not appear from the jail calls that Sandlin ultimately consummated a transaction with Ms. Pelosi for the footage.   Sandlin also used his jail account to facilitate Ms. Pelosi's telephone interview of fellow January 6 defendant, Robert Palmer (21-cr-328-TSC).

### vi.   Lack of Remorse

After the riot, Sandlin sent messages reflecting a clear lack of remorse for and even pride in his actions on January 6.   For example, he told one friend on Facebook that he "did it for god and country and I'm ready to face my consequences like a man I believe god is on my side."   *See* Ex. 17 at 6.   To another, he stated, "I'm a true patriot I'll do my time proudly."   *Id.* at 4.   In another exchange, Sandlin wrote that his "lawyer said worst case scenario 1 year in federal prison. I need to los[e] some weight anyway and it's a small price to pay for my country."   *Id.* at 7.

In one notable exchange from January 9, 2021, with an individual who had originally planned to travel to D.C. with the trio but backed out at the last minute, Sandlin wrote, "Josiah is a hero.   I'm a patriot and I'm fine with whatever happens.   For god and country.   We have a noble and just cause."   *Id.* at 15.   He later wrote, "I'm prepared to face my decisions like a man. I crossed the rubicon and so did Josiah and there's no turning back now," adding that he had "conviction about my cause."   *Id.* at 16.

Even two months after his arrest, on March 30, 2021, Sandlin wrote his ex-fiancée from jail that he was "proud to call [the other Capitol riot inmates housed in the D.C. jail] my friends we stood up for what we believed in and sacrificed," adding that he was "writing a book on my journey and I hope to turn it into [a] movie."   *See* Ex. 20.   He also communicated with fellow rioter, Nick Alvear,[14] via text message from jail on April 7—the day after his statement to the Court—inviting him to "work together on making this a big movie and book."   *See id.*   Providing a deeper view of his mental state, on March 30, he told his mother and ex-fiancée the following:

> I'm at peace now and I've accepted that I'm here for a reason…it
> may sound self serving but I truly believe I have a divine destiny to

---

[14] *See U.S. v. Gonzalez*, 21-cr-115 (D.D.C. 2021).

fulfill and I/we made history that day and the full implications of our
actions [have] yet to be realized.

*See id.*

## III.    THE CHARGES AND GUILTY PLEA

On September 15, 2021, a federal grand jury returned a superseding indictment charging
Sandlin with Conspiracy to Obstruct an Official Proceeding in violation of 18 U.S.C. § 1512(k),
Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Assaulting, Resisting,
or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Civil Disorder in violation of
18 U.S.C. § 231(a)(3), Entering or Remaining in any Restricted Building or Grounds in violation
of 18 U.S.C. §§ 1752(a)(1), and Disorderly and Disruptive Conduct in a Restricted Building or
Grounds in violation of 18 U.S.C. § 1752(a)(2).

On September 30, 2022, Sandlin pleaded guilty to Count One, Conspiracy to Obstruct an
Official Proceeding, and Count Four, Assaulting, Resisting, or Impeding Certain Officers—
specifically, Officer B.A.

## IV.    STATUTORY PENALTIES

Sandlin now faces sentencing on Conspiracy to Obstruct an Official Proceeding in
violation of 18 U.S.C. § 1512(k)(2) and Assaulting, Resisting, or Impeding Certain Officers in
violation of 18 U.S.C. § 111(a)(1).   As noted by the plea agreement and the Probation Office,
Sandlin faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised
release of not more than three years for Count One and up to 8 years of imprisonment, a fine up to
$250,000, and a term of supervised release of not more than three years for Count Four.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.   The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.   *Id.* at 49.

