UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )( | |
| )( | Criminal No. 21-88 (DLF) |
| v. )( | Judge Friedrich |
| )( | Sentencing: December 9, 2022 |
| RONALD SANDLIN )( | |

## MEMORANDUM IN AID OF SENTENCING

COMES NOW the defendant, Ronald Sandlin, by and through undersigned counsel, and respectfully provides the following information to aid this Court in determining the appropriate sentence for him. Towards this end, Mr. Sandlin would show:

1. On January 28, 2021, Ronald Sandlin was arrested in Las Vegas, Nevada on a warrant that had originated from this District.. The charges at issue in the warrant pertain to the events that occurred at the United States Capitol on January 6, 2021. On February 1, 2021, Mr. Sandlin appeared before a Magistrate Judge in the United States District Court for the District of Nevada. The government moved for Mr. Sandlin to be preventively detained. The Magistrate Judge ordered Mr. Sandlin held without bond, and his case was transferred to this District. Mr. Sandlin has been detained in this case ever since he was arrested in Las Vegas on January 28, 2021.

2. On September 30, 2022, Mr. Sandlin pled guilty to two counts of the indictment pending against him (Superseding Indictment (ECF #46)). These counts are 1) conspiracy to obstruct an official proceeding (18 U.S.C. § 1512(k)) and 2) assaulting, resisting, or impeding a police officer (18 U.S.C. § 111(a)). Sentencing is set for December 9, 2022.

1

3. The appropriate sentence for Mr. Sandlin is 41months followed by a period of supervised release. The government and Mr. Sandlin disagree on Mr. Sandlin's Guidelines range. The government believes that that range is 63-78 months,[1] and Mr. Sandlin believes that it is 51-63. Plea Agreement (ECF #84) at 3-4; see also Pre-Sentence Investigation Report (PSR) (ECF #90) at 5. A sentence of 41 months is, of course, less than the bottom of the Guidelines range that even Mr. Sandlin agrees is the correct one for him. Nevertheless, the appropriate Guidelines range is only one factor the Court is to consider when determining the appropriate sentence for Mr. Sandlin, as it must, under 18 U.S.C. § 3553(a). Determining the appropriate sentence for Mr. Sandlin by considering all the factors spelled out § 3553(a) supports a finding that 41 months is the appropriate prison sentence for him.

## DISCUSSION

In determining an appropriate sentence for a defendant, the Court is to consider the factors spelled out in 18 U.S.C. § 3553(a). These factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

---

[1] As part of its plea agreement with Mr. Sandlin, the government has agreed to cap its allocution at 63 months, the bottom of the Guidelines range that it believes applies to him. Plea Agreement at 5.

(3) the kind of sentences available;

(4) the kinds of sentence and the sentencing range established… [by the Sentencing Guidelines];

(5) any pertinent policy statement… issued by the Sentencing Commission…;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## Nature and Circumstances of the Offense

The events at the Capitol on January 6 were alarming and dangerous, and Mr. Sandlin's involvement in those events cannot be excused.  Mr. Sandlin has come to recognize this on a fundamental level.  His consciousness of his wrongdoing in connection with those events has evolved dramatically as his case has progressed and he has reviewed the evidence and thought about what happened and how he came to be involved in it.  Indeed, Mr. Sandlin has written a letter to the Court in which he expresses his shame and regret about what he did.  A copy of the letter is attached.[2]  Exhibit, Letter to the Court from Ronald Sandlin.  Nevertheless, while Mr. Sandlin's conduct in this case is inexcusable, it should be noted that there is no evidence that Mr. Sandlin caused any physical injury to anyone.  See Statement of Offense (ECF #85) at 6-12; PSR ¶¶ 8-11.

## History and Characteristics of the Defendant

Mr. Sandlin is 35 years old.  He was born in Mexico into unfortunate circumstances, and he ended up being adopted by an American family when he was three. However, Mr. Sandlin's adoptive family ultimately decided that they did not want him

---

[2] Mr. Sandlin sent the letter to his mother through the internet-based messaging system that the Northern Neck Regional Jail, where Mr. Sandlin is currently incarcerated, allows inmates to use to communicate with family and friends.  Mr. Sandlin's mother copied the letter and put it in the body of an e-mail she then sent to undersigned counsel from her e-mail account.

