UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )( | |
| )( | Criminal No. 21-88 (DLF) |
| v.            )( | **Judge Friedrich** |
| )( | Sentencing: December 9, 2022 |
| RONALD SANDLIN    )( | |

## REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM

COMES NOW the defendant, Ronald Sandlin, by and through undersigned counsel, and respectfully replies to the Government's Sentencing Memorandum (ECF #92). Towards this end, Mr. Sandlin would show:

### Planning and Coordination Pre-January 6

In its sentencing memo, the government discusses how Mr. Sandlin, in planning to come to D.C. for January 6, 2021, coordinated with his codefendant Nathaniel DeGrave and their mutual friend Josiah Colt. Government's Sentencing Memorandum at 6-9. However, in doing this, the government presents no evidence that the three men engaged in such planning and coordination in order to storm the Capitol on January 6 or actually obstruct the congressional hearing to certify the Electoral College votes. See id. This is so even though both Mr. DeGrave and Mr. Colt have entered into cooperation plea agreements with the government[1] and have therefore undoubtedly been debriefed by government agents. Indeed, as the government itself acknowledges, the three men came to the D.C. area on January 5 to attend the legal protests that were scheduled for January 5 and 6 on the Mall and at the Ellipse. Id. at 8-9. The first time the three men ever gave any indication that they were contemplating actually going into the Capitol or even onto

---

[1] Plea Agreement for Codefendant DeGrave (ECF #74) at 6-7; Plea Agreement for Mr. Colt, case 21-cr-74 (TFH) (ECF #21) at 6-7.

1

restricted Capitol grounds was when they were at a TGIF restaurant on January 6 itself. There, after hearing then President Trump's inciteful speech (the one in which he told his followers to march to the Capitol and "fight like hell" to prevent the election from being stolen), the three men talked for the first time about possibly needing to occupy the Capitol building.  See id. at 10-12.

Additionally, in its memorandum, the government talks about how Mr. DeGrave, Mr. Colt, and Mr. Sandlin brought firearms with them on their trip to the D.C. area to attend the protests that were scheduled for January 5 and 6, 2021.  Government's Sentencing Memorandum at 8-9.  However, the government presents no evidence that the three men actually brought firearms with them into D.C. on either January 5 or January 6—even though, as just stated, Mr. DeGrave and Mr. Colt had to have been debriefed about what the three men did on those days.  See id. at 9-10.  Indeed, in its memorandum, the only assertions that the government makes about the three men bringing items that might serve as weapons into D.C. are that, on January 6,  Mr. Sandlin was carrying a knife and Mr. DeGrave was carrying a can of bear spray.  Id.

## Assault of Officer B.A.

In its sentencing memo, the government discusses the assault involving Officer B.A. that Mr. Sandlin has pled guilty to.  Government's Sentencing Memorandum at 13-14.  The government describes this assault as one in which Mr. Sandlin "tried to rip the helmet off" Officer B.A.  Id. at 14 & n.9.  In support of this assertion, the government cites the Statement of Offense (ECF #85) that Mr. Sandlin agreed to as part of his guilty plea and CCTV footage showing the assault.  Id. at 14.  However, the Statement of Offense only says that Mr. Sandlin "grabbed Officer's B.A. helmet," Statement of Offense at 8, and the CCTV footage only shows Mr. Sandlin reaching out over the back of other rioters to grab Officer B.A. and taking hold of his helmet, Government's Sentencing Memorandum, Ex. 7.  While Mr. Sandlin's assault on Officer B.A. is inexcusable, it is nevertheless

2

speculation to say that Mr. Sandlin was trying to rip the officer's helmet off.  Moreover, while noting that Mr. Sandlin's assault on Officer B.A. did not result in Officer B.A. suffering any injury, the government notes how Officer B.A. had, in a previous assault by another rioter, suffered an injury (briefly losing consciousness) after being thrown to the ground.  Id. at 14 n.9.  The government suggests that Mr. Sandlin was responsible for this earlier assault on Officer B.A. because his "participation in the riot aided those rioters who did succeed in injuring officers" and because his "violent conduct and rhetoric served to incite and embolden other violent rioters around him."  Id.   However, video capturing the previous assault on Officer B.A. reveals that, when the previous assault of Officer B.A. occurred, Mr. Sandlin was nowhere around.  See id., Ex. 7 (at time stamp 12:08).

