UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 21-cr-88-DLF |
| | : | |
| RONALD SANDLIN, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S REPLY IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this response to the defendant's reply in aid of sentencing. ECF. No. 94. Briefly, the government states as follows:

1. Sandlin has admitted that he brought his pocket pistol from Tennessee to the District of Columbia on January 5, 2021. Statement of Offense ¶ 15. As the defendant well knows, and which the reports of interviews with his co-conspirators document,[1] the trio drove their car full of weapons and gear to an AirBnb in northeast Washington, D.C. on January 5, which they deemed unsuitable upon arrival. They later checked into a hotel in Takoma Park, MD. Contrary to Sandlin's assertions, Colt did in fact bring his Glock pistol with him to a rally in Washington, D.C. the evening of January 5. Colt Statement of Offense ¶ 15, ECF No. 22, 21-cr-74 (TFH). And as the Court may recall from the detention proceedings, the trio had a "debate" in their hotel, live streamed on social media by Colt, the morning of January 6 over whether to carry their

---

[1] The defendant received these "302" interview reports of his co-conspirators' proffers with the government immediately after each pleaded guilty and their cooperation became public.

1

guns in D.C. in light of the five-year penalty for doing so. *See* DeGrave Statement of Offense ¶ 20. While they ultimately, wisely, chose not to bring their guns to the rally on January 6, they did bring knives, bear spray, and other gear prepared for a fight. *See* Colt Statement of Offense ¶ 17; Sandlin Statement of Offense ¶ 21.

2. A preponderance of the evidence amply shows that Sandlin deleted various items of material evidence from his Facebook account in the aftermath of the riot at the Capitol. *See* U.S.S.G. § 6A1.3. Resolution of Disputed Factors (Policy Statement) (noting that "use of a preponderance of the evidence standard is appropriate…in resolving disputes regarding application of the guidelines to the facts of a case"); *United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994) (noting that "the preponderance-of-the-evidence standard usually applies to sentencing determinations"). The timeline submitted with the government's sentencing memo illustrates that Sandlin initially was "not scared" of leaving his videos up for the world to see, despite the likelihood of criminal repercussions, but that he changed his tune and ultimately deleted the videos and the majority of the trio's private group chat. *See* Ex. 27. While it is in theory possible for Facebook to have taken down his public posts, Sandlin himself clarified to his friend that he was not "being censored"—rather, he quite clearly insinuated that he took the videos down himself by responding to the friend's question about potential censorship that the "FBI [is] after us." *See id.*

3. Similarly, a preponderance of the evidence shows that Sandlin deleted the trio's group chat containing evidence of their extensive planning and purchases of weapons to bring to the rally on January 6. In light of the timeline showing the evolution of Sandlin's

mental state regarding the potential consequences of his actions on January 6, it cannot credibly be said that he did not delete the group chat "to thwart the investigation or prosecution of the offense." *See* U.S.S.G. § 3C1.1, Application Note 1. As this Court recalls, the group chat figured heavily during the detention proceedings—i.e., the prosecution of the offense—and an absence of such evidence most certainly would have altered the course of this case. To say that Sandlin's act of deleting it was not purposeful and related to his fear of law enforcement detection (e.g., "we are at risk for serious jail time") simply is not credible. *See* Ex. 27.

4. With respect to his lack of remorse, Sandlin's statements from as recently as October of this year—following his transfer to the Northern Neck jail in Virginia—indicate that he believes he is a victim in all of this. *See* Ex. 1 (Sandlin letter published in Gateway Pundit, https://www.thegatewaypundit.com/2022/10/must-read-j6-prisoner-dc-jail-abuse-witness-kept-solitary-6-days-week-shipped-off-coerced-plea-needs-help/). He claims that his "vindictive and selective prosecution is on purpose to intimidate any perceived political threat to the Biden regime," that the Department of Justice is "unethically and unconstitutionally lengthening our sentences by manipulating the law," and that if he was a "BLM or Antifa protestor[] there would be a national outrage for our treatment." Notably absent from this published letter is any contrition for assaulting officers or participating in a mob that resulted in countless injuries, psychological trauma, and property damage. It is worth comparing Sandlin's verbose impassioned letter to the Gateway Pundit two months ago with his brief generalized

3

letter to the Court on the eve of sentencing to get a sense of where his mindset truly lies.