### A.  Guidelines Not in Dispute

The parties agree that Sandlin's criminal history is category I, which mirrors the conclusion of the U.S. Probation Office.   PSR ¶ 64.   The parties and Probation also agree that the below Guidelines apply:

Count One: 18 U.S.C. § 1512(k)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[15] | +8 |

---

[15]   This Court previously applied this Guideline to a January 6 defendant in part because his "failure to stand down and follow the lawful command of the officers was threatening to them." *United States v. Reffitt*, 21-cr-32, Sentencing Tr. 38:11-18.   Here, the parties and Probation have agreed that this Guideline applies because Sandlin's conduct was clearly threatening.   First, he shouted at USCP officers, "you're going to die, get out of the way," as he tried to get them to move from their post guarding the Rotunda doors.   When they did not, Sandlin joined in a mob push forcing the doors open and attempted to remove one officer's helmet in the process.   Shortly thereafter, Sandlin again approached USCP officers trying to lock the doors to the Senate Chamber, threatening "don't you lock another door," before participating in a shoving match over access to the space.   Sandlin's active attempts to interfere with the officers' lawful duties and not-so-veiled threats about what would happen if the officers did not stand down, coupled with Sandlin's assaults following up on those threats, certainly "involved ...threatening to cause

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[16] +3 | |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation[17] | +2 |
| | **Total** | **27** |

See Plea Agreement at ¶¶ 4(A); PSR ¶¶ 50-53.

The revised PSR concludes that Counts One and Four group under the Guidelines because Count One "produces the highest offense level."   See PSR ¶¶ 44-53.   The government agrees. Nevertheless, the revised PSR should have determined the base offense level for Count Four as well as any special offense characteristics and Chapter 3 adjustments before conducting the grouping analysis.   U.S.S.G § 1B.1(a)(1)-(4).   That calculation, as agreed to by the parties, is as follows:

Count Three: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[18] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

---

physical injury to a person…in order to obstruct the administration of justice" in the context of the riot at the Capitol during the Electoral College vote certification.   U.S.S.G. § 2J1.2(b)(1)(B).

[16] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s]…the unnecessary expenditure of substantial governmental or court resources."   See U.S.S.G. § 2J1.2(b)(2), Application Note 1.   Sandlin has admitted that he forcibly breached the Capitol believing that he was trying to stop or delay the proceedings before Congress—namely, the certification of the Electoral College vote.   SOO ¶ 39.   The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses.   As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.   These facts clearly meet the commentary's definition.

[17] This Court has previously found that Sandlin engaged in "substantial planning," and that his actions on January 6 were "premeditated."   Apr. 13, 2021, Detention Hr'g Tr. 20:22-22:7.

[18] The cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers) directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault, as here.

### B. Disputed Enhancement for Obstructing/Impeding the Administration of Justice[19]

The parties dispute the applicability of the two-level adjustment under U.S.S.G. § 3C1.1 ("Obstructing or Impeding the Administration of Justice").   *See id.*; Plea Agreement ¶ 4. Probation, for its part, agrees with the government that the enhancement does in fact apply because Sandlin "deleted [from] his Facebook account the group chat with Defendant De[G]rave and Colt, which contained photographs and messages regarding the events of January 6, 2021."   PSR ¶ 42; *see also* SOO ¶ 37.

As noted above, this group chat was replete with evidence of the defendants' conspiracy— i.e., the count of the Section 1512(k) conviction—including messages regarding the weapons and gear they planned to bring to Washington, D.C. on January 6 and their reasons for doing so.   *See* Ex. 18.   Deleting this evidence thus triggers U.S.S.G. § 3C1.1 n. 4(D), which instructs that the enhancement applies where there is evidence of "destroying or concealing … evidence that is material to an official investigation or judicial proceeding (*e.g.*, shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence)."