3

after all, and when he was four, he was put up for adoption again. Eventually, he was adopted a second time—this time by his parents, Stephen and Leigh Sandlin. See Presentence Investigation Report (PSR) (ECF #90) ¶¶ 69-71. His parents raised Mr. Sandlin in Long Beach, California. His father was a chemical engineer working in the aerospace industry, and his mother was a school teacher.[3] See id. ¶ 70. According to his mother, Mr. Sandlin was a bright student and actively involved in the Boy Scouts from the ages of six to sixteen. Mr. Sandlin lived with his parents and his younger adoptive brother in Long Beach until he was 19, when he moved out to be on his own. See id. ¶ 76. Around this time, Mr. Sandlin began a relationship with a woman whom he ended up cohabitating with until 2020. See id. ¶ 74.[4]

As the Court will no doubt recall, earlier on in this case, Mr. Sandlin moved the Court to lift his preventive detention through an Amended Motion to Lift Preventive Detention and Points and Authority in Support Thereof (Motion for Bond) (ECF #15). As he noted in his Motion for Bond, upon moving out of his parents' home, Mr. Sandlin became heavily involved in community activism. See Motion for Bond at 5. He ended up being one of the founders of a non-profit organization called Pedal Movement in a low-income neighborhood in Long Beach with a large homeless population. Pedal Movement worked to provide bicycles to people in the community to foster their ability to get and keep jobs. Mr. Sandlin and a friend were able to get a local arts college to donate a parking lot with an abandoned building to Pedal Movement. They then transformed the building into the hub of the operation. Pedal Movement accepted donated bikes and parts, gave the bikes they received and refurbished to people in the community, trained persons to become bicycle mechanics, and provided people in the

---

[3] Mr. Sandlin's parents are now retired. See ¶ PSR 70.
[4] The PSR indicates that Mr. Sandlin and his girlfriend split up in 2016. PSR ¶ 74. This is not correct.

4

community with affordable bicycle-repair services. Even today, an iteration of Pedal Movement is still operating in Long Beach, California.[5] See id.

While starting up and then running Pedal Movement, Mr. Sandlin was also employed full-time. In 2005, just prior to leaving home to be on his own, Mr. Sandlin went to work for Mitsubishi dealership, becoming a car salesman. He did this until 2007. From 2007 until 2009, Mr. Sandlin worked as salesperson for a call center. From 2009 through 2014, Mr. Sandlin was self-employed building websites for people and small businesses. See PSR at ¶¶ 87-89.

In 2105, Mr. Sandlin and his girlfriend moved from California to Las Vegas, Nevada. In Nevada, using the lessons he had learned from doing online outreach for Pedal Movement and from his prior sales and website-building jobs, Mr. Sandlin started up and developed his own online marketing company, Temet Nosce, LLC. See PSR ¶ 86. Through Temet Nosce, Mr. Sandlin would invest in advertising to identify people and businesses who were in need of certain services and products. The business of the Temet Nosce was to then connect these people and businesses with the appropriate providers of services and products, who would pay the company to be so connected to them. As an adjunct to his online marketing business, Mr. Sandlin also consulted with other online business owners, especially minority business owners, about developing their businesses. Much of this work was done pro bono. See Motion for Bond at 5. Temet Nosce was seemingly quite successful for a while. At its height, Mr. Sandlin had seven employees and a monthly payroll in excess of $50,000. See id. However, Mr. Sandlin allowed the company to fall into serious arrears with its taxes, see PSR ¶ 94, and approximately three years ago, the company ceased to be a viable concern. Mr. Sandlin ended up going on Unemployment. See id. ¶ 85. It should be noted that this was the first time that Mr. Sandlin had been unemployed since before he left home to be on his

---

[5] See https://pedalmovement.com.