## Removal of Videos from Facebook

In its memorandum the government claims that, after the events of January 6, Mr. Sandlin took down from his Facebook page videos that he had previously posted capturing his conduct on January 6.  However, the government cites no evidence showing that Mr. Sandlin actually did take down any videos related to January 6 from his Facebook page, and it must be noted that it is entirely possible that, if Mr. Sandlin had uploaded videos regarding January 6 to his Facebook page, Facebook itself may have taken those videos down in the aftermath of January 6.  It is well known that, after January 6, Facebook aggressively sought out posts and videos concerning the events at the Capitol on January 6 in order to take them down for violation of its use policies.  See, e.g., https://www.politico.com/news/2021/10/25/facebook-jan-6-election-claims-516997.  Moreover, as the government itself even acknowledges, immediately after the events of January 6, Mr. Sandlin told codefendant DeGrave in a message on Facebook that he would not be taking down any videos regarding January 6 that he had posted to the platform because "I'm not scared."  Government Sentencing memorandum at 19.

### Lack of Remorse

In its memorandum, under a heading captioned, "Lack of Remorse," the government references three Facebook messages that Mr. Sandlin sent out in the days immediately after January 6 in which he expresses a certain pride in what he did on January 6 and a willingness to face the consequences for his actions. Government's Sentencing Memorandum at 22. Additionally, it cites other statements that he made in March and early April 2021 that express similar sentiments. Id. at 22-23. To whatever extent the above-referenced statements can be said to evince a lack of remorse on Mr. Sandlin's part, it must be noted that they were all made well over a year and half ago, in the immediate aftermath of January 6 or shortly thereafter. These statements are not representative of how Mr. Sandlin feels about what happened on January 6 and his role in those events now. As Mr. Sandlin notes in his Memorandum in Aid of Sentencing (ECF #93), his consciousness of his wrongdoing has evolved dramatically in the almost two years that have passed since the events of January 6. Memorandum in Aid of Sentencing at 3. He recognizes now that the 2020 presidential election was not stolen from Donald Trump and that his actions on January 6 were completely unjustified. Id. at 9 & Ex., Letter to the Court. He is ashamed of his conduct and he regrets what he did. Id. at 3 & Ex., Letter to the Court.

### Profiting from the Events of January 6

In its memorandum, the government argues that Mr. Sandlin has sought to profit from the conduct he engaged in on January 6. Government's Sentencing Memorandum at 20-21. The government notes that Mr. Sandlin has explored selling and otherwise making available to the media the footage he took while at the Capitol on January 6. Id. Also, it claims that he has sent a text message to his ex-fiancée in which he claims that he is "writing a book about my journey and I hope to turn it into a movie." Id. Additionally, the government notes that Mr. Sandlin created an online fundraiser page to help with his

"legal fees." Id. at 21.  The government appears to be arguing that these actions on Mr. Sandlin's part also evince a lack of remorse on his part.  See id. at 32-33.  However, it should be noted that these actions all appear to have occurred in 2021.  See id. at 20-21 & Ex. 23 (showing fundraiser page was created in October 2021).  Thus, even if it could somehow be said that these actions did evince a lack of remorse on Mr. Sandlin's part at some point, it cannot be claimed that they are reflective of his view of things now.

### USSG § 3C1.1

In its memorandum, the government asserts that Mr. Sandlin should be given a two-point enhancement to his Guidelines offense level under U.S.S.G § 3C1.1.  Government's Sentencing Memorandum at 26-29.  The government asserts that increasing Mr. Sandlin's offense level as indicated is warranted because, sometime after the events of January 6, he deleted the Facebook chat that Mr. DeGrave, Mr. Colt, and he had in the lead-up to January 6 and on that day itself.  Government's Sentencing Memorandum at 26-27.  The government claims that the Facebook chat contained incriminating information regarding Mr. Sandlin's involvement in the events of January 6 and that, prior to chat being deleted, Mr. Sandlin acknowledged to others that he could potentially be identified as a suspect in relation to those events.  Id.  The government says that Mr. Sandlin "knew at the time he deleted the group chat that the government would immediately commence an investigation of the attack on the Capitol in which he participated." Id. at 26.