5. With regards to sentencing disparities, the government submits the following distinctions and clarifications:

    a. The government indeed was incorrect in describing defendant Rubenacker's conduct.[2]  That said, Rubenacker and Sandlin remain differently situated.  Unlike Sandlin, Rubenacker did not engage in extensive planning or the transportation of lethal weapons to the District prior to January 6, and he did not delete material evidence.  *See* Gov't Sentencing Memorandum, ECF No. 56, *United States v. Rubenacker*, 21-cr-163-BAH.  His Guidelines therefore were drastically different than Sandlin's—41 to 51 months as opposed to 63 to 78 months.  Moreover, while Rubenacker's assaults were egregious—i.e., pushing against a line of officers along with other rioters and throwing a plastic bottle and its liquid at officers—they do not match the severity of Sandlin's assaults or their consequences.  Despite his many assertions to the contrary, Sandlin did try to rip off Officer B.A.'s helmet while he was pinned by rioters at the Rotunda doors, an assault Sandlin helped instigate in the first place by shouting at the officers to "get out of the way" and "your life is not worth it."  That assault resulted in the successful breach by countless rioters through the Rotunda doors, including Rubenacker himself.  *Compare id.* at 15 (noting Rubenacker entered Rotunda doors at 2:42 p.m.), *with* Ex. 7 (showing Sandlin's

---

[2] It is unclear how the undersigned made such an obvious mistake.

    assault of Officer B.A. leading to second breach of Rotunda doors at approximately 2:37 p.m.). Similarly, Sandlin was clearly the first rioter to instigate the assaults on officers over access to the Senate Chamber, hitting Officer N.T. in the process. The successful breach of that space by dozens of rioters, who rifled through Senators' paperwork and left threatening notes for the Vice President, is well documented. The increased gravity of Sandlin's conduct vis-à-vis Rubenacker therefore supports imposing a higher sentence that comports with Sandlin's calculated Guidelines range.

b. No one is disputing that hoisting a metal sign into a line of police officers is frightening and dangerous. The government would note, however, that putting your hands up to handle and push a sign that is sailing over your head—neither Neefe nor Smith were alleged to have picked up the sign themselves—is very different from an intent perspective than being two feet away from another human being and choosing to assault them with your own two hands, particularly when the motive behind that assault is to enable a mob to breach sensitive spaces where one's elected representatives have gathered.

c. With respect to defendant Chansley, he did not bring a car full of weapons and protective gear to the District in anticipation of a civil war. While he arguably instigated violence with his rhetoric, his pre-riot conduct pales in comparison to Sandlin's, as does his conduct on January 6. Furthermore, Chansley was significantly more remorseful than Sandlin to date. Indeed, Chansley's lengthy expression of remorse at sentencing led Judge Lamberth to state, "I

5

       think your remarks are the most remarkable I've heard in 34 years…akin to the kind of thing Martin Luther King would have said"—a far cry from Sandlin's remarks to date.  *See* Rabinowitz & Polantz, *"QAnon Shaman" Jacob Chansley sentenced to 41 months in prison for role in US Capitol riot*, CNN (Nov. 17, 2021), https://www.cnn.com/2021/11/17/politics/jacob-chansley-qanon-shaman-january-6-sentencing/index.html.  Judge Lamberth still issued a Guidelines sentence of 41 months.

    d. With respect to the remaining Capitol riot defendants described in the defendant's reply, all are readily distinguishable from Sandlin based on his own recitation of the facts of those cases, as well as the mitigating factors previously noted by the government.  *See* ECF No. 92.  The government would add, however, that with the exception of defendant Wood, the downward variances granted to those defendants were six and seven months, respectively.

6. In sum, nothing supports a variance in this case.  The government has already accounted for Sandlin's compelling pre-offense history by departing from its usual practice of recommending a mid-Guidelines range sentence.  And certainly nothing Sandlin has done since then weighs in favor of anything but a Guidelines sentence.  To the contrary, he appears to have internalized a sense of victimhood without regard for the lasting effects of his actions on others, like Officer B.A.  On this record and for this defendant, a Guidelines sentence is more than appropriate.

For the reasons set forth above, the government reiterates its request that the Court impose a Guidelines sentence of 63 months' imprisonment, three years of supervised release, restitution of $2,000, a $20,000 fine, and the mandatory $100 special assessment for each count of conviction.

        Respectfully submitted,

        MATTHEW M. GRAVES
        UNITED STATES ATTORNEY
        D.C. Bar Number 481052

By:   */s/ Jessica Arco*
        JESSICA ARCO
        Trial Attorney-Detailee
        D.C. Bar No. 1035204
        601 D St., NW
        Washington, D.C. 20530
        jessica.arco@usdoj.gov
        Telephone: 202-514-3204