Contrary to his counsel's assertions of a potentially benign reason for deleting material evidence, *see* Def.'s Objections to Draft PSR, Sandlin clearly knew at the time he deleted the group chat that the government would immediately commence an investigation of the attack on the Capitol in which he participated.   The evidence shows that Sandlin deleted the group chat, which was absent from the items on his Facebook search warrant return, sometime after his message to

---

[19] A timeline of Facebook messages relevant to the disputed enhancement, which illustrates Sandlin's knowledge of the impending criminal investigation of his conduct as well as his actions with respect to the deleted content, has been attached as Exhibit 27.

the group, on January 6 at around 6 p.m., that he was not scared of being identified, and after a Facebook friend noted that Colt would be facing federal charges, had been "doxx[ed],"—i.e., identified—and was "all over the news."   *See* Ex. 17.   And as early as approximately 8 p.m. on January 6, Sandlin explicitly acknowledged that he was a criminal target, writing a friend that the "FBI [is] after us."   *See id.* at 5.

But deleting the group chat was not Sandlin's only obstructive act related to the counts of conviction.   He also deleted multiple videos documenting his crimes on January 6 from his Facebook account, including the video recorded from the Senate Gallery moments after he assaulted USCP officers.   As noted above, Sandlin appears to have deleted these videos only after his co-conspirator Nathaniel DeGrave pleaded with him to "untag and delete all posts," fearing repercussions.   *See* Ex. 18.   Sandlin defiantly responded, "I'm leaving it up I'm not scared," indicating that he was aware of the risk of being identified by the authorities and was willing to take it.   *See id.*

Although the government ultimately was able to recover these videos from Sandlin's seized laptop, it was only after Sandlin engaged in further obstructive methods to hide material evidence from law enforcement detection.   Specifically, he encrypted his video footage of the Capitol on his laptop prior to his arrest and then gave a copy to a third party, who later attempted to watermark the footage for sale to media outlets.   The government was only able to access the files, including the video capturing his assaults on police, in January 2022—an entire year after the crime—after Sandlin provided his encryption key to the third party in a recorded jail call.

In light of these willful acts by Sandlin to conceal material evidence and thereby obstruct the administration of justice with respect to the investigation of the offenses of conviction, the Court should apply a two-level enhancement pursuant to U.S.S.G. § 3C1.1.

Accordingly, Sandlin's Combined Offense Level is 29, and his Total Adjusted Offense Level after acceptance of responsibility is 26, resulting in a Guidelines imprisonment range of 63 to 78 months.   Sandlin's plea agreement, however, includes an agreement by the government to cap its allocution at 63 months' imprisonment, which is what the government seeks here.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).   In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history.   It represented a grave threat to our democratic norms.   Indeed, it was one of

the only times in our history when the building was literally occupied by hostile participants.   By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.   As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.   Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Sandlin's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.   While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration.   Sandlin's statements prior to the riot demonstrate that he was

prepared for and willing to commit violence in aid of his ideological goals.   Shortly before his arrival at the Capitol on January 6, Sandlin told his social media followers: "You either have conviction and you stand up for what you believe in or you sit down and shut the fuck up," "I'm willing to sacrifice," and, repeatedly, "freedom is paid for with blood."   He encouraged others to join him in taking the Capitol at 1 p.m., precisely when Congress's proceeding to certify the Electoral College vote was due to start.

Sandlin followed through on these words.   After unlawfully storming the Capitol as part of a mob, he assaulted multiple police officers and instigated other rioters to do so as well.   On two separate occasions, Sandlin effectively led the charge against USCP officers guarding sensitive spaces—the East Rotunda doors and the Senate Gallery.   In both instances, Sandlin repeatedly shouted at the officers to leave their posts in a threatening manner—e.g., "you're going to die, get out of the way" and "don't you lock another door."   During the first assault, Sandlin tried to rip the helmet off of USCP Officer B.A. in what can only be described as an attempt to expose him and render him vulnerable as the mob surrounded him.   And in the second assault, Sandlin initiated the confrontation with officers, directing other rioters to "grab the door, grab the door."   During this incident, he took a swing at Officer N.T., which made contact with the back of his head near his ear.