own.  With the collapse of his company, Mr. Sandlin grew depressed.  Mr. Sandlin has had significant issues with substance abuse over the years.  See PSR ¶ 80.  However, it seems that, in the period prior to his arrest in this case, his alcohol use in particular had become, perhaps not surprisingly, a serious problem.  Around this same time, his girlfriend, with whom he had been living for almost his entire adult life, left him.  He ended up moving from Las Vegas to Memphis, Tennessee to be closer to his his parents, who had now retired to a rural community just outside of Memphis.  See PSR ¶¶ 70, 76.  Subsequently, he ended up moving in with his parents.  This is where he was officially residing at the time of his arrest in this case.[6]

At the time leading up to events at issue in this case, Mr. Sandlin was in a bad state.  His company had failed, his long-term girlfriend had left him, he was living with his parents in a strange place, and he was isolated and depressed.  In this state, Mr. Sandlin undoubtedly found a strange sense of community and purpose with people who indulged in the politics of grievance.  It is therefore possible to see how he allowed himself to become convinced by the lies, propaganda, and disinformation that was being spread that the 2020 presidential election had been stolen from Donald Trump.  As evinced by his Letter to the Court, Mr. Sandlin recognizes now that his actions on January 6 were completely unjustified, and he no longer believes that the election was stolen.  Nevertheless, at the time, he did believe that the election had been stolen, and it was this wrong belief that informed his actions on January 6.  This is not being said to make excuses for Mr. Sandlin's conduct.  Rather, it is being said to explain how a man with a fundamentally optimistic outlook and a desire to succeed and help other people succeed got to a place where he ended up storming the Capitol on January 6.  According to the PSR, Mr. Sandlin has an arrest for DUI from July 2022.  PSR ¶ 66.  This is

---

[6] The PSR indicates that, at the time of his arrest, Mr. Sandlin was living alone in an apartment in Memphis, Tennessee.  PSR ¶ 76.  This is not correct.

obviously a mistake. Mr. Sandlin was incarcerated in this case in July 2022. Additionally, the PSR appears to indicate that Mr. Sandlin may have been ticketed for a number of violations in connection with a traffic stop shortly before his arrest in this case. PSR at ¶ 65. Apart for this incident, it does not appear that Mr. Sandlin has had any other involvement with the police or the criminal justice system. See PSR at ¶¶ 64-68. Under the Sentencing Guidelines, Mr. Sandlin has zero criminal-history points and is in Criminal History Category I. See PSR at ¶ 64.

As the Court will no doubt recall from when Mr. Sandlin asked the Court to lift his preventive detention in this case, with his Motion for Bond, Mr. Sandlin submitted an attachment that contained numerous letters of support that friends, former employees and business colleagues, and family members had written for the Court to consider in deciding whether Mr. Sandlin's preventive detention should be lifted. Motion for Bond, Attachment, Letters of Support (ECF #15-1). In the letters, Mr. Sandlin is consistently described as a kind, extremely generous, and non-violent person who goes out of his way to engage and help other people and who is devoted to volunteerism and helping the community. Among other things, the writers frequently remark on how Mr. Sandlin helped start up and develop a non-profit organization serving people in a low-income neighborhood (Pedal Movement) and how he has been actively involved in animal rescue. The writers also frequently remark on Mr. Sandlin's entrepreneurial spirit and how he not only created his own business but also helped others to start and develop their own businesses. Notably, several of the people who wrote letters for Mr. Sandlin expressed deep disapproval of what happened at the Capitol on January 6, 2021. Nevertheless, all of these people still maintain a firm belief that Mr. Sandlin is a person of goodwill. For ease of reference, the attachment that contained the letters that was filed with the Motion for Bond, is being re-filed as an Exhibit with the sentencing memorandum. Exhibit, Attachment, Letters of Support. It is submitted that a review of

these letters presents a side of Mr. Sandlin that must be taken into account when determining the appropriate sentence for him.