While a defendant can be given an enhancement under § 3C1.1 for engaging in obstructive conduct "prior to the start of [an] investigation" of the offense for which he is being sentenced if that obstructive conduct was "purposefully calculated… to thwart the investigation or prosecution of the offense," U.S.S.G. § 3C1.1, Application Note 1, the government has not shown that Mr. Sandlin's deletion of the group chat at issue here was purposefully calculated to thwart the government's investigation into his involvement in the events at the Capitol on January 6.  Indeed, apart for indicating that the group chat was

5

deleted sometime after the events of January 6, the government does not present any evidence to show when Mr. Sandlin deleted the chat.  Additionally, while the government speculates that he must have deleted the chat to prevent law-enforcement from finding it because, prior to the chat being deleted, he acknowledged that he could be suspect in connection with the events of January 6, the government provides no evidence to support such speculation.  As Mr. Sandlin notes in his Memorandum in Aid of Sentencing, text and chat messages are not typically viewed as things to be preserved and people routinely delete them for various reasons, including freeing up data-storage space and reducing electronic clutter.  Memorandum in Aid of Sentencing at 10.  Additionally, it should be noted that a person might delete a chat because that chat is no longer needed for whatever purpose the it was created for or simply because he no longer wants to have continued communications with some or all of the persons who were party to the chat.  The mere fact that a person deletes a chat that contains some communications that could incriminate him in connection with an investigation that he suspects might be instituted does not automatically mean that he deleted those communications to prevent law-enforcement from finding them.

      In addition to saying that Mr. Sandlin should be given a two-point enhancement to his offense level under § 3C1.1 because he deleted the Facebook chat, the government also indicates that he should be given the enhancement because he took down videos he had posted to his Facebook page "documenting his crimes on January 6."  Government Sentencing Memorandum at 27.  However, as previously noted, the government has not presented any evidence that Mr. Sandlin did actually take down videos related to January 6 from his Facebook page, and what evidence there is on this issue tends to indicate that he did not.  See supra at 3.  Moreover, even if it assumed that Mr. Sandlin did take down videos that would have incriminated him in connection with an investigation into the events on January 6 that was likely to be commenced, the government has still not shown that he took those videos down in order to prevent law-enforcement from finding them.

He very well may have taken them down simply because he was embarrassed by them or because he simply no longer wanted people to see them. The mere fact that someone takes a video down from where everyone in the world can see it does not mean that he is trying to conceal it from law enforcement.

Finally, the government has suggested that Mr. Sandlin should be given the § 3C1.1 enhancement because the videos he supposedly took down from his Facebook page were put on his laptop computer in such a way that they could only be accessed with an "encryption key," a fact which the government says evinces an intent on Mr. Sandlin's part "to hide material evidence from law enforcement detection." Government Sentencing Memorandum at 27. However, as the government itself notes, Mr. Sandlin perceived that the videos might have monetary value and was attempting to shop them to media outlets. Id. Thus, to the extent Mr. Sandlin put the videos on his laptop in such a way that they could not be accessed without an encryption key, it would seem that Mr. Sandlin was protecting their monetary value. Moreover, the fact that he was seeking to sell the videos to media outlets shows that he was not trying to conceal the videos from law enforcement at all. Finally, the mere fact that, he put the videos on his laptop in such a way that they could not be accessed without an encryption key shows only a general intent to keep the videos private—not a specific intent to conceal them from law enforcement. The mere fact that someone puts something in, say, a locked file cabinet in his home, does not mean he is trying to conceal that item from the police.

## **Incident at CTF**

In its memorandum, the government discusses an incident at the D.C. Department of Correction's Central Treatment Facility (CTF) in early September 2022 in which Mr. Sandlin allegedly "wield[ed] a chair in a threatening manner against a D.C. corrections officer after that officer pepper sprayed a fellow January 6 inmate." Government Sentencing Memorandum at 32. The memorandum references a report regarding the

incident that is attached as an exhibit.  Id.  A review of the attached report shows that the corrections officer at issue alleges that, as she was pepper spraying an inmate that she and other guards were restraining, Mr. Sandlin and other inmates were surrounding the officers while "holding chairs in a threatening manner."  Id., Ex. 26 at 2.  The report further indicates that Mr. Sandlin and the other inmates "will be charged with Threatening Conduct, Inciting a Riot."  Id.  In subsequent conversations with government counsel in this case about this incident, undersigned counsel has learned that, after investigating the matter, the government has decided not to charge Mr. Sandlin in connection with it.  Moreover, Mr. Sandlin has not been subjected to disciplinary sanctions by the D.C. Department of Corrections in connection with the event.

## Unwarranted Sentencing Disparities

In its memorandum, in attempt to justify seeking a sentence of 63 months incarceration for Mr. Sandlin, the government compares Mr. Sandlin to a number of other January 6 defendants that were given lesser sentences.  Government's Sentencing Memorandum at 37-42.  The government argues that Mr. Sandlin's conduct is more egregious than these inmates and thus that he should be given a sentence that is greater than the ones they received.  Id.