Officer B.A. suffered lasting emotional "scars" as a result of the assaults perpetrated by Sandlin and others at the Rotunda doors.   *See* Ex. 25 (victim impact statement submitted by Officer B.A.).   He felt like "a human punching bag" and described January 6, 2021, as "the worst [day] I've ever had to live through."   *Id.*   Officer B.A. recalled that rioters "continued their attempts to rip off my helmet from my head, causing me to choke again and unable to physically

function in any sort of defensive manner"—describing precisely the assault by Sandlin in which he grabbed at Officer B.A.'s helmet.   The rioters' actions "greatly impacted" Officer B.A.'s life, so much so that he has understandably declined to attend the sentencing hearing in this matter so as not to have to relive the trauma of that day.   *See id.*

Sandlin's actions in forcing the Rotunda doors open also enabled dozens of rioters to stream in and commit criminal acts inside the building.   And by forcing open the Senate Gallery doors, he enabled rioters to occupy and defile the Senate Chamber, where just moments before Congress had been conducting its constitutional duty to certify the results of the 2020 election. The evidence paints a picture of Sandlin as seeking out violence at every available opportunity.

Sandlin's actions prior to the riot are perhaps even more disturbing.   Sandlin and his co-conspirators amassed weapons and paramilitary gear, which they drove cross country to the D.C. area.   He admits he was prepared for "the boogaloo"—civil war.   SOO ¶ 14.   This was not the behavior of someone who intended only to protest peacefully.   His actions leading up to the riot demonstrate planning, coordination, and determination to engage in violent conduct that day to "stop the steal" and prevent the certification of the electoral college results deeming Joe Biden the winner of the 2020 presidential election.   Sandlin incited others to "occupy the Capitol" and to pay for "freedom … with blood."   He sought out, incited, and perpetuated violence that day.

After the riot, Sandlin celebrated his actions, showing no contrition in his messages to friends via social media.   He lauded himself a "patriot" on multiple occasions and scoffed at spending a year in prison for his actions.   Sandlin even articulated that he believed he had a "divine destiny to fulfill," and that "the full implications of our actions [have] yet to be realized."

31

These are the words of a would-be martyr.  Nothing that Sandlin has done or said since then indicates to the contrary.

On January 6, Sandlin combined his criminal intention to interfere with the functioning of Congress with assaults on the police officers trying to protect that function.  He incited and engaged in mob violence.  The seriousness of this offense demands a lengthy sentence of imprisonment.

### B.  Sandlin's History and Characteristics

Sandlin does not have a notable criminal history.  He comes from a loving adopted family and went to good schools.  At one point in his life, he apparently made approximately $300,000 annually as an internet marketer.[20]  Statements submitted to the Court during the detention proceedings indicate that Sandlin helped found a bicycle non-profit organization.

Needless to say, Sandlin's history is inconsistent with his more recent conduct.  In addition to his actions leading up to and on January 6, 2021, less than three months ago, Sandlin again turned to violence in the name of a "cause"—wielding a chair in a threatening manner against a D.C. corrections officer after that officer pepper sprayed a fellow January 6 inmate.  *See* Ex. 26 (Sept. 5, 2022, incident report from D.C. Department of Corrections).  His willingness to resort to violence after nearly two years of incarceration illustrates the need for additional specific deterrence in this case.

Similarly, recent statements by Sandlin fail to reflect any remorse for the wrongs he committed on January 6—to the contrary, he views himself as a "political prisoner."  *See, e.g.*,

---

[20] Such income presumably led him to rack up the $500,000 tax burden that he owes the IRS.  *See* PSR ¶ 94.