**The Need for the Sentence Imposed
(A) to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense;
(B) to Afford Adequate Deterrence to Criminal Conduct; and
(C) to Protect the Public from Further Crimes of the Defendant**

It is not possible to argue that the events at the Capitol on January 6 were not serious and disturbing. However, in evaluating Mr. Sandlin's conduct in connection with those events, it is important to take note of the fact that the assault he pled guilty to did not result in any injuries to the victim. Moreover, there is no evidence that he injured anyone else on January 6. Given this, it is submitted that a sentence of 41 months reflects the seriousness of Mr. Sandlin's criminal conduct and is sufficient to promote respect for the law and provide just punishment for his conduct. At this point, it should be noted that Mr. Sandlin been incarcerated in this case since January 28, 2021, and that his incarceration has been unusually harsh. At the time he began his incarceration, COVID protocols were in full force. Mr. Sandlin reports that, for almost all of the time he was incarcerated in 2021, he was kept alone in a cell and only allowed out for an hour a day. This is consistent with what undersigned counsel has heard from other clients of his who were also in pretrial incarceration during this time. While conditions of incarceration for pretrial defendants began to improve in 2022, this improvement was slow and incremental. Moreover, it bears noting that Mr. Sandlin is not from D.C. and has no friends or family here. Since being incarcerated, apart from phone calls and text messages, Mr. Sandlin has not been able to have any contact with the people who care about him. That the portion of Mr. Sandlin's eventual sentence that he has already served was under unusually harsh circumstances must be recognized when determining the appropriate sentence for him. This further supports a finding that a sentence of 41

months reflects the seriousness of Mr. Sandlin's offense, promotes respect for the law, and provides just punishment for his offense.

Additionally, it is submitted that a sentence of 41 months is more than enough to deter Mr. Sandlin from engaging in future criminal activity and to protect the public. Mr. Sandlin is 35 years old and has no criminal convictions of any sort or even any prior involvement with the police of any note. Mr. Sandlin has a history of community activism and volunteerism and is widely regarded as kind, generous, and non-violent person. He has been a productive member of society—a developer of a non-profit organization serving low-income and homeless people, an entrepreneur, an employer. He has helped other people develop their own businesses. Accordingly, it must be acknowledged that the conduct Mr. Sandlin engaged in connection with the events of January 6 was anomalous and not representative of who he is as a person. He recognizes now that he engaged in the conduct that he has admitted to in this case because he allowed himself to believe in lies and disinformation. He no longer believes that what he was being told was true. He has pled guilty and accepted responsibility for his actions. He has strong support from his family and friends. Given all this, it seems that there is little likelihood that Mr. Sandlin will recidivate upon his release from prison.

## Sentencing Guidelines

The Presentence Investigation Report (PSR) indicates that Mr. Sandlin's offense level is 26. PSR § 61. In reaching this level, the PSR indicates that Mr. Sandlin should be given a two-point enhancement under U.S.S.G. § 3C1.1. PSR § 56. The PSR indicates that Mr. Sandlin should be given this two-point enhancement because "the Probation Office has received information to suggest that the defendant willfully impeded or obstructed the administration of justice during the course of the investigation,

prosecution or sentencing of the instant offense of conviction." PSR ¶ 42. The conclusion made in the PSR that Mr. Sandlin engaged is such obstructive conduct appears to be based on four acts that Mr. Sandlin is said to have undertaken:

1) "Mr. Sandlin deleted [from] his Facebook account the group chat with Defendant DeGrave and Colt, which contained photographs and messages regarding the events of January 6, 2021."

2) "On January 7, 2021, Defendant Sandlin expressed to a female that he, along with Defendant DeGrave and Colt, left D.C. to 'get to a safe spot' and that they were 'at risk for serious jail time.'"

3) "Defendant Sandlin downloaded [and] directed others to download encrypted software in order to continue communicating with one another, including about potentially selling their footage of the riot."

4) "Prior to his arrest in the instant case, Defendant Sandlin encrypted footage of the Capitol riot, gave it to a friend for safekeeping, and asked his friend to 'watermark' the footage so that it could be used to pitch the footage for sale to media outlets."

Id. However, none of the above-listed acts by Mr. Sandlin warrant a finding that he was obstructing or attempting to obstruct justice so as to justify increasing his offense level under U.S.S.G. § 3C1.1.