One of the January 6 defendants that the government compares Mr. Sandlin to is Greg Rubenacker (21-cr-193 (BAH)).  Government's Sentencing Memorandum at 40.  Mr. Rubenacker received a sentence of 41 months incarceration.  See id.  The government indicates that Mr. Rubenacker can be distinguished from Mr. Sandlin because "Mr. Rubenacker did not engage in violent or destructive conduct."  Id.  This assertion is incorrect.  Mr. Sandlin discusses Mr. Rubenacker in his Memorandum in Aid of Sentencing.  Memorandum in Aid of Sentencing at 15-16.  A review of what Mr. Sandlin says about Mr. Rubenacker shows that his conduct was every bit as egregious as Mr. Sandlin's conduct—if not more so.  See id.  Moreover, despite the government's assertion

to the contrary, Mr. Rubenacker did repeatedly engage in violent and destructive conduct. According to the Government Sentencing Memorandum for Mr. Rubenacker (ECF # 56) (Rubenacker Memo), among other things, in the Rotunda, Mr. Rubenacker joined with other rioters in physically pushing back on police officers who were trying to clear the room and, while doing so, "engaged in two assaults on law enforcement." Rubenacker at 19-21. He rushed towards the police line and pushed another rioter into an officer and then, with a plastic bottle in his hand, swung and hit an officer in the head. Id. at 21-22. A minute later, he threw liquid on officers, distracting them as they physically engaged with rioters. Id. at 23.

Other January 6 defendants that the government compares Mr. Sandlin to are codefendants Marshall Neefe and Charles Bradford Smith (21-cr-567 (RCL)). Government's Sentencing Memorandum at 40-41 & n.25. Like Mr. Rubenacker, Mr. Neefe and Mr. Smith were also both given a sentence of 41 months incarceration. See id. at 40. Mr. Sandlin also discusses Mr. Neefe and Mr. Smith in his sentencing memo. Memorandum in Aid of Sentencing at 12-14. He points out that both men joined other rioters in hoisting up a large, eight-by-ten-foot metal sign with sharp edges and castors the size of an adult's head and then using that sign to assault a police line that had formed to prevent rioters from entering the building. Id. at 12-13 (citing Government's Sentencing Memorandum for Mr. Neefe (ECF #84) at 10-12; Government's Sentencing Memorandum for Mr. Smith (ECF #90) at 13-15. In its sentencing memo for Mr. Sandlin, the government says that Mr. Neefe and Mr. Smith's assaultive conduct towards the police can be distinguished from the assaultive conduct towards the police that Mr. Sandlin engaged in because, unlike Mr. Sandlin, neither Mr. Neefe nor Mr. Smith "put his hands directly on officers." Government Sentencing Memorandum at 41 n.25. However, between being assaulted by someone's hands and being assaulted by an eight-by-ten-foot metal sign with sharp edges and castors the size of an adult's head, no one is going to choose the latter, nor can it be credibly argued that the latter is not a more egregious assault.

Another January 6 defendant that the government compares Mr. Sandlin to is Jacob Chansley (21-cr-03 (RCL)).  Government's Sentencing Memorandum at 40.  Like Messrs. Rubenacker, Neefe, and Smith, Mr. Chansley was also given 41 months incarceration.  See id.  The government indicates that Mr. Sandlin should be given a sentence that is greater than Mr. Chansley's because Mr. Chansley "engaged in no pre-planning or violence."  Id.  As to Mr. Chansley not engaging in pre-planning, the government is incorrect.  Indeed, in the lead-up to January 6, Mr. Chansley coordinated with others far more than Mr. Sandlin did to get people to come to D.C. and engage in violence.  According to the Government's Memorandum in Aid of Sentencing for Mr. Chansley (ECF #81) (Chansley Memo),  prior to January 6, Mr. Chansley had "accrued thousands of followers across several [social media] platforms, including Facebook, Rumble, Parler, and YouTube."  Chansley Memo at 5.  In the lead-up to January 6, Mr. Chansley "used his social media presence to spread the type of false information and hateful rhetoric that led thousands of rioters to descend on the U.S. Capitol on January 6, 2021."  Id.   He advocated for violence.  For instance, he posted to Facebook, "We shall have no real hope to survive the enemies arrayed against us until we hang the traitors lurking among us."  Id.   Moreover, while Mr. Chansley may not have personally engaged in any violence on January 6, he instigated a considerable amount of it.