Ex. 24.   Any after-the-fact remorse that Sandlin may show during the sentencing proceedings would thus ring hollow in light of his repeated contrary statements.   He has also reiterated, time and time again, his desire to profit from his illegal conduct in the form of publishing a book or selling his footage of the events of January 6.   The fact that Sandlin is still intent on doing so suggests that he has not internalized the impropriety of his actions, which weighs in favor of a lengthy term of incarceration.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law.   "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[21]   As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Sandlin's criminal conduct—assaulting a police officer and corruptly obstructing of an official proceeding—is the epitome of disrespect for the law.   When Sandlin entered the Capitol, it was abundantly clear to him that lawmakers and the police officers charged with protecting them were under siege.   Police officers were overwhelmed, outnumbered, and, in some cases, in serious danger.   The rule of law was not only disrespected, it was under attack that day.   A lesser sentence would suggest to the public and other rioters that attempts to obstruct official proceedings and assaults on police officers are not taken seriously.   In this way, a lesser sentence could encourage further abuses.   *See Gall*, 552 U.S. at

---

[21] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                        at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

> **D.** **The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, the need to protect the public from further crimes by this defendant.   18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

> *i.* *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[22]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.   The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.   As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for

---

[22] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'" as domestic activities that (1) "involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State" and (2) "appear to be intended to intimidate or coerce a civilian population; influence the policy of a government by intimidation or coercion; or affect the conduct of a government by mass destruction, assassination, or kidnapping" (edited for clarity)).

decades.

Tr. at 69-70.   Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.   It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."   *Id.* at 70.

The gravity of these offenses demands deterrence.   This was not a protest.   *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").   And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.   There is possibly no greater factor that this Court must consider.

      ii.   *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   First, although Sandlin has a criminal history category of I, his recent behavior shows a penchant for violence in support of his ideology.   Second, although he has formally accepted responsibility for his actions by pleading guilty, his statements on social media and to third parties after January 6 were those of a man who viewed himself as a "patriot" with a "divine destiny to fulfill" and now as a political prisoner.   *See* Exs. 17, 24; *see also United States v. Matthew Mazzocco*, 1:21-cr-54-TSC, Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that

day. It came when he realized that he could go to jail for what he did. And that is when he felt

remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Sandlin's own statements demonstrate that his sentence must be sufficient to provide specific

deterrence from committing future crimes of violence, particularly in light of his admitted

conduct and violent rhetoric.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United

States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied]

and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency,

complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S.

85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to

'base its determinations on empirical data and national experience, guided by professional staff

with appropriate expertise,'" and "to formulate and constantly refine national sentencing

standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration

to the Guidelines." *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States
> Sentencing Commission's in-depth research into prior sentences,
> presentence investigations, probation and parole office statistics,
> and other data. U.S.S.G. §1A1.1, intro, comment 3. More
> importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's
> on-going approval of Guidelines sentencing, through oversight of
> the Guidelines revision process. See 28 U.S.C. § 994(p) (providing
> for Congressional oversight of amendments to the Guidelines).
> Because the Guidelines reflect the collected wisdom of various

> institutions, they deserve careful consideration in each case.
> Because they have been produced at Congress's direction, they
> cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that Asignificantly increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that might

achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate

sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court

knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and

fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.[23] *See United States v. Smocks*, D.D.C. 21-cr-198-TSC, Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan); *cf. United States v. De La Cruz*, 397 F. App'x 676, 678 (2d Cir. 2010) ("a Guidelines sentence can create an unwarranted disparity") (citing *Kimbrough v. United States*, 552 U.S. 85, 91 (2007)).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the

---

[23] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate the severity of the offense conduct.   *See United States v. Knutson*, D.D.C. 22-cr-31-FYP, Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id*. at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."   *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."   *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.[24]

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Sandlin and others like him committed on January 6 are unprecedented.   These crimes defy statutorily appropriate comparisons to other obstructive-related conduct in other cases.   To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

---

[24] A table outlining the sentences imposed in all Capitol riot cases to date has been included as an attachment to this memorandum.

Relatively few Capitol riot cases involving the lead charge of conviction here—18 U.S.C. § 1512(k) or its related substantive offense, 18 U.S.C. § 1512(c)(2)—have proceeded to sentencing. Less than ten have been sentenced subsequent to pleas, and those cases encompass a wide range of conduct.