In regards to Mr. Sandlin deleting a Facebook chat involving Codefendant DeGrave and Mr. Colt, it should be noted that people delete electronic information like text messages and chats from social media accounts and electronic devices for many reasons, including freeing up data storage and reducing clutter. Text messages and chats are not typically viewed as things that are to be preserved, and people routinely delete them the same way they delete voice mail messages on an answering machine. The mere fact that text messages or chats were deleted does not support a finding that they were deleted to obstruct or impede the administration of justice.

In regards to Mr. Sandlin indicating that he had left D.C. to "get to a safe spot," it should be noted that Mr. Sandlin needed to leave D.C. no matter what. He had no connection to the city and no reason to stay here. Moreover, even if it could somehow be said that the only reason he left D.C. was because he was running from a crime scene, this still would not be a sufficient reason to apply the two-point enhancement to his offense level under § 3C1.1. See U.S.S.G. § 3C1.1, Application Note 5(D) (§ 3C1.1 is not meant to apply where a person is simply "avoiding or fleeing from arrest").

In regards to Mr. Sandlin taking steps to be able to have encrypted communications with others, it must be noted that, to the extent he was seeking to have such communications, he would only have been seeking to have the same level of privacy that he could have with an ordinary phone call. Beyond this, there are no indications that Mr. Sandlin actually had any encrypted communications with others regarding the events of January 6.

In regards to Mr. Sandlin encrypting his footage of the riot, giving it to a friend for safekeeping, and asking the friend to watermark the footage so it could be shopped to media outlets, it appears Mr. Sandlin's actions were for the purposes of protecting the perceived monetary value of the footage until it could be sold—not for the purposes of preventing government agents from being able to view it.

Given that Mr. Sandlin does not qualify for a two-point enhancement under U.S.S.G.§ 3C1.1, his offense level under the Sentencing Guidelines should be 24—not 26 as is claimed in the PSR. Because Mr. Sandlin is in Criminal History Category I, his Guidelines range is 51-63 months, Sentencing Table, U.S.S.G. Ch. 5, Pt. A ¶ 56—not 63-78 months as is claimed in the PSR. PSR ¶ 98.

### The Need to Avoid Unwarranted Sentencing Disparities

Mr. Sandlin should be given a sentence that is in keeping with the sentences given to fellow January 6 defendants Marshall Neefe (21-cr-567 (RCL)), Charles Bradford Smith (21-cr-567 (RCL)), Scott Fairlamb (21-cr-120 (RCL)), Duke Wilson (21-cr-345 (RCL)), Matthew Miller (21-cr-75 (RDM)), and Greg Rubenacker (21-cr 193 (BAH)). Like Mr. Sandlin, all of these defendants also pled guilty to one count of obstruction under § 1512 and one count of assault, resisting, or impeding a police officer under 18 U.S.C. § 111(a), and Mr. Rubenacker even pled guilty to other additional felony charges as well. Plea Agreement for Neefe (ECF #66) at 1; Plea Agreement for Smith (ECF #78) at 1; Plea Agreement for Fairlamb (ECF #38) at 1; Plea Agreement for Wilson (ECF #17) at 1; Plea Agreement for Miller (ECF #58) at 1; Notice of Intention to Enter Plea by Rubenacker (ECF #41) and docket entry for 2/11/22.

Marshall Neefe and Charles Bradford Smith were codefendants, and both were sentenced to 41 months. Judgment for Neefe (ECF #98) at 3; Judgment for Smith (ECF #100) at 3. According to the Government's Sentencing Memorandum for Mr. Neefe (Neefe Memo) (ECF #84) and the Government's Sentencing Memorandum for Mr. Smith (Smith Memo) (ECF #90), Mr. Neefe and Mr. Smith conspired to obstruct the congressional hearing to certify the Electoral College votes on January 6, 2021, and in the two months between the presidential election and January 6, 2021, they used Facebook to coordinate with each other and plan their trip to D.C. for the events of that day. Moreover, they used Facebook to encourage other people to come to D.C. on January 6 to support—by violence if necessary—having Donald Trump being declared the winner of the presidential election. Neefe Memo at 6-8; Smith Memo at 6-9. On January 6, Mr. Neefe and Mr. Smith went to the Capitol together, and Mr. Neefe brandished a club as they approached the building. Later, he continued to brandish the club when he entered the building. Neefe Memo at 9-10; Smith memo at 9-10. When Mr. Neefe and Mr.