Mr. Chansley was among the rioters to first approach the police line on the west side of the building.  He then climbed the nearby media-tower scaffolding.  Id.  He "was dressed in a Viking hat with fur and horns, was shirtless, wearing red, white, and blue face paint, and carrying an American flag tied to a pole with a spear at the tip and a bullhorn."  Id.  When the first rioters overwhelmed the police line, Mr. Chansley was able to enter the scaffolding and join them on stairs leading up to Upper West Terrace.  He then helped them push past another police line and gain access to the Upper West Terrace.  Id. at 6.  Mr. Chansley was present when two other rioters broke through windows near the Senate Wing door and breached the building.  This was the initial breach of the building.  Mr. Chansley entered the building within a minute of these two rioters and "was among the

10

first 30 rioters inside the U.S. Capitol building on [January 6]." Id. at 7.  Once inside the building, Mr. Chansley proceeded towards the Senate.  In a "clearing" of some sort, he and other rioters encountered a line of police officers who instructed them to leave the building.  Not only did he disregard this order, but he also began "using his bullhorn to rile up the crowd and demand that lawmakers be brought out." Id. at 8.  He then went up a flight of stairs and was able to enter the Senate Gallery.  At that point, he began to "scream obscenities in the Gallery, including 'time's up motherfuckers,' while other rioters flooded the chamber below." Id. at 9-10.  He then went back down the stairs and entered onto the Senate floor. Id. at 10.  Once on the floor of the Senate, he proceeded to the dais and took the seat of Vice President Mike Pence. Id.  A police officer who was present told him to vacate the seat, but he refused, stating, "Mike Pence is a fucking traitor."  While still in Mike Pence's seat, he wrote a note on some paper that read, "It's only a matter of Time. Justice is Coming!" Id. at 10-11.  Disregarding the officer's continuing orders to vacate the seat and leave the chamber, Mr. Chansley began "calling other rioters up to the dais and leading them in an incantation over his bullhorn."  At some point, additional police officers arrived, and he was "escorted" from the building. Id. at 12.  He had been inside the building for over an hour at this point. Id.

      As already noted, in connection with Mr. Sandlin, the government has stated that Mr. Sandlin bore some responsibility for the injurious assault on Officer B.A. that occurred when Mr. Sandlin was not even present because Mr. Sandlin's "participation in the riot aided those rioters who did succeed in injuring officers" and because his "violent conduct and rhetoric served to incite and embolden other violent rioters around him." See supra at 3.  Given this and given the fact that Mr. Chansley with his bullhorn and attention-getting attire was a prominent inciter of the mob at the Capitol on January 6, it is hard to understand how the government can say that Mr. Sandlin's conduct was more egregious than Mr. Chansley's because Mr. Chansley did not actually physically assault anyone.

The government also compares Mr. Sandlin with January 6 defendants Richard Michetti (21-cr-232 (CRC)), Paul Hodgkins (21-cr-188 (RDM)), and Matthew Wood (21-cr-223 (APM)).  Government's Sentencing Memorandum at 41-42.  These defendant's all pled guilty to obstruction of an official proceeding under 18 U.S.C. § 1512.  See id.  Mr. Sandlin's conviction under § 1512 will be the conviction driving whatever sentence he gets.  See Presentence Investigation Report (ECF #90) ¶¶ 44-61; Government Sentencing Memorandum at 24-25.  Accordingly, the sentences given to Mr. Michetti, Mr. Hodgkins, and Mr. Wood for their violations of § 1512 are informative for determining the appropriate sentence for Mr. Sandlin.

According to the Government's Sentencing Memorandum for Mr. Michetti (ECF #46) (Michetti Memo), he was part of a mob that tried to force its way past a line of police officers in the hallway by the Old Senate Chamber, directly menaced those officers, told them they were "Fucking Animals," "supported actual assaults by others in the mob perpetrated upon [those officers], and even pinched one officer's sleeve."  Further, he confronted and yelled at police officers both in the Rotunda and then by the east Rotunda doors.  Later, in the Rotunda, he joined a mob that was pushing against a police line that had formed there.  Michetti Memo at 16-20.