In *United States v. Pruitt*, 21-cr-23, Judge Kelly sentenced the defendant to 55 months in prison. This sentence was roughly in the middle of Pruitt's advisory Guidelines range of 51 to 63 months. Pruitt, in contrast to Sandlin, did not plead guilty to assaulting a police officer, though his Guidelines range did include the eight-level enhancement for threatening physical injury. At sentencing, Judge Kelly found that Pruitt was at the forefront of the mob on January 6, and that he "amped up" the crowd. He found Pruitt's offense conduct was aggravated by the fact that he engaged in planning and coordination with the Proud Boys. Similarly here, Sandlin amped up the mob in two separate spaces leading up to assaults on USCP officers in which he participated, and he also engaged in significant planning and coordination with his co-conspirators. Sandlin also attempted to destroy evidence, which further elevates his culpability as compared to Pruitt.

In the *United States v. Rubenacker,* 21-cr-193, Chief Judge Howell sentenced the defendant to 41 months' incarceration—the bottom of his Guidelines range of 41 to 51 months. Unlike Sandlin, Rubenacker did not engage in violent or destructive conduct. Judge Lamberth sentenced four defendants who faced the same Guidelines range to 41 months' imprisonment. *See United States v. Chansley*, 21-cr-3 (engaged in no pre-planning or violence but stormed the Senate Chamber); *United States v. Fairlamb*, 21-cr-12 (engaged in violence but no pre-planning or obstructive conduct after riot); *United States v. Neefe et al.*, 21-cr-567 (helped mob hoist metal

sign into line of officers).[25]   Judge Lamberth sentenced an additional § 1512 defendant, Duke

Wilson, who hit a USCP officer with a PVC pipe near the Lower West Terrace tunnel, to 51

months—the top of his Guidelines range.   *See United States v. Wilson*, 21-cr-345.

Sandlin's higher Guidelines range and the conduct supporting it justify imposing a higher

sentence than these individuals.   None of the above defendants brought a gun, knives, and bear

spray to Washington, D.C., ready for a civil war.   None of the above defendants implored others

to "occupy" and "take" the Capitol hours before the mob did so.   None of the above defendants

initiated a violent confrontation with officers guarding the Senate Chamber where only moments

before, the Vice President, whom rioters wanted to "hang," was presiding.   *See* Associated Press,

*Watch: Video shows Capitol mob calling for the death of the Vice President,' Plaskett Says*, PBS

News (Feb. 10, 2021), https://www.pbs.org/newshour/politics/watch-video-shows-capitol-mob-

calling-for-the-death-of-the-vice-president-plaskett-says.   All of these facts support imposing a

Guidelines sentence.

Mitigating factors present in four § 1512 cases—*United States v. Michetti*, 21-cr-232-CRC

(defendant was sole financial support for minor child and proactively engaged in post-offense

rehabilitation); *United States v. Miller*, 21-cr-75-RDM (defendant's age, possible intoxication at

time of offense, and "otherwise exemplary behavior" warranted variance); *United States v.*

---

[25] Unlike Sandlin and his co-conspirators, Neefe and his codefendant Smith did not bring guns to
the District in anticipation of a civil war—only a makeshift wooden club.   Neefe and Smith
likewise did not lead the mob's charge against officers guarding the Senate Chamber in a
premeditated effort to "take the Capitol," as Sandlin did.   Finally, although the assault by Neefe
and Smith was certainly serious, neither put his hands directly on officers.   Sandlin cannot blame
the mob mentality for assaulting multiple officers with his own two hands.   These distinguishing
facts, coupled with his higher Guidelines range (i.e., an additional 4 levels), support imposing a
higher sentence in this case.

*Hodgkins*, 21-cr-188-RDM (defendant took "exceptionally" early guilty plea, engaged in no violence, and took significant steps towards rehabilitation); *United States v. Wood*, 21-cr-223-APM (defendant was 23 years old at time of riot, engaged in no pre-planning or violence, demonstrated early remorse, voluntarily surrendered, and cooperated with the FBI)—resulted in non-Guidelines sentences.   Notably, unlike Sandlin, the eight-level enhancement under U.S.S.G. § 2J1.2(b)(1)(B) was not applied to three of these defendants.