Smith got up to the West Front of Capitol on January 6, they joined with other rioters in hoisting up a large, eight-by-ten-foot metal sign with sharp edges and castors the size of an adult's head and then using that sign to assault a police line that had formed to prevent rioters from entering the building. Neefe Memo at 10-12; Smith Memo at 13-15. Eventually, the officers who were assaulted ended up yielding their position, thus allowing rioters to access the West Terrace and then stream into the building without further resistance. Neefe Memo at 13-14; Smith Memo 15-16. After the police defensive line was breached, Mr. Neefe and Mr. Smith also went onto the West Terrace. Neefe Memo at 14, Smith Memo at 16. They then went their separate ways. Smith Memo at 17.

After he separated from Mr. Neefe, Mr. Smith stayed on the West Terrace where he encouraged other rioters to push on a door and keep it closed so that police officers inside the Capitol who were trying to come through that door to reinforce the officers already on the West Terrace could not do so. Smith Memo at 17-18. After he left the Capitol, he posted on Facebook to lament that the riot had not been more violent and that no politicians had actually been harmed. Id. at 18-19. The next day, he posted again on Facebook expressing his desire to do again what he had done the day before and stating that, next time, "[m]aybe we can all join up and skin them [congresspersons] alive." Id. at 19.

After he separated from Mr. Smith, Mr. Neefe entered the Capitol and went into the Rotunda, where he participated in resisting police efforts to clear that room by "mak[ing] himself immovable and disregard[ing] commands from the police to leave." Neefe Memo at 14-15. After he left the building, Mr. Neefe bragged on Facebook about engaging in future violence and about "bringing a gun next time." He also talked about "lin[ing] up and put[ting] down" the officers he had encountered at the Capitol. Id. at 16. Later, he texted Mr. Smith about them shaving their beards to make it harder for law

enforcement to identify them and he deleted his Facebook account. Id. at 16-17. When he was subsequently arrested, he admitted that he owned a firearm. Id. at 18.

Scott Fairlamb received a prison sentence of 41 months. Judgment for Fairlamb (ECF #57) at 2. According to the Government's Sentencing Memorandum for Mr. Fairlamb (Fairlamb Memo) (ECF #50), Mr. Fairlamb was part of a group that breached a police defensive line on the northwest stairway that leads up to the Capitol's Upper West Terrace. Fairlamb Memo at 8. After he breached that defensive line, he armed himself with a police baton that an officer had dropped, id. at 9-10, and entered the Capitol as part of the very first rioters to do so, id. at 12-13. Later, after exiting the building, he harassed and blocked police officers who were trying to reinforce other officers, and in doing so, he shoved an officer and punched his face shield. Id. at 17-19. After the events of January 6, Mr. Fairlamb appears to have deleted incriminating Instagram and Facebook posts he had made during those events. Id. at 23. He also appears to have deleted posts in which he made threatening comments against others, including Congressperson Cori Bush. Id.

Duke Wilson received a prison sentence of 51 months. Judgment for Wilson (ECF #36) at 3. According to the Government Sentencing Memorandum for Mr. Wilson (Wilson Memo) (ECF #29), on January 6, Mr. Wilson was particularly violent and "engaged in several acts of violence against police officers," including "punching them, attempting to take their shields, and throwing objects at them." Wilson Memo at 1-2. On the Lower West Terrace of the Capitol, Mr. Wilson personally prevented police officers from closing doors into the building, thus allowing rioters to pull the doors open and attack the officers. Id. at 9-10. Mr. Wilson engaged in the attack himself and joined with other rioters in "punching, shoving and kicking" the officers. Id. at 10. He picked up "a several feet long white cylindrical object, believed to be a thin polyvinyl chloride (PVC) pipe and indiscriminately struck at the officers with it, striking two of them with it. Id. at

14

12. He then joined with other rioters in pushing an officer to the ground and attempting to take his riot shield from him. Id. at 14.