According to the Government's Sentencing Memorandum for Mr. Hodgkins (ECF #32) (Hodgkins Memo), he came to D.C. on January 6 "preparing to encounter violence," Hodgkins Memo at 12, and he brought with him "rope, protective eyewear, and latex gloves," id. at 10.  He did not simply enter the Capitol building and walk around the halls.  Rather, donning his eye goggles as he did so, he actually entered the Senate chamber, id. at 11, and at a time when other rioters were rummaging Senators' desks, walked past them to the well of the chamber where he joined in the "chanting and ranting" that others were leading from the dais, id. at 11-12.

According to the Government's Sentencing Memorandum for Mr. Wood (ECF #55) (Wood Memo), Mr. Wood travelled to D.C. for the events of January 6 with his

grandmother and a friend. Wood Memo at 13. Mr. Wood was among the first rioters to rush onto the West Plaza of the Capitol. Id. at 18. While there he took an extremely active role in encouraging other rioters to push through the police line to get access to upper Northwest Plaza so that they could then enter the building. Id. at 18-24. When the police line was overrun, Mr. Wood advanced with other rioters onto the "NW Plaza." This is where other rioters started breaking out the windows by the Senate Wing Door. Id. at 24. Mr. Wood was the tenth rioter to enter the building through those windows and was thus one of the very first rioters to actually breach the building. Id. Once inside the Capitol, Mr. Wood joined with other rioters in chasing and pushing on police officers. Id. at 24-25. He was part of the initial standoff between police and rioters in the Ohio Clock Corridor and was at the head of the crowd that overwhelmed the police line in the Crypt. Id. 25-28. He was among the rioters who entered and ransacked Speaker Pelosi's office suite, and while doing so, he stole a small object. Id. at 29-30. Some members of Speaker Pelosi's staff were still in the suite when Mr. Wood and the other rioters entered it. They hid in the dark in a room whose door they barricaded and remained silent for two and a half hours. Id. at 30. Mr. Wood and the rioters he was with "got to within a single door of the cowering and terrorized staffers." Id. Later, Mr. Wood found his way to the entrance to the House Chamber, which was closed. Recognizing where he was, he then went to the Rotunda, and enlisted rioters who were there to come back with him to the House Chamber entrance. Id. at 32-33. He was with the group of rioters who were trying to break through the House Chamber doors while USCP Officers were barricaded behind them with guns drawn. Id. at 36. Later he ended up in the Rotunda where, repeatedly ignoring orders to leave and getting repeatedly gassed, he became part of a massive fight between rioters and police officers. Id. at 37-40. After he left the Capitol, he made several posts to Facebook bragging about his conduct. Id. at 41-42.

Mr. Michetti was given a sentence of 9 months incarceration. Judgement for Mr. Michetti (ECF #42) at 2. Mr. Hodgkins was given a sentence of 8 months incarceration.

Judgement for Mr. Hodgkins (ECF #37) at 2.  And Mr. Wood was given a probationary sentence that included 12 months home detention.  Docket Entry for 11/28/22 (case 21-cr-223).  In explaining why Mr. Sandlin should be given a 63-month sentence when Messrs. Michetti, Hodgkins, and Wood received sentences that were so much less, the government points out that, unlike Sandlin, they were not subjected to an eight-level enhancement of their offense level under U.S.S.G 2J1.2(b)(1)(B) (causing or threatening to cause injury or property damage in order to obstruct justice).  Government's Sentencing Memorandum at 42.  However, the fact that they were not given that enhancement hardly explains why Mr. Sandlin's' conduct was so much more serious than theirs that he should get a sentence of 63 months.  Indeed, especially given that the government ascribes to the theory that, by just participating in the events at the Capitol on January 6, a rioter can be said to have aided those rioters who actually injured officers because his "conduct and rhetoric served to incite and embolden" those rioters, see supra at 3, it is hard to see how it can credible calin claim that Mr. Sandlin's should be treated differently in connection with the eight-point enhancement under § 2J1.2(b)(1)(B) than Messrs. Michetti, Hodgkins, and Wood.  This seems particularly true of Mr. Wood who, among other things, recruited people to come with him to the House Chamber doors and who was among the rioters who were trying to break through those doors while USCP Officer were barricaded on the other side with guns drawn.

## **CONCLUSION**

WHEREFORE the defendant, Ronald Sandlin, replies to the Government's Memorandum in Aid of Sentencing.

Respectfully submitted,

\_\_\_\_/s/_____
Jerry Ray Smith, Jr.
D.C. Bar No. 448699
Counsel for Ronald Sandlin
717 D Street, N.W.
Suite 310
Washington, DC 20004
E-mail: jerryraysmith@verizon.net
Phone: (202) 347-6101