No similar constellation of mitigating factors is present here.   Accordingly, the government's recommendation of a 63-month prison sentence would not produce unwarranted sentencing disparities.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[26]   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea

---

[26] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here.   *See* 18 U.S.C. § 3663A(c)(1).

agreement." *See* 18 U.S.C. § 3663(a)(3).  *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The victim in this case, Officer B.A., did not suffer bodily injury as a result of Sandlin's assault.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Sandlin must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Sandlin played in the riot on January 6.[27]   Plea Agreement at ¶ 11.   As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in April 2022.  *Id.*   Sandlin's restitution payment must be made to the Department of Treasury, which will forward the payment to the Architect of the Capitol.   *See* PSR ¶ 104.

## VIII.   FINE

Sandlin's convictions under Sections 111 and 1512 subject him to a statutory maximum fine of $250,000.   *See* 18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or

---

[27] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.  *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A $20,000 fine is more than appropriate in this case.   On multiple occasions during these proceedings, including as recently as this year, Sandlin has sought to profit from his illegal conduct at the Capitol by selling his footage of the riot or publishing a book regarding the events of January 6.   It is of course a basic premise that a criminal defendant should not profit from violating the law.   Indeed, other judges in this district have levied fines in January 6 cases where the circumstances warranted it.   *See, e.g.*, *United States v. Williams*, 21-cr-377-BAH (imposing $5,000 fine on § 1512(c)(2) conviction); *United States v. Gold*, 21-cr-85-CRC (imposing $9,500 fine where defendant used court-appointed attorneys but did not pay them after raising substantial funds for purported legal defense); *cf. United States v. Fairlamb*, 21-cr-120-RCL (did not impose fine, as requested by government, after finding defendant did not have ability to pay, given that he had lost his business (a gym) and was at risk of losing his house).

The government was so concerned about Sandlin's desire and apparent ability, from jail, to profit from his unlawful acts that it included a unique provision in his plea agreement prohibiting him from profiting off the conduct encompassed by the Statement of Offense in any way, shape, or form for a period of five years.   *See* Plea Agreement ¶ 12.   A court-ordered fine would serve to negate any attempts by Sandlin to capitalize on his participation in the Capitol breach after the five years has passed.

In addition, Sandlin has raised over $21,000 in an online campaign styled as "Mexican J6er Political Prisoner in DC's Gitmo."   Ex. 24; *see also* PSR ¶ 93.   The website indicates the donated funds will be used for "legal fees," which seems highly unlikely, as Sandlin enjoys the services of

44

a court-appointed attorney at no cost to him.   *See* Ex. 24.   Presumably, the donated funds will not be used for legal fees at all, but rather on Sandlin's personal expenses while in custody and upon his release.

Sandlin can therefore afford a fine to reimburse taxpayers for his court-appointed attorney as well as his part in the mob that caused significant damage to the United States Capitol and has resulted in enormous burdens on the criminal justice system.   The Probation Office concurs with this conclusion,[28] based on Sandlin's assets and reported donations as well as his plans to live with his parents for an extended period upon his release from custody.   *See* PSR ¶¶ 76, 95.

## IX.   CONCLUSION

For the reasons set forth above, the government asks that the Court impose a Guidelines sentence of 63 months' imprisonment, three years of supervised release, restitution of $2,000, a $20,000 fine, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:      */s/ Jessica Arco*
JESSICA ARCO
Trial Attorney-Detailee
D.C. Bar No. 1035204
601 D St., NW
Washington, D.C. 20530
jessica.arco@usdoj.gov
Telephone: 202-514-3204

---

[28] To be clear, the Probation Office agrees that Sandlin can *afford* a fine but ultimately did not recommend one in light of his tax debt.   *See* ECF No. 91.