Matthew Miller received a prison sentence of 33 months. Judgment (ECF #74) at 2. According to the Government Sentencing Memorandum for Mr. Miller (Miller Memo) (ECF #67), on January 6, Mr. Miller went onto the restricted grounds of the Capitol and, throwing a full can of beer at officers guarding the building, encouraged other rioters to come with him in getting closer to the building. Id. at 17-18. Once he worked his way to the Lower West Terrace of the building, Mr. Miller involved himself in the attack of the police line that had formed at the "tunnel" there. He "urged other rioters to push against the police; threw batteries at police officers; and… released the contents of a fire extinguisher, a dangerous weapon when used as Miller did, directly onto law enforcement officers." Id. at 17; see also id. at 20-25.

Greg Rubenacker was sentenced to 41 months. Amended Judgement (ECF #77) at 3. According to the Government Sentencing Memorandum for Mr. Rubenacker (Rubenacker Memo) (ECF # 56), on January 6, Mr. Rubenacker was with the very first rioters who gained entry into the Capitol. These were the rioters who entered the building by smashing out a window by the Senate Wing Door. Rubenacker Memo at 7-9. Once in the building, he encountered an officer (Officer Goodman) who was guarding a flight of stairs leading up to where congresspersons where being evacuated. Mr. Rubenacker and other rioters chased the officer up the stairs to just outside the Senate chamber, where the officer was then joined by other officers. At this point, Mr. Rubenacker went to the front of the crowd and directly confronted the officers, pointing at the officers while another rioter (Doug Jensen) yelled at them to back up. Id. at 10-14. After confronting the officers just outside the Senate chamber, Mr. Rubenacker exited the building. Id. at 14. However, he then joined the crowd of rioters assembling outside the East Rotunda doors, and helped those rioters to push through the doors and overwhelm

the police officers who were standing guarding there.  Id. at 15-16.  Upon entering the building a second time, Mr. Rubenacker proceeded to the Senate Hall, where he joined a group rioters who were pushing against a police line that had formed there.  Id. at 17.  After being repelled by chemical-irritant spray, Mr. Rubenacker then went to the Rotunda, where he appeared to smoke marijuana.  Id. at 17-18.  When law-enforcement officers entered the Rotunda to clear Mr. Rubenacker and the other rioters who had assembled there,  Mr. Rubenacker joined with some of those rioters in resisting the police efforts to clear that room.  Id. at 17-24.  First, Mr. Rubenacker went to the front of the crowd to directly berate the officers.  Id. at 19.  Then, he joined with others rioters in forming a line and physically pushing against the officers.  Id. at 20-21.  While he doing so, Mr. Rubenacker "engaged in two assaults on law enforcement."  Id. at 21.  He swung a plastic bottle and hit an officer's head, and he threw liquid from the bottle onto a cluster of officers, causing them to flinch and pause while they were physically engaged with other rioters.  Id. at 22-24.  After the January 6, Mr. Rubenacker began doing online searches for "fbi pictures of rioters" and researched methods for concealing evidence of his criminal activity.  Id. at 27-28.

       A sentence of 41 months for Mr. Sandlin is entirely in keeping with the sentences given to Messrs. Neefe, Smith, Fairlamb, Wilson, Miller, and Rubenacker.  Indeed, a sentence of greater than 41 months for Mr. Sandlin would result in an unwarranted sentencing disparity.

## CONCLUSION

Given the above, Mr. Sandlin submits that the Court should sentence him to 41 months incarceration followed by a period of supervised release.

WHEREFORE, the defendant, Ronald Sandlin, submits the foregoing information to aid this Court in determining the appropriate sentence for him.

Respectfully submitted,

_____/s/_____
Jerry Ray Smith, Jr.
D.C. Bar No. 448699
Counsel for Ronald Sandlin
717 D Street, N.W.
Suite 310
Washington, DC 20004
Phone: (202) 347-6101
E-mail: jerryraysmith@verizon.net